```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   SWIMWAYS CORPORATION and           )
     KELSYUS, LLC,                       )
 6                                       )    CIVIL ACTION NO.
             Plaintiffs,                 )    2:16cv260
 7                                       )
     v.                                  )
 8                                       )
     AQUA-LEISURE INDUSTRIES, INC.,      )
 9                                       )
             Defendant.                  )
10   - - - - - - - - - - - - - - - - - -

11

12                    TRANSCRIPT OF PROCEEDINGS

13                      Norfolk, Virginia

14                       April 4, 2017

15

16   BEFORE:  THE HONORABLE ROBERT G. DOUMAR
              United States District Judge
17

18
     APPEARANCES:
19
                WILLIAMS MULLEN, P.C.
20              By:  Joshua B. Brady
                     Craig L. Mytelka
21                   Michael B. Steele
                     Counsel for the Plaintiffs
22
                LeCLAIR RYAN PC
23              By:  Alan D. Albert
                         And
24              MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, PC
                By:  Herbert Joseph Hameline
25                   Richard H. Maidman
                     Counsel for the Defendant
```

```
 1              (Hearing commenced at 10:01 a.m.)
 2              THE CLERK:  SwimWays Corporation, et al., versus
 3    Aqua-Leisure Industries, Inc., in civil action 2:16cv260.
 4              Are counsel ready to proceed?
 5              MR. BRADY:  Yes, Your Honor.
 6              MR. ALBERT:  We are, Your Honor.
 7              THE COURT:  All right.  First, we have 19 claims
 8    that seem to be disputed in this matter, and, accordingly, I
 9    want to get rid of it today if we possibly can.  Therefore, I
10    want to know, my question is, that generally I would allow
11    each side five minutes to argue any one of the points because
12    you've already gotten in some excellent memoranda, and we've
13    gone over it.
14              However, there are several that may need more than
15    five minutes, so I want the suggestion that you have
16    concerning those that you feel you need more than five
17    minutes a side.  Just tell me.  No more than four.  There are
18    four that I think you may want more than five minutes a side.
19    I've looked at them, and the four that I thought might merit
20    10 minutes a side were the apparatus, the back support
21    member, the extension continuously, and the last one was the
22    different than the shape.
23              Those four I will allow 10 minutes a side.  Any
24    problems with any of this?  If there is any problems, let me
25    know.
```

 1          MR. BRADY:  No, Your Honor, that would be fine for

 2     plaintiffs.

 3          MR. ALBERT:  Your Honor, I've not had a chance to

 4     introduce my co-counsel.  I don't believe they have appeared

 5     in front of you before.  Joe Hameline and Rich Maidman from

 6     the Mintz Levin firm in Boston.

 7          THE COURT:  Mr. Hameline?

 8          MR. HAMELINE:  Yes, Your Honor.

 9          THE COURT:  I just want to make sure.

10          And Mr. Maidman?

11          MR. MAIDMAN:  Yes, sir.

12          THE COURT:  You must have had a lot of kidding going

13     to school.

14          MR. ALBERT:  Fortunately, he was tall, Your Honor.

15          THE COURT:  Nobody would mess with him, that's for

16     sure, Mr. Albert.

17          MR. ALBERT:  I think Mr. Hameline was going to

18     respond, if the Court doesn't mind.

19          THE COURT:  All right.  Who is going to be arguing

20     most of these matters for SwimWays?

21          MR. BRADY:  Your Honor, that would be me, Joshua

22     Brady, from Williams Mullen.

23          MR. ALBERT:  On our side, Your Honor, we would

24     propose, with the Court's leave, Mr. Hameline would argue two

25     of the patents and Mr. Maidman the third.

1          THE COURT:  Perfectly all right with me.  I want to

2     make it clear that two people don't argue the same point.

3     Just so either side, two people do not argue the same point.

4          Okay.  My law clerk is prepared to take time.  I

5     think we will go, half of you will start with the plaintiff

6     and half of you will start with the defendant, and there will

7     be no rebuttals because we just don't have time, okay.

8          So what we'll do is we'll start with the plaintiffs

9     SwimWays at first and go through them just as you went

10    through them.  We'll start with the first one on your charts,

11    which you originally submitted, and we'll go right down the

12    chart, if we can do that.  That is, we start with the first

13    one that I believe was "seated position."

14         MR. ALBERT:  Your Honor, while Mr. Brady is getting

15    set up, I might mention to the Court, we actually have at

16    least one of these floats here, and are prepared to bring it

17    out at the appropriate time.  I just wanted to mention that

18    to the Court.  That's why the box and the pump are sitting in

19    the chair.

20         THE COURT:  All right.

21         MR. ALBERT:  We will see how our time is going and

22    see where the Court is.

23         THE COURT:  I've also got to advise you that quarter

24    to 12:00 I'm going to stop and come back at quarter after

25    2:00, and we will quit at quarter to 5:00 no matter where we

1  are, okay.

2      MR. ALBERT:  Thank you so much, Your Honor.

3      THE COURT:  We can't pay overtime here, if you

4  really want to know the truth.  We can't.

5      MR. BRADY:  Your Honor, you wanted to begin with

6  "seated position"; is that correct?

7      THE COURT:  "Seated position," as I recall the first

8  one on the combined chart; isn't that correct?

9      MR. BRADY:  Yes, Your Honor, I believe that is

10  accurate.  So the term "seated position" appears in claims of

11  the '540 and the '640 patents.  These are related.  They

12  share a common specification.  An example of limitation is

13  the apparatus being configured to support a user in a seated

14  position.

15      Now, this term was considered previously by the

16  Eastern District of Virginia.

17      THE COURT:  By Judge Gibney.  I'm familiar with it.

18  You can assume that I have read the memoranda, okay.  Just

19  assume that, but don't assume that I understood it, just

20  understood that I read it.  Okay.  In fact, I read it twice,

21  so we will see where we go from there, okay.

22      MR. BRADY:  Understood.  Plaintiffs take the

23  position that Judge Gibney got it right, that construing the

24  term "seated position" as an uprighted seated position and a

25  reclined seated position, but not a prone position, is

1    accurate, that that accurately reflects the scope of the
2    invention disclosed in the specification.  For clarification
3    we've also inserted the word "supine," which I believe means
4    laying face up as opposed to prone which sometimes means
5    laying face down.  But the point is the Court previously
6    interpreted the claim correctly to distinguish between seated
7    and reclined positions versus a prone or laying flat
8    position.

9            Aqua-Leisure proposes to construe it as a position
10   with the torso erect.  Not entirely sure what that means
11   because neither of those terms appear in the specification.
12   I don't know if erect means a 90-degree angle relative to the
13   hip or anything less.  It would appear from the arguments
14   that Aqua-Leisure's trying to use figure 4A to support its
15   proposed construction.  The problem there is figure 4A is
16   just one of many disclosed embodiments.

17           If the Court were to adopt Aqua-Leisure's proposal,
18   I think we run the risk of excluding numerous embodiments
19   disclosed in the specification.  The Federal Circuit is very
20   clear that doing so requires a significant evidentiary
21   burden.  So the specification teaches that each of the
22   disclosed embodiments are designed to support a user in a
23   seated position while floating on water.

24           So with that scope, one of ordinary skill would
25   understand that subsequent statements also relate to that

1    seated position phrase.  For example, the '540 patent teaches

2    that figure 1 can support a user in an upright seated

3    position and also in a reclined position between an uprighted

4    seated position or a prone position.  So that's a wide range

5    of reclining positions.  And there's several instances in the

6    specification that relate to that, that a user can recline

7    and still have his or her back supported on an embodiment.

8         I think it's helpful to keep in mind why this

9    limitation is present.  So the background of the

10   specification identifies another patent to an inventor named

11   Arias, and that patent relates to a flat float where the user

12   can be prone, laying all the way flat down.  In fact, the

13   specification describes that patent as used by a person in a

14   laying or prone position.

15        And then to distinguish that, the '540 patent and

16   the '640 patent teach upright positions.  In fact, one of the

17   advantages is that the configuration would be desirable for

18   many activities in which a laying or prone position is less

19   advantageous.

20        So in view of the range of seated positions that a

21   user may have in the disclosed embodiments, I think Judge

22   Gibney had it right.  Adopting Aqua-Leisure's narrow

23   construction of a torso erect, which I'm not sure entirely

24   what that means, runs the risk of excluding anything less

25   than a fully erect torso.  So we ask the Court to adopt the

1    prior construction by Judge Gibney.

2              THE COURT:  Thank you, Mr. Brady.

3              All right.  Is Mr. Hameline?

4              MR. HAMELINE:  Mr. Hameline, Your Honor.  Your

5    Honor, we have so many of these back and forth, I have a hard

6    copy of my presentation, and rather than going back and forth

7    with the computers, if I hand up the hard copy, we won't have

8    to do that.  I think it will be more efficient.

9              THE COURT:  Well, I'm all in favor of more

10   efficiency.

11             MR. ALBERT:  One for the law clerk and one for the

12   Court.  I've got a third if there is anyone else who wants

13   one.  We provided it to opposing counsel, Your Honor.

14             THE COURT:  It's very attractive pictures in here.

15             MR. HAMELINE:  Thank you, Your Honor.  None of them

16   are of me, that's for certain.  So we have a fairly hefty

17   package here, Your Honor.  I don't think I'll use a quarter

18   of the references in this.  It's really just for context, et

19   cetera.  And in terms of context, if you look at Page 3 and

20   4, just to give a focus to what we are talking about, these

21   are the, quote, accused devices, and you'll see that there

22   are a range of pool floats in various configurations.  And

23   those are the accused devices, just to give some context and

24   perspective.

25             Seated position begins on Page 17.  We have, just

 1     for ease of reference in putting in one place, and also

 2     because I have trouble reading some of the patents, and the

 3     languages or the font is so small, we have reproduced some of

 4     the claims in here just so they are all in one place.

 5            The context for these claims is that it is

 6     referencing a seated position collectively configured to

 7     support a user in a seated position and being configured to

 8     support a user in a seated position.  So it's all about what

 9     is the configuration of the apparatus or the device that

10     allows someone to be in a seated position.

11            I would say initially there is no disclosure in the

12     patent, and there is nothing in the claims that gives us an

13     understanding of how the device is supposed to be

14     collectively figured or is configured to support the user in

15     a seated position.

16            So it's indefinite at best in that context.  But to

17     focus in particularly just on the term "seated position," if

18     you turn to Page 20, which is where the figure 4A that

19     Mr. Brady referred to, that's the reference in the '640

20     patent, and the reason why the prior claim construction

21     doesn't apply here, one of the reasons, is because the '640

22     patent issued in 2014.  The '540 and the '640 have the same

23     specification except for this one figure, and they all come

24     out of the same prior patent application filed years ago.

25            The '640 patent issued in 2014, the prior claim

```
 1    construction was in 2013.  So this figure was not in front of
 2    the judge in that prior claim construction.  What this figure
 3    shows, it is the only embodiment, it is the only figure, it
 4    is the only description in the patent which shows how a user
 5    sits in the apparatus in a seated position.  And you'll note
 6    it is in an uprighted seated position, clearly delineates the
 7    difference between that, and if you look at some of the
 8    accused devices, we are looking at where somebody lies flat
 9    with their head just tilted up on a pillow, et cetera, or
10    essentially in that configuration.
11              THE COURT:  Who argued the case before Judge Gibney?
12              MR. HAMELINE:  So two different lawyers, Mr. Pierce
13    on behalf of Aqua-Leisure and Mr. Poynter on behalf of
14    SwimWays.  They have gone their separate ways, and we are
15    here today.
16              THE COURT:  All right.  I have a little problem.
17    Here we have a judge in this district with the same parties
18    ruling in a particular manner, and what you're saying is you
19    want to overrule that judge; correct?
20              MR. HAMELINE:  I'm not sure that overrule is the
21    right word.  I understand your position.
22              THE COURT:  I'm certainly not going to overrule
23    Gibney, but I may not agree with him necessarily.
24              MR. HAMELINE:  Yes.
25              THE COURT:  However, the question really is, you're
```

1    saying, well, he didn't make a proper argument in the case

2    before Gibney.

3              MR. HAMELINE:  No, no, I'm not saying that, Your

4    Honor.  I'm saying that this issue was not available to argue

5    in 2013 because this patent didn't issue until 2014.  This is

6    the seated position, figure 4A.  It was not available to be

7    before the Court.  So it could not have been considered --

8              THE COURT:  So what you're saying is this changes

9    everything?

10             MR. HAMELINE:  It does, Your Honor, absolutely.  And

11   I would also comment, in connection with the reclined

12   position, when they say they're not sure what "seated

13   position" means, I would just turn the tables on that and say

14   this reclined position, this range of reclined positions.

15             THE COURT:  Certainly, it can't be a prone position.

16   You agree with that?

17             MR. HAMELINE:  I agree with that, and it's not

18   standing up.

19             THE COURT:  What they are doing is differentiating

20   between a prone position and their position, is what they are

21   doing, and you're saying it's got to be a greater difference

22   than just not a prone position?

23             MR. HAMELINE:  Exactly.

24             THE COURT:  Because prone position is in another

25   patent or a past patent; correct?

1          MR. HAMELINE:  It's in a completely separate family

2    of patents, has nothing to do with this.

3          THE COURT:  Right.  I understand that.  You

4    understand it.  So you're saying distinguishing it is such

5    that the only way to distinguish it is to have a fully seated

6    position, which is upright?

7          MR. HAMELINE:  Correct, Your Honor.

8          THE COURT:  And so a recliner just doesn't fit the

9    bill, as far as you're concerned?

10         MR. HAMELINE:  Correct, Your Honor.

11         THE COURT:  If the person isn't sitting upright,

12   then it's terrible; correct?

13         MR. HAMELINE:  Correct.  It does not fit.

14         THE COURT:  That's a little tough; isn't it?

15         MR. HAMELINE:  Well, I would say, Your Honor, for

16   the purposes of a patent where you're getting a 17-year

17   monopoly on providing something to the market, you've got to

18   clearly and objectively distinguish what your invention is

19   and what is not claimed in the patent.  And when you talk

20   about ranges of reclined position, it doesn't send a message

21   to the market, it doesn't send a message to a person of

22   ordinary skill in the art as to what is distinguished and

23   what is claimed.

24         When they talk about a range of reclined positions,

25   that doesn't tell us anything.  It is from flat with a head

1    tilted to, you know, almost upright seated.  I don't know

2    where that line is drawn.  No one out there in the market

3    knows where the line is drawn; and, therefore, we have to

4    draw the line somewhere to appraise the market, to appraise

5    people who are trying to either abide by the patent, or

6    license the patent or whatever, what is the line that is

7    drawn.  Where is it drawn?

8              THE COURT:  I understand your position is as long as

9    the back of this is not on a 90-degree angle, you can copy it

10   all day long and Sunday; isn't that correct?

11             MR. HAMELINE:  That is not correct, Your Honor.

12             THE COURT:  If that isn't your position, then you've

13   got a position where, what, is it 89-degree angle, 79-degree

14   angle?

15             MR. HAMELINE:  It's that position, Your Honor,

16   figure 4A.  (Indicating).

17             THE COURT:  Always this position?

18             MR. HAMELINE:  No, Your Honor.

19             THE COURT:  Only this position that you can have?

20             MR. HAMELINE:  Well, it is this general position.

21             THE COURT:  And this isn't a 90-degree angle,

22   though.

23             MR. HAMELINE:  It's pretty close.  It is.

24             THE COURT:  It's close?

25             MR. HAMELINE:  As we say in our description.

1          THE COURT:  It's close?

2          MR. HAMELINE:  As we say in our description, it's an

3   upright position as opposed to what they say is it anywhere

4   from 1 degree to 90 degrees.  If you're looking at what is an

5   objectively reasonable limitation and explanation, we give

6   you one.  They give you nothing.  That's the simple fact.

7          THE COURT:  You just said it's not prone.

8          MR. HAMELINE:  I'm sorry.

9          THE COURT:  They claim that it's not a prone

10  position.

11         MR. HAMELINE:  But that's not a seated position.

12  There is a reclined position they talk about.  They talk

13  about various levels of reclined position in the

14  specification.  That's not seated.

15         THE COURT:  It's an interesting argument that you

16  will take a picture and say everything that's not in the

17  picture is open; correct?

18         MR. HAMELINE:  No, what I'm saying is --

19         THE COURT:  And the picture isn't a 90-degree angle,

20  that worries me.

21         MR. HAMELINE:  What I'm saying, Your Honor, is the

22  description we give of the torso upright is what is

23  referenced in figure 4A.  What they are saying is it's

24  anything from almost flat to 90 degrees.  So we are trying to

25  give some objective, reasonable limitation.  They are saying

1    it's anything.

2         THE COURT:  So I thought you were saying it had to

3    be absolutely at a 90-degree angle?

4         MR. HAMELINE:  Sufficient with the torso erect.

5         THE COURT:  In this picture you could do it;

6    correct?  It's not 90 degrees.

7         MR. HAMELINE:  That picture is the representation of

8    seated position, correct, Your Honor.

9         THE COURT:  So you're saying that under this

10   anything -- I don't understand what you're saying.  How many

11   degrees is that?  That's measurable.  How many degrees is it

12   in this picture?  You give me your estimate.

13        MR. HAMELINE:  I'd say 80 degrees.

14        THE COURT:  So 80 degrees is perfectly all right?

15        MR. HAMELINE:  It's a position with the torso erect.

16   The difference, Your Honor, and this is important for patent

17   purposes, is they give us nothing.

18        THE COURT:  The torso is erect.  What part of the

19   torso has to be erect?

20        MR. HAMELINE:  From the buttocks up has to be erect.

21        THE COURT:  All of it has to be erect?

22        MR. HAMELINE:  Generally erect, yes, not aligned or

23   prone position.  The difference, Your Honor, is we are giving

24   you something.  They are giving you nothing.  And we are

25   trying to give you what the patent law requires is an

1  objectively reasonable, distinctive understanding of the

2  term.  They give you nothing.

3          THE COURT:  They are allowed to do exactly what's

4  shown in the picture because that's not an absolute upright

5  position; correct?

6          MR. HAMELINE:  No, the torso is erect.

7          THE COURT:  As opposed to upright, because parts of

8  the body of the back are up.  So you're saying it has to be

9  just like this?  It can't be anything else?

10          MR. HAMELINE:  We are saying that this gives you an

11  objective understanding of what a torso erect in a seated

12  position is.  They give you nothing.  That's a huge

13  distinction.

14          THE COURT:  You have an uphill battle on this one.

15          MR. HAMELINE:  Your Honor, it's patent law.

16          THE COURT:  I'm not going to make an absolute ruling

17  now, but let me look at all of this material and what you've

18  just handed me, which I have not read yet.  I'll read it and

19  see if I can come to some conclusion that says an upright

20  position is not 90 degrees.

21          Excuse me.  I want to take a little recess.

22          (Recess from 10:24 a.m. to 10:26 a.m.)

23          THE COURT:  The law clerk got a little ill.

24          I'm familiar with your position.  Your time is up,

25  five minutes.  I gave you a lot more.

1          MR. HAMELINE:  You did, Your Honor, and I enjoyed

2    the colloquy and the discussion.  I was just going to point

3    to Page 3, which are the accused products.

4          THE COURT:  You can point to anything when your time

5    is up, Mr. Hameline.  Okay.

6          Next one.

7          MR. BRADY:  I believe it is "foot support" and "foot

8    support member."

9          THE COURT:  "Foot support" or "foot support member"?

10         MR. BRADY:  Yes, sir.  And plaintiffs address this

11   on slide 10 of our presentation.  I'm not going to hook up

12   the laptop.  I don't think we need it.  This term, like many

13   others, is -- defendants introduce a separate from theme.

14   They want specifically recited members or portions to be

15   separate from other portions of the apparatus.

16         Judge Gibney already ruled on this, the specific

17   term, and ruled that a foot support or foot support members,

18   a member that supports a user's feet but not necessarily

19   different or separate from the buoyant member.  Now, that's

20   consistent with the specification.  There is a lot of

21   teachings that describe how foot support member can be

22   inflated with the same bladder that inflates the rest of the

23   apparatus.

24         So when I read broad teachings like that, in my mind

25   I think that one embodiment could be a continuous integral

1    piece with a single bladder that inflate and it provides back

2    support and it provides a foot support.  That is consistent

3    with the scope of the disclosure.  That is consistent with

4    Judge Gibney's prior ruling, and that is what the Court

5    should adopt here.

6            Now, defendants take it a few steps further.  Not

7    only do they request this element to be separate from the

8    buoyant member, they say that it should be attached to the

9    flotation device via a panel, a rod, a tether, or the spring.

10   Now, those elements certainly do not appear in the claim

11   language itself, and they are imported limitations from the

12   specification.

13           But that would be inconsistent with not only the

14   specification itself but also some claims.  For example, the

15   '640 patent, claim 5, says that the inflatable member

16   includes a foot support member.  So right there is an example

17   of a claim specifically saying that it can be an integral

18   component.

19           Under Aqua-Leisure's proposed construction I'm just

20   not sure really what "separate from" means, but I would

21   certainly be concerned about how its application would

22   exclude these integral embodiments.  And the separate from

23   theme is something that is going to come up a number of times

24   later on, but I think that given the breadth of disclosure

25   relating to these components, and how they can be commonly

1    inflated, and they can be integral with other components.

2          Aqua-Leisure's first construction just does not

3    remain consistent with the teachings, so we would ask the

4    Court to adopt Judge Gibney's construction.  Thank you.

5          THE COURT:  All right.  Let me hear.

6          MR. HAMELINE:  Thank you, Your Honor.

7          THE COURT:  All right, Mr. Hameline.

8          MR. HAMELINE:  Your Honor, I would refer to Page 8

9    of the PowerPoint because this is a good point that comes up

10   again, as Mr. Brady correctly says.

11         THE COURT:  Slow down.  Let me get to it.

12         MR. HAMELINE:  Page 8.  It comes up in the context

13   of foot support member, buoyant member, support member, back

14   support member.  And in the specification the plaintiffs

15   read, and the inventors disclosed, that the invention

16   includes, "the outer portion of the panel can include one or

17   more buoyant members (e.g., an inflatable bladder), one or

18   more support members (e.g., a spring, rigid support member,

19   or semi-rigid member), one or more foot support members, one

20   or more back support members," and so forth.  That's in the

21   '540 patent at column 3, lines 33 to 38, just for the record.

22         Their proposals -- I'm sorry, plaintiffs' proposals

23   are basically the foot support member is a member that

24   supports the user's feet.  The back support member need not

25   be a separate part and need not be in addition to or

1   something over and above the buoyant member, that is, the

2   inner tube that goes around.  The support member may or not

3   by the same inflatable bladder as the buoyant member, and the

4   buoyant member provides buoyancy.  In other words, if you

5   look back on Page 7, what they have defined is nothing.  They

6   have correctly used all of the holdings from various cases

7   from the Federal Circuit on claim construction for saying

8   what it doesn't mean, but they haven't told us what it means.

9   Here is the problem with the broader issue of foot support,

10  back support, et cetera, is that it hasn't been defined to

11  mean anything.

12        That's the problem here.  You have an inner tube,

13  basically, is what they have defined.  The foot support

14  member is anyplace you put your feet.  The back support

15  member is anyplace you put the back.  The support member is

16  anything that provides support.  The buoyant member first

17  portion is anyplace you point to, and the second portion is

18  another place you point to in the same apparatus.

19        So what they have done is defined a way or attempted

20  to construe or define a way any meaning for these things.  So

21  a foot support just provides support for the foot.  A back

22  support -- this is very important -- isn't anything in

23  addition or different or separate from the buoyant inner

24  tube.  It just is where you put your back.  If you look at

25  the disclosures in the patent, you see that the back support

```
1    is something that is in addition to and above, and in the --

2    actually in the abstract, it initially talks about -- in the

3    first couple of sentences -- how the back support is in

4    addition to the buoyant member, and the foot support, which I

5    just referenced and just read --

6            THE COURT:  The foot support can't be buoyant, then,

7    is what you're saying?

8            MR. HAMELINE:  The foot support can be buoyant but

9    it has to be --

10           THE COURT:  Separate buoyancy, is what you're

11   saying?

12           MR. HAMELINE:  It has to somehow be separate and

13   apart from the inner tube, yes, and that's what the figures

14   show in the patent.

15           THE COURT:  Well, the figures in the patent, have

16   you got those in here?

17           MR. HAMELINE:  Sure.  We've got a bunch of those.

18           THE COURT:  What page is that?

19           MR. HAMELINE:  Let me find those quickly.  You look

20   on Page 24 where we are talking about foot support.

21           THE COURT:  Go slow.  Realize I have to get to the

22   thing.

23           MR. HAMELINE:  I realize, Your Honor.  I apologize

24   for the number of pages here.

25           THE COURT:  Don't apologize.
```

1          MR. HAMELINE:  So if you look at figure 24 you see

2     that the -- what is called the foot support, which is 10 --

3     112, it is separate from the buoyant member, the support

4     member, and the back support member.  And that's what we are

5     trying to articulate here in connection with our

6     construction.  Your Honor, if I might make a second broader

7     point.

8          THE COURT:  Explain something to me here.

9          MR. HAMELINE:  Yes, Your Honor.

10         THE COURT:  On Page 24 it says, "Figure 1, ('540

11    patent sheet 1, '640 patent)."  Now, which figure 1 is this

12    figure taken from?

13         MR. HAMELINE:  They are identical.  The '540 patent

14    and the '640 patent are identical.

15         THE COURT:  All I'm asking, they are both patents;

16    correct?

17         MR. HAMELINE:  Correct.  The only difference between

18    the two is that seated position figure that we saw a moment

19    ago.

20         THE COURT:  The only difference between the two is

21    what?

22         MR. HAMELINE:  The '540 patent and the '640 patent,

23    the specifications and the figures are identical.  The only

24    difference is in the '640 patent that seated position figure

25    was added.

1          THE COURT:  What do you mean was added?

2          MR. HAMELINE:  In the prosecution, the '640 came

3     later.

4          THE COURT:  Oh, I see.

5          MR. HAMELINE:  They stuck that in to show what a

6     user in a seated position is.  Your Honor, I have probably

7     taken up my five minutes, if you have any questions,

8     otherwise I rely on the brief and the charts.

9          Your Honor, I would also reference figure 4 in the

10    patent, if that's what you were looking through.  That has

11    the side view of the foot support.

12         THE COURT:  I'm merely looking through figures

13    showing in the patent.

14         MR. HAMELINE:  Yes.

15         THE COURT:  Obviously, it's interesting.

16         MR. HAMELINE:  Most of those are top down views,

17    Your Honor.  Figure 4 is a side view.  There are a couple of

18    other side views.

19         THE COURT:  All right.

20         MR. HAMELINE:  Should I cede to Mr. Brady?  Should

21    Mr. Brady come up?  Are you done with questions for me, Your

22    Honor?

23         THE COURT:  Your five minutes are up.

24         MR. HAMELINE:  It's well overdue.  Thank you.

25         MR. BRADY:  Your Honor, I believe the next term on

```
 1    the list is "apparatus," which may be a 10-minute term.

 2              THE COURT:  10 minutes on apparatus.

 3              MR. BRADY:  I'm not sure plaintiffs will need all 10

 4    minutes.

 5              THE COURT:  What I can do is I'll allow you five

 6    minutes and five minutes.

 7              MR. BRADY:  I will accept that, Your Honor.  I

 8    appreciate that.

 9              THE COURT:  Mr. Hameline, on this one, I'm going to

10    allow you to reply to him, then he is going to reply, and

11    I'll allow you to re-reply, that is, split your five minutes

12    on apparatus.  Okay.

13              MR. HAMELINE:  Thank you, Your Honor.

14              MR. BRADY:  This is a semi-failed attempt by

15    defendants to read in a limitation into every asserted claim,

16    that limitation being a coilable spring.  Now, that issue was

17    raised in the context of another claim term in the prior

18    litigation.  That term was "panel" in the '540 patent, and

19    Judge Gibney correctly found that the plain language of the

20    asserted claims does not require a spring.

21              So these specifications are relatively long, and

22    they describe numerous structural components.  The applicant

23    for these patents chose to focus some of the claims on

24    structure other than the spring.  In fact, out of 58 claims

25    in these patents, 38 of them do not recite a spring, but
```

1   others do.  Some independent claims recite a spring or a

2   shape-retaining member, and some dependent claims add that

3   spring to the independent claim.  So what that means is the

4   applicant clearly intended not to include a spring in the

5   asserted claims.

6         Aqua-Leisure, nonetheless, wants to read that in.

7   So in this situation we have the presumption of claim

8   differentiation, which means that a claim limitation and a

9   dependent claim is presumed to not be present in the

10  independent claim.  And that's a very strong presumption in

11  this case.

12        For example, there are a number of claims that

13  recite spring.  They are dependent narrowing the broader

14  claims.  I don't think I need to list them all.  We have

15  addressed that in our briefing.  The Federal Circuit has

16  addressed similar situations.  I think we cited to the

17  *ScriptPro* case.  In that case the specification described --

18  it's some sort of a collating machine -- I forget the

19  particulars -- and the defendant and the accused infringer

20  wanted to read a sensor into every single independent claim

21  because the described embodiments described a sensor.

22        The Federal Circuit said, no, the specification

23  could teach one of ordinary skill that other components of a

24  described can be claimed.  In fact, that's not uncommon.

25  Claims do not have to have every component of a disclosed

```
 1    embodiment.  And nothing in the prosecution history for the

 2    asserted patents requires a claim either.  So at the end of

 3    the day, this is another attempt by the defendant to read a

 4    limitation into the claims that's improper, and we'd ask the

 5    Court to agree with Judge Gibney and rule that apparatus --

 6    well, I should say that he construed the panel, so there is

 7    that distinction.  But panel or apparatus, neither of them

 8    require a spring for these claims.

 9              THE COURT:  Thank you, Mr. Brady.

10              Mr. Hameline.

11              MR. HAMELINE:  Thank you, Your Honor.

12              THE COURT:  You want to take 10 minutes or do you

13    want to take five?

14              MR. HAMELINE:  I'll take five.  I don't think -- I

15    think the briefs are actually pretty good on this back and

16    forth on these points.  I turn to Page 14 of our package

17    presentation.  In the abstract on the right, that's the

18    abstract from the '540 and '640 patents.  First line says, "A

19    collapsible flotation device is provided that used a coilable

20    spring coupled to a panel," et cetera, et cetera.  This is

21    the essence -- this is the invention.  It is recited with

22    respect to every embodiment that is provided in the patent,

23    it is disclosed in every figure in the patent, and it is

24    referenced on basically every line in the patent.

25              And what they want to say now is, oh, no, we didn't
```

1    mean that a collapsible flotation device is provided that

2    uses a coilable spring.  They want to say that ten years

3    after they filed these initial patent applications somehow,

4    oh, no, the spring, that's just not part of this.  And so it

5    is very clear, and we have references on the left here from

6    the '540 and '640 patents talking about the various

7    collapsible flotation devices of the invention.  That is the

8    invention.

9          Also refers to a collapsible device that provides a

10   panel with inner portion and outer portion and a spring.  So

11   throughout this patent it is inherent, it is explicit, it is

12   clearly stated that the invention is a flotation device with

13   a spring.  In the '888 patent, which we really haven't

14   mentioned yet, but the spring is also in the '888 patent.

15         THE COURT:  Which one of the asserted claims refers

16   to a spring?  Can you point one out to me?

17         MR. HAMELINE:  I couldn't.  There is a dependent

18   claim somewhere deep in the bowels of one of these that

19   references a spring directly.

20         THE COURT:  I couldn't find one and that is what

21   made my curiosity raised.

22         MR. HAMELINE:  I'm sure Mr. Brady can point one out

23   to you, and I would say that it is inherent in all of the

24   claims, particularly the independent claims --

25         THE COURT:  Only because it's in this thing at 57;

JODY A. STEWART, Official Court Reporter

 1   correct?  1:57-60?

 2          MR. HAMELINE:  '540 patent at column 1, lines 57 to

 3   60, that's where it says spring.  These are simply examples

 4   of where it's found, and I tried to present in particular the

 5   abstract, which is the general description of the invention,

 6   and it says the invention is a flotation device with a

 7   spring.  And that's what we talked about --

 8          THE COURT:  Although none of the claims contain the

 9   word "spring"?

10          MR. HAMELINE:  Correct.

11          THE COURT:  Because the abstract says spring.

12          MR. HAMELINE:  Correct.

13          THE COURT:  It means that the claims necessarily

14   include spring because it's in the abstract; isn't that your

15   position?

16          MR. HAMELINE:  It's not just in the abstract.

17          THE COURT:  No, I understand.

18          MR. HAMELINE:  It's everywhere in the patent.

19          THE COURT:  Isn't that interesting.

20          MR. HAMELINE:  So in the '888 patent, Your Honor,

21   which we haven't really gotten to yet, I think a spring is

22   referenced in every sentence in the '888 patent.  So it is

23   clearly part of -- it is the invention.  That's what the

24   patent says.

25          THE COURT:  So what you're saying is without the

1    spring, there is no support for this patent?

2         MR. HAMELINE:  That's essentially what we are

3    saying, Your Honor.  There's patentees behind all that.

4    That's what we are saying.

5         THE COURT:  The spring becomes most important in

6    this case.

7         MR. HAMELINE:  The spring is -- if you look at the

8    spec, it is the case.

9         THE COURT:  So the whole case really falls on the

10   spring almost; correct?

11        MR. HAMELINE:  Well, if the patent is about a

12   spring, which we say it is, our products don't have a spring.

13   There are other issues, but that's it.

14        THE COURT:  So you can copy all of it except,

15   because you don't have a spring, you are in great shape;

16   correct?  That's your position?

17        MR. HAMELINE:  I wouldn't say we can copy everything

18   else.

19        THE COURT:  Doesn't make any difference whether it

20   is reclining or erect or whatever it is.

21        MR. HAMELINE:  I would say that the invention is the

22   flotation device with the spring.  We don't have a spring,

23   and so we don't infringe.  There are many other reasons we

24   don't infringe.

25        THE COURT:  Well, I know that you've got many other

```
 1   reasons, but this is one of the most important.
 2          MR. HAMELINE:  Correct, Your Honor.  This is the
 3   distinguishing factor in the market, in the patent,
 4   everything else, yes.
 5          THE COURT:  Okay.  Let me hear from Mr. Brady five
 6   minutes, and then you can come back, Mr. Hameline.
 7          All right, Mr. Brady.  You got five minutes.  This
 8   is pretty important, so let's hear what you have to say.
 9          MR. BRADY:  Yes, sir.
10          THE COURT:  I don't know that it's in any of the
11   claims, but it is in this abstract thing; correct?
12          MR. BRADY:  We are not denying that the presence of
13   a spring is in the specification.  There is clearly
14   advantages to including it.  But the '640 and the '540 teach
15   that there are various embodiments and a number of features
16   that you can include should that be desired.  If we turn to
17   plaintiffs' slide 6, I have listed claims that recite a
18   spring or a shape-retaining member.
19          THE COURT:  Plaintiffs' slide.
20          MR. BRADY:  Number 6, yes, Your Honor.
21          THE COURT:  All right.
22          MR. BRADY:  These are claims that recite the -- they
23   add the limitation of a shape retaining member, which can be
24   a spring, coilable spring to the independent claims.  I
25   believe the '888 patent actually uses the term "spring";
```

1    whereas, the '540 and '640 patents use the phrase

2    "shape-retaining member."  So in view of those further

3    limitations in the dependent claims, the doctrine of claim

4    presumption states that the broader independent claim should

5    not be limited as such.

6           Now, the plain language of the claim does not recite

7    a spring or a shape-retaining member, and that's what Judge

8    Gibney ruled about with respect to the term "panel" in the

9    '540 patent.  In this case the examiner agreed and allowed

10   claims that did not -- were not limited to a spring, and the

11   Richmond division also agreed.

12          THE COURT:  Did you indicate were not limited to a

13   spring?

14          MR. BRADY:  At least the asserted claims in this

15   action.  I don't have that list handy in front of me.

16          THE COURT:  Can you have this list?

17          MR. BRADY:  Yes.  These are claims that, and I

18   believe the briefing also provides a list, claims that recite

19   an element such as a spring or a shape-retaining member.  So

20   reading that spring into these broadest claims, our

21   independent claim that's asserted, would be importing

22   limitation from the specification.  The Federal Circuit has

23   repeatedly warned against doing so.  We cited case law that

24   is directly on point with that issue.

25          THE COURT:  What case is that that you say you

1    cited?

2            MR. BRADY:  A number.  I think we start with *SciMed*,

3    for example, Federal Circuit case that describes importing

4    limitation.

5            THE COURT:  Slow down.  You said it is a Federal

6    Circuit case?

7            MR. BRADY:  Yes.

8            THE COURT:  That you rely on?

9            MR. BRADY:  I would have cited that numerous times

10   in the brief.

11           THE COURT:  Which case is that?

12           MR. BRADY:  The first party is *SciMed Life Systems*

13   *v. Advanced Cardiovascular Systems*.  I can provide the

14   citation.

15           THE COURT:  And the citation?

16           MR. BRADY:  It is 242 F.3d 1337.

17           THE COURT:  Wait a minute.  242 F.3d 1337?

18           MR. BRADY:  Yes, Your Honor, that's correct.  And at

19   Page 1340 it describes the cardinal sin of patent law reading

20   a limitation from the written description into the claims.

21   And that's the issue that Aqua-Leisure's inviting the Court

22   to do here, is read the spring into these claims.

23           If there is other 112 issues, which I'm sure that

24   they are advancing in their invalidity contentions, we will

25   address those issues at that time if there is lack of written

```
 1    description or enablement problems, things like that.  But
 2    for claim construction, the issue is whether the term
 3    "apparatus" should be interpreted as requiring a spring, and
 4    there is just no basis for doing so.
 5              THE COURT:  All right.  Let me hear from
 6    Mr. Hameline.
 7              Mr. Hameline, he's indicated that the utilization of
 8    the abstract to be placed in every claim is not appropriate.
 9    What do you think about that and what he says the case is?  I
10    don't know that the case says that.  I haven't read the case.
11              MR. HAMELINE:  Certainly, Your Honor.  There is a
12    reason that the patent doesn't just have claims, that it has
13    an abstract, a background, the figures, the specification.
14    It's to disclose and explain what is in the claims, and
15    that's what's being done here.  It isn't that we are picking
16    and choosing among various sections to limit the claims.  We
17    are looking at the full expanse of the specification, the
18    figures, the abstract, the background, all of which teaches
19    spring.
20              THE COURT:  That's at the beginning of every single
21    patent, is embodied in every single claim.  That's not your
22    position?
23              MR. HAMELINE:  That's not our position, no, Your
24    Honor.
25              THE COURT:  In what claims is it done?  In what
```

1    patents?

2              MR. HAMELINE:  In these patents.

3              THE COURT:  Just in these patents?  You mean it's

4    not done in another case?

5              MR. HAMELINE:  Your Honor, every patent is read for

6    the specific terms in the patent.

7              THE COURT:  So every patent you decided separately?

8              MR. HAMELINE:  Correct.

9              THE COURT:  Whether the abstract is included or not

10   included?

11             MR. HAMELINE:  What you do is you look at the patent

12   claims and you look at the patent in its entirety.

13             THE COURT:  I don't have a problem with that.  You

14   are telling me this is a rule of construction that it fits

15   into every claim, and if it does, then every time there's an

16   abstract in every case it would fit in every claim in every

17   patent; wouldn't it?

18             MR. HAMELINE:  That's not what we're saying, Your

19   Honor.

20             THE COURT:  You're not.  What are you saying?

21             MR. HAMELINE:  Well, what we have said is that the

22   abstract, the background, the figures, the specification, the

23   13 to 14 pages -- actually, it is more like 25 pages of the

24   patent that precede the claims -- all make it very clear that

25   every embodiment of the invention has a spring, that every

1   reference to the invention refers and recites to a spring,

2   that a spring is the invention.  So when you talk about an

3   apparatus, you are talking about an invention that has a

4   spring.  All of their products have a spring.  Their products

5   are called the spring float products.  They tell us that

6   their products practice the patents.  So they are telling us

7   the spring is inherent in all of this.  We are using the

8   patent specification --

9           THE COURT:  Stop a minute.  What difference did it

10  make in relation to this particular flotation device?  Tell

11  me about that.  If you didn't have a spring --

12          MR. HAMELINE:  Sure.

13          THE COURT:  -- what would you have?

14          MR. HAMELINE:  So if you don't have a spring and you

15  don't have enough buoyancy or a support rod that goes across

16  the middle, and you lay down in one of these floats -- and

17  you look at Page 4 again, you will see what the floats look

18  like -- they taco in the middle.  They just go like this

19  (indicating).  So you lay down in them, and there is no way

20  to keep them flat, and there is just a flotation device on

21  the outside.  They taco up like this (indicating).  So you

22  have a spring around the outside that holds them out and flat

23  so you just don't get sort of folded down into the middle of

24  the pancake, and that's what the spring does, and that's why

25  they do it.

1          They also do it because it's important because you

2     can open it up and close it and put it in a carrying bag,

3     because the spring folds up into a figure 8 and folds up into

4     a much smaller space.  That's the essence of their claim.

5          Now, I think what's important here, Your Honor, in

6     all of these discussions, is that the plaintiffs want the

7     broadest possible construction possible.

8          THE COURT:  And you want the narrowest possible

9     construction?

10         MR. HAMELINE:  We want a narrow and reasonable

11     construction.  Thank you.

12         THE COURT:  Okay.

13         MR. HAMELINE:  If you have any other questions, Your

14     Honor.

15         THE COURT:  So the spring in this case serves a dual

16     function?  One of the functions is to keep the float erect?

17         MR. HAMELINE:  To open, correct.

18         THE COURT:  The other function is to be utilized in

19     folding the document or whatever it is?

20         MR. HAMELINE:  Yes.

21         THE COURT:  And folding.

22         MR. HAMELINE:  That is what they called the

23     collapsible function, but that's absolutely correct, Your

24     Honor.

25         THE COURT:  Well, that's a good way to think, a

     1    collapsible function.

     2                MR. HAMELINE:  Yep.

     3                THE COURT:  Bracing or holding function.  And so

     4    every claim, therefore, has this spring in it; correct?

     5                MR. HAMELINE:  Correct.

     6                THE COURT:  We will see.

     7                MR. HAMELINE:  Okay.  Thank you, Your Honor.

     8                THE COURT:  Okay.  I do think this is a very

     9    important portion of this case.

    10                Okay.  We go to the next point, Mr. Brady, which is.

    11                MR. BRADY:  Back support portion and back support

    12    member.

    13                THE COURT:  Okay.  We are now on --

    14                MR. BRADY:  They don't make --

    15                THE COURT:  Don't start yet.  I'm just not as fast

    16    as you all.

    17                MR. BRADY:  Some ways addresses this in our

    18    presentation beginning at Page 11.

    19                THE COURT:  Is this the fifth one we are on?  This

    20    is the fourth one, right?

    21                MR. BRADY:  Yes, I believe that's correct.  This is

    22    the fourth; seated position, foot apparatus, now back.

    23                THE COURT:  Okay.  Back support member or back

    24    support portion.

    25                MR. BRADY:  These are terms that appear in both the

1    '540 patent and the '640 patent.  SwimWays' position is that

2    these terms don't require construction.  The specification

3    provides broad descriptions of different types of back

4    supports that can be provided.  It can be inflatable with a

5    shared bladder.

6            THE COURT:  So Aqua-Leisure maintains that the

7    specification refers to a back support member only.  And

8    you're saying that it does not require a separate segment or

9    providing support over and above the perimeter of the buoyant

10   member?

11           MR. BRADY:  That's correct.  So Aqua-Leisure took

12   two positions.  First they contend that back support portion

13   is indefinite because that exact phrase does not appear in

14   the specification.  They also propose as an alternative

15   position constructions of back support portion and back

16   support member.  I'll start with the constructions first and

17   then I'll address indefinite.

18           THE COURT:  Well, there are two terms, back support

19   member, back support portion.  The portion of the back

20   support member would not necessarily be the entire member; is

21   that correct?

22           MR. BRADY:  I believe that's correct.  Portion

23   denotes less than all of the whole.  But in this case, we

24   might as well turn to slide 13 of plaintiffs' presentation.

25   What I have done is I'm addressing the indefiniteness

1    argument in this slide.  So Aqua-Leisure is saying the term

2    "back support portion" is indefinite because it doesn't

3    appear in the specification, so it must be something

4    different from back support member.

5             Our position is that's not correct.  The patentee

6    used this term interchangeably in the claims, and this is a

7    perfect example.  I reproduced claim 22 --

8             THE COURT:  Which one is the perfect example?

9             MR. BRADY:  Claim 22 of the '540 patent.

10            THE COURT:  Claim 22 of the '540 patent?

11            MR. BRADY:  Yes.

12            THE COURT:  You claim it has used interchangeably?

13            MR. BRADY:  Yes.  This is an example of how the

14   patentee -- whoever drafted these claims, I think, mistakenly

15   transitioned from back support portion to back support

16   member.  So I have the claim on Page 13 of our slide -- it's

17   in the middle -- and I have underlined where the first

18   instance is the recitation of a back support portion.

19            Then later at line 45 there is a recitation of the

20   back support portion.  So what that means is a back support

21   portion provides what we call antecedent basis for the back

22   support portion.  Then when you get to five lines down, there

23   is a reference to the back support member.  The back support

24   member, when we use "the" in a claim, we're referring to some

25   other structure already recited.

JODY A. STEWART, Official Court Reporter

1          Here the only other structure we cited was a back

2     support portion.  Our understanding is that the patentee used

3     these terms interchangeably; otherwise, there would be no

4     antecedent basis for the phrase "the back support member" in

5     claim 22.  But there is a rule of construction that we have

6     to construe in favor of validity.  So the only way to

7     construe "the back support member" for validity would be to

8     refer back to a back support portion.

9          So our position here is that claim 22 demonstrates

10    how the applicant meant to use the phrases interchangeably.

11    You can also see it -- there is over 250 instances of the

12    word "portion" and over 200 instances of the word "member" in

13    the specification.  They are used interchangeably in numerous

14    contexts.  So because of that, that interchangeability, there

15    is no ground for indefiniteness.

16         THE COURT:  So what you're saying is you're claiming

17    that they both mean the same thing, but they don't, do they?

18         MR. BRADY:  I think they do.  A back support portion

19    of an apparatus is the back support member.

20         THE COURT:  The back support portion of an apparatus

21    may be the back support member.  It's possible because that

22    would be a portion of the apparatus.

23         MR. BRADY:  That's correct.

24         THE COURT:  I understand that.  But we've got to go

25    through every claim and look at the position of how it's

1   utilized, wouldn't we?

2           MR. BRADY:  Absolutely.  And we should always return

3   to the exact claim language.  When we are construing these

4   terms in a vacuum, you lose the context of how it is used,

5   and that will come up in other limitations later, and I will

6   raise that issue again.

7           Want to turn briefly to Aqua-Leisure's proposed

8   construction for these terms.  Briefly, there are a couple of

9   reasons why they're wrong.  First is, revisiting the theme of

10  a separate part, that the back support portion or back

11  support member must be a separate part.  I've already

12  recited, said a couple of times how the specification teaches

13  that the back support can be an integral piece with the

14  inflatable bladder, the support member.

15          For example, on slide 11 I cite to the '540

16  paragraph or '540 patent at column 8, lines 10 through 12.

17  That is where we get this, they can form an integral piece.

18  So the "separate from," I don't think, is appropriate for

19  these terms.  But then there is also --

20          THE COURT:  Stop a minute.

21          MR. BRADY:  Sure.  Slide 11 at the very bottom.  If

22  I may make one more point about another issue.  With their

23  proposed construction, they use the phrase "over and above

24  the perimeter buoyant member."  That phrase would be further

25  limiting what's present in the claims, the structure that --

1    or to a configuration that is not required by the plain

2    language.  And if you turn to slide 12, that phrase would

3    exclude an embodiment.

4         The Federal Circuit has told us numerous times that

5    you have to have persuasive evidence to exclude an

6    embodiment.  Figure 8 shows us the back support member is

7    below the inflatable bladder.  So if the Court were to adopt

8    Aqua-Leisure's construction and limit a back support member

9    to a structure that is over and above the perimeter buoyant

10   member, the Court would be excluding figure 8, that

11   embodiment, and any modifications of that embodiment

12   disclosed in the patent.

13        I should also point out that this '640 patent claims

14   don't use the term "buoyant member."  I think they use the

15   phrase "an inflatable member."  And '640 patent, claim 1,

16   says, "The inflatable member including a back support

17   portion."  It's neither separate nor required to be over and

18   above a buoyant member.

19        THE COURT:  Thank you, Mr. Brady.

20        All right, Mr. Hameline.

21        MR. HAMELINE:  Thank you, Your Honor.  So, once

22   again, we start from first principles.  The abstract of the

23   patent says, at the last sentence, it says, "A back

24   support" --

25        THE COURT:  What page are you on of your --

```
 1          MR. HAMELINE:  I'm actually looking at the patent,
 2   Your Honor.
 3              THE COURT:  Okay.
 4          MR. HAMELINE:  I can hand up a copy.
 5              THE COURT:  Which patent?  '540?  I have a patent
 6   here.  Just tell me which one you're looking at?
 7              MR. HAMELINE:  The '540, '640, it's the same.
 8              THE COURT:  Okay.  You are talking about at the
 9   abstract?
10              MR. HAMELINE:  At the abstract, the last sentence,
11   it says, "A back support member and a headrest, both of which
12   can be inflatable, provide additional support for a user to
13   maintain a seated position..."  And if you look at --
14              THE COURT:  Wait a minute.  You are talking about
15   the abstract?
16              MR. HAMELINE:  Yes.  Last sentence.
17              THE COURT:  Last sentence?
18              MR. HAMELINE:  I'm sorry, next to last sentence.
19              THE COURT:  "...and a headrest, both of which can be
20   inflatable..."
21              MR. HAMELINE:  "Provide additional support."  That's
22   the reference that I'm looking at, "...for a user to maintain
23   a seated position on the panel."
24              THE COURT:  "...provide additional support for a
25   user to maintain a seated position on the panel."
```

```
 1              MR. HAMELINE:  Right.  If you look down directly
 2    below that at the figure, you'll see what is referenced at
 3    110.  That's what they're referring to here as the back
 4    support, back support member.  What the plaintiffs are trying
 5    to do is, once again --
 6              THE COURT:  One question I have, is the spring at
 7    110?
 8              MR. HAMELINE:  102.
 9              THE COURT:  But that's the same type of drawing
10    that's at 110, isn't it?
11              MR. HAMELINE:  No.  The 110 is pointing to the
12    whole --
13              THE COURT:  I know it's pointing to the formal
14    thing, and the 102 that you say is the spring?
15              MR. HAMELINE:  Yes.
16              THE COURT:  What is 107, then?
17              MR. HAMELINE:  So, Your Honor --
18              THE COURT:  See, what I'm referring to?  107 points
19    to the spring also; right?
20              MR. HAMELINE:  If you look at figure 4 from a
21    different perspective, that might be helpful to understand
22    what you're pointing to.
23              THE COURT:  I understand what you're pointing to.
24    I'm trying to make sure I understand what I consider the most
25    important thing here is the question of the spring.
```

1          MR. HAMELINE:  Yes, Your Honor.  If you look at
2    figure 4, it shows a different perspective.  I think that's
3    helpful to understand what 102 is as opposed to what 110 is.
4    So 110 is the back rest, the back support member.  You'll
5    see.  And 102, down at the very bottom, is the spring, and
6    it's discussed in the specification where it talks about 102
7    being the spring.
8          THE COURT:  But the spring surrounds it all.
9          MR. HAMELINE:  Correct.  I'm sorry.  104 is the
10   spring.  102 is the --
11         THE COURT:  You are worse than I am.
12         MR. HAMELINE:  I may be, Your Honor.  102 and 104
13   point to the same thing.  It's 104 is called the spring in
14   the specification.
15         THE COURT:  Okay.  102 is not the spring, 104 is the
16   spring?
17         MR. HAMELINE:  Correct.
18         THE COURT:  What is 102?
19         MR. HAMELINE:  102 is what is called the panel.
20   It's a generic reference to the whole part of the -- I don't
21   know what it is, Your Honor.
22         THE COURT:  You got five minutes.  Go ahead.
23         MR. HAMELINE:  Sure.  So what we are talking about
24   here is that the headrest, the back support member has to be
25   something in addition to the inner tube.  I've showed you

```
1    where we were looking at the inner tube, and they are trying
2    to say that an inner tube has a back rest because your back
3    is against it.  The back rest, the back support member has to
4    be something in addition to it.  It has to stick up above.
5    It has to support the user in a seated position.
6            Their definition, their construction does away with
7    any distinction between the back support members, which is
8    110, which stands up and supports the back in the seated
9    position, and the rest of the buoyant tube that goes around,
10   essentially the inner tube that goes around.  That is
11   complete contradiction to the figures, the discussion, the
12   seated position, all of the figures in the patent and the
13   specification.
14           THE COURT:  So you're saying the back support member
15   refers only to the portion on the back?  The back support
16   portion refers to what?
17           MR. HAMELINE:  The back -- if you look at --
18           THE COURT:  I'm only asking you what you maintain,
19   not what they maintain.
20           MR. HAMELINE:  Yes.  If you look at Page 9 of our
21   PowerPoint, it addresses the member and portion issue, and it
22   cites the case law which says, as you correctly stated, if
23   they use different terms in a patent, they should mean
24   different things, and this is the case that cites that.
25           In our brief we talk about the difference between a
```

```
 1    member and a portion, and while it's unclear from the
 2    specification, what we've tried to do is understand how it
 3    works in some way and isn't internally contradictory.
 4              THE COURT:  I can understand that.  What we have to
 5    do is we have to start going through the claims one at a
 6    time.
 7              MR. HAMELINE:  Yes.
 8              THE COURT:  So let's start looking at them where you
 9    are saying you have some problem understanding it.  I don't
10    have much problem between what a member is and what a portion
11    is.  The question is how it's utilized in particular claims.
12    So you tell me what your interpretation of each and every
13    claim is in which it's used and we'll go down them.  We are
14    going to take some time with it because I think it's
15    important.
16              MR. HAMELINE:  So generally, Your Honor --
17              THE COURT:  So let's start with '540.
18              MR. HAMELINE:  Yep.
19              THE COURT:  And see where you claim that it's
20    something entirely separate and apart.  Okay.
21              MR. HAMELINE:  It's not entirely separate and apart.
22    It's a separate member, and therefore it's not just part of
23    the tube.
24              THE COURT:  Let's go down each claim so I'll
25    understand it without trying to do it abstractly.
```

```
 1              MR. HAMELINE:  Sure.  Claim 1 of the '540 patent.

 2              THE COURT:  Let's go down.  Claim 1 in which patent?

 3              MR. HAMELINE:  The '540 patent in column 14, second

 4   claim element reads, "A back support member coupled to at

 5   least a part..."

 6              THE COURT:  Where are we in this particular one?

 7              MR. HAMELINE:  If you look, we are on line 43.  If

 8   you look at the numbers down the middle of the page, it

 9   denotes the lines.

10              THE COURT:  Where it says, "The outer portion may

11   include a sleeve, one or more inflatable bladders, a back

12   support member, and a foot support member"?  Is that what

13   you're talking about?

14              MR. HAMELINE:  In column 14 of the patent, Your

15   Honor, line 43, the lines are denoted in the middle of the

16   page, you will see 5, 10, 15, 20, 25.

17              THE COURT:  This is not in column 4?

18              MR. HAMELINE:  Is that the '540 patent?  It is

19   column 14, Your Honor.

20              THE COURT:  Okay.  What is claimed is "an apparatus,

21   comprising," correct?

22              MR. HAMELINE:  Your Honor, I can hand up --

23              THE COURT:  "A back support member coupled to at

24   least part of the inner portion of the panel"?

25              MR. HAMELINE:  Correct, Your Honor.  That's the
```

```
 1   first place that I see back support member used in claim 1 of
 2   the '540 patent.
 3            THE COURT:  What do you contend it says?
 4            MR. HAMELINE:  Well, I contend, when you look at
 5   figure 1 of the patent, it means that that back support
 6   member is a separate inflatable bladder that provides support
 7   for a user in a seated position, and obviously it is in
 8   addition to that outer inflatable tube or inflatable member
 9   or buoyant member.
10            THE COURT:  You are saying the "back support member
11   coupled to at least part of the inner portion of the panel"?
12            MR. HAMELINE:  Correct.  By that what they mean --
13            THE COURT:  So what do you contend that means?
14            MR. HAMELINE:  So the "back support member coupled
15   to at least part of the inner portion of the panel."  The
16   inner portion of the panel is the mesh that the user sits on
17   or the fabric the user sits on, but the back support member,
18   in and of itself, means a part of the device, the apparatus,
19   that is in addition to this outer member, the outer buoyant
20   member, and therefore provides that support over and above
21   the outer buoyant member to support a user in a seated
22   position exactly as 110 denotes in the figure.
23            THE COURT:  What do you contend it does?  All I'm
24   seeing here is "a back support member coupled to at least
25   part of the inner portion of the panel."
```

```
 1            MR. HAMELINE:  Right.  I'm telling you.

 2            THE COURT:  What's the problem there?

 3            MR. HAMELINE:  I'm telling you what my understanding

 4       from the specification is.

 5            THE COURT:  So your understanding is that the back

 6       support member is not back support member?

 7            MR. HAMELINE:  No.  My understanding is that's

 8       exactly --

 9            THE COURT:  What is your understanding?

10            MR. HAMELINE:  My understanding is that's exactly

11       what it is, and that's the way it should be defined, as

12       opposed to being simply part of the inner tube without

13       extending up.

14            THE COURT:  All of this periphery, I'm looking at

15       the meaning of this, "A back support member coupled to at

16       least part of the inner portion of the panel."

17            MR. HAMELINE:  Correct.

18            THE COURT:  I don't have any problem understanding

19       that.  You say you have a problem, you want to change that?

20            MR. HAMELINE:  No.  We want it defined exactly what

21       back support member means.

22            THE COURT:  You want to define it.  I don't have any

23       problems with it.  It's simple.  It's coupled to it.

24            MR. HAMELINE:  The term "back support member" is

25       what we are construing, not what it is coupled to.
```

1          THE COURT:  I understand that.  I don't have any
2   problem with that.
3          MR. HAMELINE:  As long as we understand, Your Honor,
4   that it is something in addition to.
5          THE COURT:  You are saying the back support member
6   is not the back support member?
7          MR. HAMELINE:  I'm saying it precisely is.
8          THE COURT:  Something else is coupled to the inner
9   portion?
10          MR. HAMELINE:  Absolutely not, Your Honor.  I am the
11   one who is saying a back support member actually provides the
12   back support above and beyond the inner tube.
13          THE COURT:  What I'm trying to do now is to figure
14   out where there's a difference between your meaning and the
15   meanings that are in the claim.  This claim does not give me
16   any problem.  Show me one that gives me a problem.
17          MR. HAMELINE:  Well, Your Honor, the issue is what
18   does back support member mean.  If it means --
19          THE COURT:  Stop.  Give me another one that shows a
20   different interpretation.
21          MR. HAMELINE:  The term "back support member" is
22   used in the claims, so that's what it means.
23          THE COURT:  You're very nice to go through that.  I
24   want to go through claim by claim because I'm having a little
25   difficulty understanding your argument because it's too

JODY A. STEWART, Official Court Reporter

1    general.  I'm asking you to make it specific.  I'm giving you

2    more time to make it specific here.  What we are trying to

3    construe are words contained in claims.

4              MR. HAMELINE:  Correct.  And the words that we

5    are --

6              THE COURT:  And that is what is so important, so I

7    want to go down these claims to see what it is other than an

8    abstract proposition.  I don't like the interpretation that

9    the plaintiff has.  I want to know how you interpret each of

10   these claims.  You keep writing in something else.  I know

11   that the back support member is coupled to at least part of

12   the inner portion of the panel.

13             MR. HAMELINE:  Correct.

14             THE COURT:  So are we going to have a problem with

15   coupled later?  But that's all right.

16             MR. HAMELINE:  Correct, Your Honor, yes.

17             THE COURT:  So everything we have a problem with

18   affects everything else; correct?

19             MR. HAMELINE:  Correct, Your Honor.

20             THE COURT:  So there's nothing that just in and of

21   itself is there.  So do we have to define the word "coupled"

22   at this point?

23             MR. HAMELINE:  No, we do not.

24             THE COURT:  We do not.  Well, what do you understand

25   that to mean here?

         1            MR. HAMELINE:  Coupled?

         2            THE COURT:  Yeah.

         3            MR. HAMELINE:  So the mesh on the bottom or the

         4    fabric on the bottom that the user lays or sits on is

         5    physically joined to the back support member.  Coupled.

         6            THE COURT:  Coupled is physically joined?

         7            MR. HAMELINE:  Correct.

         8            THE COURT:  So the husband and wife are physically

         9    joined.  I see a couple of those.  Adam and Eve are

        10    physically joined.

        11            MR. HAMELINE:  I think the term may be used in

        12    different context, Your Honor.

        13            THE COURT:  Well, I understand it's different.  What

        14    I'm finding out is all words are different.  If you place

        15    them in different places and say, well, they are different.

        16    In any event, let's go back to "back support member."  I'm

        17    concerned about this, and that is that where is it used in

        18    some other place and when is the next reference to it in the

        19    '540 patent in a claim?

        20            MR. HAMELINE:  Yes, Your Honor.  I'd have to go to

        21    the '540 and look at the next claim.

        22            THE COURT:  '540 and the next claim is claim 2?

        23            MR. HAMELINE:  Yes.

        24            THE COURT:  Okay.

        25            MR. HAMELINE:  Claim 2 simply incorporates claim 1

```
 1   so it doesn't use "back support member" in a different
 2   fashion.  Claim 15 --
 3            THE COURT:  So the next reference is to claim 15?
 4            MR. HAMELINE:  Well, that's the next one that I see
 5   directly, Your Honor.
 6            THE COURT:  An apparatus comprising a panel.
 7            MR. HAMELINE:  And the next paragraph, yes:  "A back
 8   support member coupled to at least one of the first portion
 9   or the second portion of the panel."
10            THE COURT:  Do you have any problem understanding
11   that?
12            MR. HAMELINE:  I don't have a problem understanding
13   it, Your Honor.
14            THE COURT:  I don't either.
15            MR. HAMELINE:  I think the key is what are they
16   going to say, when we're actually doing the case, back
17   support member means.
18            THE COURT:  So what you're saying is no problem
19   understanding that?
20            MR. HAMELINE:  I don't think there should be, Your
21   Honor.
22            THE COURT:  Okay.
23            MR. HAMELINE:  Thank you.
24            THE COURT:  I don't have any problem understanding
25   it.  What's next?
```

1          MR. HAMELINE:  I guess we look at the next
2     independent claim.
3          THE COURT:  Then we have another thing down here, it
4     says, "Back support member and the second portion of the
5     panel collectively defined an inner perimeter," and so forth.
6     Do you have any problem with that?
7          MR. HAMELINE:  I don't, Your Honor.  I don't think
8     this claim is actually asserted.  I was just pointing it out
9     that it was the next claim.  I don't.  Again, it's not the
10    overall sentence, it's what does "back support member" mean
11    in the context of how they're going to try to apply it.
12         THE COURT:  You talk about -- well, I skipped some
13    part.  I shouldn't have skipped any.  It says, "Back support
14    member having a front surface in contact with the first
15    portion of the panel, the front surface of the back support
16    member having a first side edge and a second side edge
17    opposite the first side edge, a distance between the first
18    side edge and the second side edge defining a width of the
19    back support member, the width of the back support member
20    being a first width, a second width being defined
21    collectively by the first portion of the panel and the second
22    portion of the panel, the first width and the second width
23    being measured along substantially the same direction...the
24    back support member in the second portion of the panel
25    collectively..." -- so far I don't have any problem.

1          Then we go down, "Each terminating at the back

2     support member, the first portion of the panel being disposed

3     within and" -- then we get down to claim 15.  "Wherein:  The

4     back support member has a side wall extending between the

5     front surface and the back surface of the back support

6     member, a distance between the front surface and the back

7     surface measured across the side wall of the back support

8     member defines a length of the back support member, the

9     length of the back support member is a first length."

10          MR. HAMELINE:  Your Honor, I don't think claim 15 is

11     actually asserted in the case so the context may or may not

12     be important.  The context that I was trying to provide here

13     is that if they --

14          THE COURT:  I'm going down them one by one to see if

15     there is anything I don't understand.

16          MR. HAMELINE:  I can tell you where the issue is

17     coming up, is whether the deluxe aqua chair has a back

18     support member even though it's basically an inner tube, and

19     that's where their interpretation becomes an issue.

20          THE COURT:  So what you're saying is that the issue

21     is exactly what -- maybe you better tell me, Mr. Hameline.

22          MR. HAMELINE:  Sure.  So what we were saying is that

23     the back support member, as articulated in the figures in the

24     patent, particularly part 110 that is referenced and we

25     talked about, talks about the back support member and shows,

1   actually pictures the back support member as something that

2   rises up above the rest of the inner buoyant tube to provide

3   support for a user, the back in the seated position.

4   　　　　THE COURT:  The back support member has to provide

5   some support, unquestionably.

6   　　　　MR. HAMELINE:  Yes, for additional support for the

7   back to put the user in the seated position.  They are going

8   to argue that the deluxe aqua chair is basically an inner

9   tube, has a back support member.

10  　　　　THE COURT:  You are saying the seated position, and

11  you wouldn't agree on what was seated.  You're saying that

12  it's a 90-degree seat?

13  　　　　MR. HAMELINE:  What I'm doing is reading the patent

14  at this point, Your Honor.

15  　　　　THE COURT:  Well, Mr. Hameline, you are good.  I've

16  got to give you that.  You are very good.

17  　　　　MR. HAMELINE:  I'm just reading from the abstract

18  where it says, "A back support member...which...provide

19  additional support for a user to maintain a seated position

20  on the panel."

21  　　　　THE COURT:  Let's go with the question, you're

22  saying a particular claim is at issue; correct?

23  　　　　MR. HAMELINE:  Correct.

24  　　　　THE COURT:  Which claim is it that you feel is at

25  issue?

JODY A. STEWART, Official Court Reporter

1          MR. HAMELINE:  Well, I think in the '540 patent,

2     claim 1 that talks about a back support member, if they are

3     trying to say the back support member --

4          THE COURT:  Forget what they are trying to say.  How

5     does it affect you?

6          MR. HAMELINE:  Exactly.  If the back support member

7     is simply wherever you put your back on the inner tube, we

8     believe that is an incorrect construction of the term "back

9     support member."  We believe it has to have some additional

10     size and support, just like in figure 1, figure 110, et

11     cetera, in the figures over and above.

12          THE COURT:  What claim is it that you dispute so

13     that I could get to the claim that they claim affects you?

14          MR. HAMELINE:  Sure.  So if you look at claim 1 of

15     the '540 patent where it says "a back support member," they

16     argue, when they argue that the deluxe aqua chair has a back

17     support, our position is it does not have a back support

18     member because it does not have any size, any --

19          THE COURT:  It doesn't have anything that supports a

20     back, in your thing?

21          MR. HAMELINE:  Thank you, Your Honor.

22          THE COURT:  Your back is not supported; correct?

23          MR. HAMELINE:  A back is supported if it's supported

24     at all by the inner tube.

25          THE COURT:  It's not supported, period; is that what

1    you're saying?

2          MR. HAMELINE:  I'm saying if it's supported, it's by

3    the inner tube.  There is no back support member.

4          THE COURT:  There is no back support?

5          MR. HAMELINE:  Okay.

6          THE COURT:  Is it or is it not?  What I'm trying to

7    figure out is what is the issue?

8          MR. HAMELINE:  The issue is whether this deluxe aqua

9    chair has a back support member.

10         THE COURT:  All right.  Stop.  I'll go to your --

11   what page is that on?

12         MR. HAMELINE:  Page 3, Your Honor.

13         THE COURT:  Page 3?

14         MR. HAMELINE:  Correct.

15         THE COURT:  Page 3?

16         MR. HAMELINE:  Correct.

17         THE COURT:  The deluxe aqua chair has no back

18   support; correct?

19         MR. HAMELINE:  It has no back support member,

20   correct, or back support portion; correct.  That's our point.

21         THE COURT:  Okay.  Now I understand where we are

22   going.

23         MR. HAMELINE:  Okay.  I apologize it took that long,

24   Your Honor.

25         THE COURT:  Has no back support, and, therefore, it

JODY A. STEWART, Official Court Reporter

1    has no springs; correct?

2              MR. HAMELINE:  Correct.

3              THE COURT:  What is that thing going around, the

4    white thing or the yellow?

5              MR. HAMELINE:  It's a piping.  It's simply a piece

6    of fabric they sew on to have it look pretty.

7              THE COURT:  It's not a spring?

8              MR. HAMELINE:  No.

9              THE COURT:  It doesn't hold a thing together?

10             MR. HAMELINE:  No.  I have one here if you'd like to

11   see it.  There is no spring.

12             THE COURT:  Okay.  A spring is only something that

13   holds it together, and this thing doesn't hold it together?

14   We better look at it.  You got it?  Bring it in.  What the

15   heck.

16             MR. HAMELINE:  Obviously, Your Honor, it's not

17   inflated, but you can see when it inflates, obviously, the

18   outer portion inflates like an inner tube, and it is

19   essentially a six-sided inner tube with the portion that you

20   can lay down on in the middle.  And the piping is -- can I?

21             MR. BRADY:  May I stand up and watch?

22             THE COURT:  I'm going to let you look at it in a

23   minute.  Just take your time.

24             MR. ALBERT:  Your Honor, if you would like, we can

25   inflate these during the lunch break.

```
 1              THE COURT:  Okay.  Do you have a copy of yours,
 2    Mr. Brady?  You don't have a copy of yours?
 3              MR. BRADY:  I did not bring it.
 4              THE COURT:  Okay.
 5              MR. BRADY:  We can have it delivered.
 6              THE COURT:  That's all right.  Put that back.
 7              COURT SECURITY OFFICER:  Yes, sir.
 8              THE COURT:  Just wanted to see what it was.  So what
 9    you maintain is this deluxe aqua chair, you want to be able
10    to utilize that?
11              MR. HAMELINE:  Correct, Your Honor.
12              THE COURT:  But not the recliner?
13              MR. HAMELINE:  No, the recliner, too, Your Honor,
14    for different reasons.  There are many, many elements in
15    these claims.
16              THE COURT:  You want to also use the two-in-one
17    water lounge?
18              MR. HAMELINE:  Correct.
19              THE COURT:  Well, that's interesting.  What you're
20    saying is that that's not a back support in the two-in-one
21    water lounge?
22              MR. HAMELINE:  Oh, it's a back support.  It may not
23    be a back support portion.  It may be a back support member.
24              THE COURT:  Not even a back support?
25              MR. HAMELINE:  I think it's a back -- most likely a
```

1    back support.  I'm not sure it puts somebody in seated

2    position, but it's one of the many elements that they have in

3    the patent claim.  This one, the two-in-one looks like a --

4    you know, depending on how you define back support member, it

5    certainly, you know, could fall within that.  The deluxe aqua

6    chair is what we are trying to discuss to show you what the

7    issue is.

8              THE COURT:  I want to hear Mr. Brady.

9              Mr. Brady, I'm looking at this deluxe aqua chair.

10   He says it has no back support in it.  Look at his figures.

11   He says he can use a recliner because he doesn't call it a

12   back support.  The two-in-one water lounge is not a back

13   support, supports something else?

14             MR. BRADY:  Well, Your Honor, I think we might be

15   straying from claim construction, visiting issues of

16   infringement.

17             THE COURT:  Right.  We are.  But I want to find out

18   where we are going, Mr. Brady.

19             MR. BRADY:  Absolutely.  So the question is going to

20   be whether the facts show that there is a back support member

21   or portion, depending on which claim we are talking about,

22   present in the deluxe aqua chair.  I think what we will see

23   is evidence relating to the relative diameter of specific

24   portions of that device that in a certain area, which you

25   can't see because her back is blocking it, it's larger than

1    other portions of the tube.

2         THE COURT:  I'm not going to worry about that.  I

3    just was curious as to where we are going and what the

4    construction of back support member is.  I'm having some

5    problems thinking that in some instances the back support

6    member is referred to as a portion, the back support portion

7    of an apparatus, which doesn't give me any problem.  I've

8    been trying to figure out where the problem was in the claims

9    itself.  Maybe you could point out to me where there may be

10   some differentiation.

11        MR. BRADY:  I don't think there is anything for me

12   to point out in that regard, depending on which claim we are

13   talking about.

14        THE COURT:  Have a seat.  Let me get back to

15   Mr. Hameline.

16        Mr. Hameline, show me here where there is, so I go

17   back to claims and not get myself waylaid off.

18        MR. HAMELINE:  I would go back to claim 1 of the

19   '540 patent.

20        THE COURT:  You keep getting back to this abstract

21   situation.  Forget the abstract.  Show me the claim.

22        MR. HAMELINE:  Claim 1 of the '540 patent.

23        THE COURT:  You keep going back to the abstract.

24   I'm not dealing with the abstract.

25        MR. HAMELINE:  No, I'm not dealing with abstract.

1    I'm dealing with a claim, claim 1 of the '540 patent.

2         THE COURT:  Okay.

3         MR. HAMELINE:  Where it says a back support member.

4    We are trying to define --

5         THE COURT:  What you're saying is the member has to

6    be separate and apart from any portion of the member?

7         MR. HAMELINE:  The member has to be separate and

8    apart from the other members, such as the buoyant member or

9    the foot support member.  But, more importantly, it has to

10   provide --

11        THE COURT:  So what you're saying is the back

12   support member cannot be part of anything else; correct?

13        MR. HAMELINE:  Well, it's part of the overall

14   apparatus.  It's a separate bladder, yes.

15        THE COURT:  Separate and distinct, is your

16   interpretation?

17        MR. HAMELINE:  That's what a separate bladder is,

18   yes, Your Honor.

19        THE COURT:  Now, that doesn't seem to make any

20   distinction.  So what difference does that make?

21        MR. HAMELINE:  Well, if on the figure we have been

22   looking at, which is figure 1 --

23        THE COURT:  Forget the figures a minute because --

24   your figures in the patent, yes, figure 1.

25        MR. HAMELINE:  So figure 1 shows 110, the back

JODY A. STEWART, Official Court Reporter

1   support, and if that's a back support member, what is
2   referenced as 110 is a bladder.
3           THE COURT:  So you're saying figure 1 defines the
4   case?
5           MR. HAMELINE:  In many ways it does, yes.  It's the
6   first --
7           THE COURT:  If you're not in the figures, you lose
8   your claim; correct?
9           MR. HAMELINE:  Generally that's correct, Your Honor.
10          THE COURT:  So you've got some law, some case that I
11  can rely on, if you don't put it in a figure, your claim
12  dies?
13          MR. HAMELINE:  No.  What we have is a patent claim
14  that uses the term "back support member."
15          THE COURT:  I understand, Mr. Hameline.  I'm asking
16  you do you have a case that says if it's not in the figure --
17  the claim is bound by the figure?
18          MR. HAMELINE:  No, Your Honor.  The law is that the
19  claims are defined.  The claim terms are defined in the
20  specification and with reference to the figures.  That's what
21  the Federal Circuit tells us.
22          THE COURT:  Well, I'm sure you must have answered
23  the question in a manner in which only Mr. Albert understood.
24  I don't think anyone else did.
25          MR. ALBERT:  Your Honor, I noticed -- I was going to

```
1    say I noticed you don't have your law clerk here but you had

2    indicated the Court needed to step down at 11:45.

3          THE COURT:  It's not quite that yet, got five more

4    minutes.  I still want to find out where it is in the claim

5    that we are talking about, and that's what's giving me some

6    difficulty.  I'll probably try to go through the entire

7    matter and see what it is myself and to see if there is a

8    differentiation.  That's really the problem, because

9    unquestionably a portion of the back support member would be

10   in the apparatus.  It may not be all of it in the apparatus

11   because they talk about a portion, and I assume "portion" has

12   some meaning.  So don't get concerned about that.  Portion

13   has a meaning.  I'm going to look at the claims to see if the

14   meaning would differentiate in this case.

15         When we come back at 2:15, you'll start.

16         MR. HAMELINE:  Thank you, Your Honor.

17         THE COURT:  You will start on the fifth one.  We

18   will keep going from there.

19         MR. HAMELINE:  Thank you very much, Your Honor.

20         (Recess from 11:43 a.m. to 2:17 p.m.)

21         THE COURT:  All right, Mr. Hameline.  You can start

22   with number five.

23         MR. HAMELINE:  Number five, Your Honor, the term is

24   "coupled," is the term used in the '540 and the '640 patent.

25         THE COURT:  You're maintaining that you have to be
```

1   physically attached?

2           MR. HAMELINE:  Correct.  There has to be a physical

3   joinder between the two things that are coupled.

4           THE COURT:  The problem about defining words is

5   defining them with regard to the context in which they are

6   located.  Oftentimes we are trying to define words without

7   regard to the context in which they're located.

8           So to that extent, "coupled" is an interesting word

9   because it does not mean physically attached, in and of

10  itself.  In a certain context it may mean just that, but it

11  doesn't necessarily mean so.  That's what bothers me.

12          So the question then will come, the word is not

13  difficult to understand, and I think its ordinary meaning is

14  there.  The question about how it's used is entirely

15  different.

16          MR. HAMELINE:  Your Honor, to step back from all of

17  this, the difficulty in a *Markman* hearing is they are so

18  abstract, rather than a summary judgment hearing where you've

19  got the product and the term and you compare the two and

20  apply it.  I agree completely that it's hard to do in many of

21  these claims, and that's why you look to specific uses of the

22  term in the specification.

23          THE COURT:  Well, when we're dealing with meanings,

24  I worry because meanings of words do not change.  The

25  utilization of the word changes, not the meaning of the word.

1    So it's how it's utilized in a particular context.  And that

2    would depend on the case that's involved, in and of itself,

3    and not on what we're dealing with here today, that is,

4    trying to define a word abstractly that is a word of ordinary

5    meaning, it doesn't take any specialized knowledge.  I'm

6    having lots of problems because none of these words seem to

7    have specialized knowledge.

8              MR. HAMELINE:  Well, with words like "coupled,"

9    which, you know, could be used as an adverb, et cetera, in

10   this context, I don't disagree with you.  With specific terms

11   that define specific parts of the apparatus, like the back

12   support member, I think that does have specific meaning

13   because it means something in the context of this patent.

14             THE COURT:  You've argued the back support member.

15   Don't argue.

16             MR. HAMELINE:  Don't go back there, yes.

17             THE COURT:  We've got enough to worry about.

18             MR. HAMELINE:  Your Honor, I will make one point on

19   coupled.

20             THE COURT:  Okay.

21             MR. HAMELINE:  So we argue that it means physically

22   attached, directly attached, et cetera.  They seem to argue

23   that it can be indirectly attached, and sort of the -- what I

24   am concerned about is that the logical extension, if they

25   take theirs to the fullest, you know, extension, which I

```
 1    don't think has anything to do with what we are talking about
 2    here is, that my sock is attached to my hat because they are
 3    indirectly coupled because they're all part of the same
 4    clothing; or that in a car, a tire is coupled to the radiator
 5    because they're all indirectly coupled in some ways, and no
 6    one would ever say that those two things are coupled within
 7    the normal course of business.  That's what I'm trying to
 8    distinguish.
 9           THE COURT:  I don't think you have any problem in
10    relation to that because the word "coupled" has a meaning,
11    and it doesn't mean physically attached.  It may indicate
12    that in a particular context something is physically
13    attached.  So that's all one can say.  So you could look at
14    one place where it might be physically attached or touching.
15    Doesn't mean it has to be attached as such.  It could be
16    touching or it could be not even touching and still be
17    attached.
18           MR. HAMELINE:  Your Honor, I would submit that in
19    the briefs we refer to the provisions in the patent which use
20    the word "coupled," and I would submit on the briefs that
21    that's where this is.  I think it's a very detailed argument
22    at that point.  I don't disagree with your general point, but
23    I do think in this case "coupled" is used in the context of
24    the patent in that fashion, and I would submit on the briefs
25    on this issue really.
```

1          THE COURT:  Thank you, Mr. Hameline.  I want to hear

2   what Mr. Brady says.

3          MR. BRADY:  Your Honor, frankly, I don't have

4   anything to add beyond what we have already argued in the

5   briefs, unless the Court has any particular questions.

6          THE COURT:  I don't have any.  Thank you, Mr. Brady.

7          Next point, Mr. Hameline, is the next one down.

8          MR. HAMELINE:  Thank you, Your Honor.  I think we

9   are moving faster than five minutes, hopefully, with some of

10  these terms.  The next term is "buoyant member."  See if I

11  can open my -- is the next term "buoyant member" or is it

12  "opening"?

13         THE COURT:  You were just on "coupled," and I have

14  "buoyant member."

15         MR. HAMELINE:  I have "buoyant member."  Is that the

16  next?

17         MR. BRADY:  It is, Your Honor.  The issue is

18  plaintiffs identify two terms that raise construction issues

19  based on noninfringement argument.  We went ahead and briefed

20  them because I was telling the issue at trial will be an

21  issue that the jury will have to decide.  So the next one

22  could be "opening," or according to using our joint

23  submission, it would be "buoyant member."

24         MR. HAMELINE:  Whichever.  We can do opening as the

25  next one in my chart on Page 37, Your Honor.

```
1              THE COURT:  Let me see what you have to say.
2              MR. HAMELINE:  Yes.  The term "opening" is used in
3    the patent, and our position is that an opening is an
4    opening.  It requires a physical hole or gap or some opening
5    in the device, and I think plaintiffs' position is it's an
6    opening, but an opening, in terms of a wall or something, is
7    an opening in the wall can be -- still be an opening if
8    there's a door there or if it's covered.
9              Our position is, with respect to the float, and this
10   is precisely the issue, Your Honor, that we are facing, is if
11   this is an opening, and it is not covered, it's an opening.
12   If there is mesh here, it's not an opening, it's covered.
13   That's the scope of this, and we think the normal term
14   "opening" means it's not covered.  If they want to say it's
15   an opening that is now covered with mesh, the claim can say
16   that, and that's what it would mean.  But as far as opening
17   alone means, it means (indicating) without material there.
18             THE COURT:  I'm going to let it wait.
19             MR. HAMELINE:  Thank you, Your Honor.
20             THE COURT:  That's the end of that.
21             MR. HAMELINE:  The next term is "buoyant member,"
22   Your Honor.  I assume since you are letting it wait, Your
23   Honor, Mr. Brady is -- you don't expect to hear from
24   Mr. Brady on "opening," you're going to let it --
25             THE COURT:  Unless he doesn't want me to wait.
```

```
 1              MR. BRADY:  That's fine, Your Honor.

 2              THE COURT:  All right, Mr. Brady.

 3         Okay.  I thought -- what happened to "buoyant

 4    member"?

 5              MR. HAMELINE:  We are going to get to "buoyant

 6    member" right now.

 7              THE COURT:  Okay.

 8              MR. HAMELINE:  "Buoyant member" is a claim term in

 9    the '540 patent, and this gets back to the issue that we

10    spoke of when we started the discussion of what's the

11    difference between a buoyant member and inflatable member or

12    back support member, a support member, and a foot support

13    member.

14         Their interpretation is that it is a member

15    providing buoyancy.  In that case it is not distinguished

16    from the terms that are used in the claims, back support

17    member, support member, foot member, foot support member,

18    inflatable member.  It is a term that is used, it is used

19    specifically, it should have a meaning.  Our meaning is that

20    it is an inflatable -- part of the flotation device separate

21    from the back support, support member and foot support member

22    which enables flotation being comprised of an inflatable

23    bladder or inflatable bladders.

24         The importance here is that if the people who wrote

25    the patent, and the inventors, thought it was important to
```

```
1    distinguish and have names for these various different
2    members, then it should have a different meaning, period.
3              THE COURT:  All right.  Mr. Brady.
4              MR. BRADY:  Just a couple of points on this term.
5              THE COURT:  All right.
6              MR. BRADY:  The term is "buoyant member."  The
7    specification teaches, and what I have on the screen right
8    now, '540 patent at column 13, ending at line 61, that --
9              THE COURT:  Stop a minute.  It's not on my screen.
10   Okay.  Thank you.  Here it is.
11             MR. BRADY:  Identified here where the specification
12   teaches that the buoyant member can be something providing
13   buoyancy other than an inflatable chamber, such as a foam
14   insert.  The point being that the buoyant member is not
15   limited to an inflatable bladder or bladders.
16             THE COURT:  All you're just saying that any member
17   that's buoyant is a buoyant member?
18             MR. BRADY:  I believe that's accurately stated.  If
19   it is a member that provides buoyancy.  It could be a number
20   of different things.  An inflatable bladder is certainly one,
21   foam insert.
22             THE COURT:  They are saying that a buoyant member,
23   to be that, the buoyant member has to be separate and apart
24   from another buoyant member?
25             MR. BRADY:  That's an argument that's going to come
```

1    up in the next term, but the entire separate-from theme that
2    they are advancing is inconsistent with the teachings.  There
3    are several instances that teach these components can be
4    integral with other components.  So we can have an integral
5    device with buoyant members and a back member.
6          I should also note that the back member does not
7    have to be inflatable.  The back support member does not have
8    to be buoyant.  That's not required by all of the claims.  It
9    could be.  There are numerous embodiments disclosed where it
10   is inflatable, either with the same inflatable chamber or
11   with its own inflatable chamber, but that's not an absolute
12   requirement for every embodiment.
13         The same goes with the foot support or the foot
14   support member.  In some embodiments it can be inflatable,
15   but it doesn't have to be.  So based on that scope, limiting
16   buoyant member as Aqua-Leisure's proposed, is inconsistent
17   with the specification.  There is even claims, for example,
18   on this screen now at the bottom, '540 patent, claim 3, says,
19   "...the back support member is inflatable and in fluid
20   communication with the buoyant member."
21         So I'm not sure how they can be separate from each
22   other if they're in fluid communication.  In some embodiments
23   they might be, but the claims do not require it.  That is all
24   I have to say.
25         THE COURT:  Thank you.

1          Next, Mr. Hameline.

2          MR. HAMELINE:  Yes.  The next is "buoyant member

3    having a first portion and a second portion."  Again, we are

4    back to the same issue here, which is if somebody thought the

5    inventor, the patent attorney who wrote these, the patent

6    examiner who allowed them, thought that these terms were

7    important enough to put in the claim, they must mean

8    something.  It can't just mean first portion, second portion.

9          Again, I go back to our slide at the very beginning,

10   which is Page 7, which is the inner tube, where you can point

11   to any part of the inner tube as the foot support member, the

12   buoyant member first portion, the buoyant member second

13   portion, the buoyant member -- the back support member.  At

14   some point they need to come forward with a description of

15   what their patent is, what it means, and the scope of what it

16   claims.

17         I think that's something they need to do on first

18   portion and second portion.  I haven't seen it.  I haven't

19   seen them do it with basically any of these, but particularly

20   here at some point they can't just point to the lectern and

21   say, here is the first portion, here is the second portion;

22   oh, no, today here is the first portion, and here is the

23   second portion.  There has to be some delineation of what the

24   claim means.

25         THE COURT:  What do you think it is or isn't?

1        MR. HAMELINE:  I don't know.  I think it's entirely

2    indefinite.  I don't think it can be interpreted and applied,

3    and I think they need to come forward with something that

4    tells us how, if I am somebody who is looking at the patent,

5    person of ordinary skill in the art, how do I understand what

6    the patent claims?

7        And this is more of an example of the problem with

8    the others, but I thought it was a glaring example of

9    something that says the patent, as we just heard with respect

10   to "buoyant member," the patent means anything and

11   everything, and that's what we have, and that's the problem

12   we have in trying to understand, as somebody who's out in the

13   market, with pool floats, which, frankly, are not the most

14   complex thing in the world.  What does it mean that they have

15   a claim?  They don't have a claim on all pool floats, that's

16   clear.  But what is it that they are claiming, and we have a

17   lot of problem, and to get around that problem, we'd like to

18   know decisively from them what they are claiming here.

19       THE COURT:  You are talking about claims 1 and 21;

20   right?  Is that correct?

21       MR. BRADY:  Yes, Your Honor.  The terms we are

22   talking about are "buoyant member having a first portion and

23   a second portion."  When we are drafting claims, we use first

24   and second as a device to identify things that have some

25   relationship later.  On the screen now I have highlighted an

1    excerpt from the '540 patent, claim 1, the bottom left.

2    That's where we first see the recitation of the buoyant

3    member having a first portion and a second portion.  But then

4    later we are talking about the inner portion of the panel

5    extending continuously between the first portion and the

6    second portion.  That's why we've identified a first and a

7    second portion previously so that we can talk about its

8    relationship spatially to that seat or the mesh member.

9         Now, I've already mentioned it several times today

10   that the specifications teach that you can have a single

11   inflatable bladder in an embodiment.  Figure 6, which I've

12   shown here just for demonstrative purposes, it's described as

13   having a single buoyant member that's actually integral with

14   item 206, the support member.  So it forms at least a "U"

15   shape.  And I've identified on here, I've annotated a first

16   portion and a second portion.

17        The reason I can do that is that now I need to look

18   at it and say does the inner portion of the panel continue

19   continuously between those portions.  So in the context of

20   the entire claim, the language is straightforward.  No terms

21   require construction.  The only issue is whether an accused

22   product meets this configuration, and not all pool floats do.

23   This is really an infringement issue.  There is nothing for

24   construction.  There is no requirement in the claim language

25   itself for separate parts of the buoyant member --

```
 1              THE COURT:  Figure 6 is the same buoyant member?
 2              MR. BRADY:  That's correct, it is the same buoyant
 3     member.  It's a hole, and we are identifying two portions of
 4     that hole.
 5              THE COURT:  Okay.  I understand your argument.
 6     Okay.  We are going now to "extending continuously"?
 7              MR. HAMELINE:  Correct, Your Honor.  That's on Page
 8     48 of our package, the PowerPoint that we gave you.
 9              THE COURT:  Page 48?
10              MR. HAMELINE:  Page 48, yes, Your Honor.  And the
11     entire claim term that we are looking at, and SwimWays is
12     correct on this, is that the inner portion extend
13     continuously between the first and second portions of the
14     buoyant member without an intervening buoyant member.
15              So, if you will, if I can just use this as a
16     demonstrative, the issue is does this inner panel here extend
17     continuously to the buoyant member here and the buoyant
18     member here (indicating)?  In our product, there is a mesh.
19     It doesn't connect.  It doesn't extend continuously.  The
20     second issue --
21              THE COURT:  Stop a minute.  I'm going back to
22     "extending continuously."
23              MR. HAMELINE:  Yes.
24              THE COURT:  Now, this was added during the --
25              MR. HAMELINE:  -- the office action with the patent
```

```
 1   office?

 2          THE COURT:  Yes.  Patent office.  And it was done to

 3   distinguish someone else's device?

 4          MR. HAMELINE:  Correct, Your Honor.

 5          THE COURT:  All right.

 6          MR. HAMELINE:  If you think of -- I'll try to do

 7   this.

 8          THE COURT:  That, "The inner portion of the panel

 9   extending continuously between the first portion of the

10   buoyant member and the second portion of the buoyant member

11   without an intervening buoyant member."

12          Okay.  Now, what is the problem here?

13          MR. HAMELINE:  Well, the issue is whether the inner

14   panel here that I'm holding up, this demonstrative, extends.

15          THE COURT:  Is that in this patent anywhere?

16          MR. HAMELINE:  This, no.  I'm using it as a

17   demonstrative to show what we are talking about.

18          THE COURT:  To show what?  We are not trying that

19   case yet.  And you are.  But don't try the case.  Let's deal

20   with the terminology.

21          MR. HAMELINE:  Sure.  If you take a look at Page 50

22   of the slide and you look at the figures from the patent.

23          THE COURT:  Okay.

24          MR. HAMELINE:  You will see in figure 1.

25          THE COURT:  Figure 1.
```

```
1              MR. HAMELINE:  Figure 1.
2              THE COURT:  Shows the inner portion of the panel.
3              MR. HAMELINE:  103 extending continuously to 108 or
4    100, whatever the other tube is, and extends continuously,
5    and is sealed or connected to it directly and physically.
6    And that's what "extended continuously" in our position
7    means, that it extends continuously; whereas, in figure 7A --
8              THE COURT:  Figure 1 shows the inner portion of the
9    panel extending continuously without interruption all the way
10   to --
11             MR. HAMELINE:  -- the inner tube, if you will.
12             THE COURT:  To the other side.
13             MR. HAMELINE:  To the other side, yes.
14             THE COURT:  Each side goes to the other side?
15             MR. HAMELINE:  Yep.  If you look at figure 7A.
16             THE COURT:  7A.
17             MR. HAMELINE:  Directly below it, you will see
18   what's 120B, you will see there is a gap.  It doesn't extend
19   continuously.
20             THE COURT:  Let's look at -- "compare figure 7A,
21   which is an example of the inner portion of the panel not
22   extending continuously due to the holes denoted by 120A and
23   120B."  Holes.  Do the holes stop anything?
24             MR. HAMELINE:  I'm sorry, Your Honor?
25             THE COURT:  Does the hole stop anything?
```

```
 1            MR. HAMELINE:  It doesn't extend continuously, so,
 2    yes.
 3            THE COURT:  It doesn't?
 4            MR. HAMELINE:  It does stop because it doesn't
 5    extend continuously.  So the hole stops the inner mesh from
 6    going --
 7            THE COURT:  So it doesn't go around in the area like
 8    figure 1?
 9            MR. HAMELINE:  Correct, Your Honor.
10            THE COURT:  Does not.  All right.  Let me hear from
11    Mr. Brady.  It's an interesting point.
12            Mr. Brady, Mr. Hameline says that this doesn't
13    extend continuously because figure 7A shows a hole, and I
14    assume that this inflatable ring does not go around like it's
15    shown in figure 1; is that correct?
16            MR. BRADY:  I think that is consistent with the
17    specifications description of figure 7A, that there are holes
18    on the side of that mesh panel.  You could theoretically put
19    your hands through and touch water.  But can we start with
20    the claim language because this is -- we should always start
21    with the claim language.
22            Aqua-Leisure is reading the claim as requiring the
23    material to extend completely from one portion to the other
24    portion.  That is not what the claim limitation says.  It
25    says it's extending continuously between the first portion
```

1    and the second portion.  So if you bear with me, I'll try

2    some background for why that distinction is very critical

3    here.  We can construe this element without excluding any

4    embodiments in the specification.  During the prosecution --

5                THE COURT:  Stop a minute.

6                MR. BRADY:  Yes, sir.

7                THE COURT:  I'm trying to figure out if this, so to

8    speak, seat is over top of the buoyant ring in figure 7A or

9    not?  I don't know.

10               MR. BRADY:  Which portion, Your Honor?  Which

11   reference numeral?

12               THE COURT:  In figure 1, okay, figure 1, then you

13   take figure 7A.  In figure 1 the seat stops, okay.  You come

14   down from the neck, which is the best way of describing it,

15   down what would be the back and then where one would have

16   your bottom of the seat, and it seems to either attach to the

17   sides of the -- what do we call this ring?  The buoyant ring?

18               MR. BRADY:  Uh-huh.

19               THE COURT:  What I'm asking, in 7A, does the seat,

20   this extra seat, go on top of the buoyant member?

21               MR. BRADY:  So the specific embodiment shown in

22   figure A, my recollection from the specification, is that

23   that seat portion 302, it rides from the back and down to

24   where you would sit, the seat portion, and then here it looks

25   like it connects over support member 306.  But the

1   specification, in describing this figure, it also teaches

2   that the seat portion can attach in other places to the back

3   support member and to the buoyant member.  So there is a lot

4   of scope of disclosure that's not represented in this figure.

5            THE COURT:  Well, tell me what that is.

6            MR. BRADY:  Sure.  Bear with me, Your Honor.  I have

7   a slide addressing this point, but I think it comes up in the

8   context of another limitation, the point being that the claim

9   should not be limited to the embodiment of figure 7A.  One of

10  the reasons being that there are numerous statements about

11  where that mesh or that seat portion can connect.  That's

12  what I'm looking for right now.

13           As I recall from memory, that the discussion of that

14  in the specification is connected to figure 7A and 7B.  Okay.

15  So advancing to my slide number 30, this is an excerpt of the

16  patent.

17           THE COURT:  All right.  Stop.  You are in the patent

18  now.  What page?

19           MR. BRADY:  Is it on your screen, Your Honor?

20           THE COURT:  It's on the screen.  Go ahead.

21           MR. BRADY:  So this is just one excerpt, and it's in

22  the portion discussing figure 7A.  Column 8, beginning at

23  line 65, so that's towards the bottom, and it says the

24  membrane can be attached to the back portion 310 along with

25  any part of the back portion.  So even though figure 7A shows

1    it attaching to the top, could attach it anywhere else.

2    Likewise, it could be coupled to the back portion and the

3    seat portion proximate to the back portion.  So it can attach

4    in places other than as shown in Figure 7A.  But I think we

5    might be straying a bit from the issues relating to the

6    extending continuously limitation.

7            As you noted, this was added during prosecution.  It

8    was added to distinguish the Peterson reference.  I have

9    shown on the slide 20 -- that should be on the screen now --

10   I've got figure 1 from Peterson, and it shows a two-person

11   seat with a buoyant member right in the middle.  In response

12   to an office action, the applicant added this extending

13   continuously limitation to distinguish this specific

14   reference.

15           Now, as I started out with this portion, I noted

16   that Aqua-Leisure's construction reads this limitation as if

17   it said extends continuously from one place to another.

18   That's how it said.  It says extending continuously between

19   two locations without an intervening buoyant member.

20           So figure 7A, which is now on the screen, that seat

21   portion 302 extends continuously without an intervening

22   buoyant member, even though these holes that I've indicated

23   in red on the slide, they're there, and it does not extend

24   from one side to the next.  It extends continuously.

25           THE COURT:  Thank you, Mr. Brady.

1          Next one we have is --

2          MR. HAMELINE:  The next term we have, Your Honor, is

3   "buoyant member disposed within at least a portion of the

4   outer portion of the panel."  That's on Page 53 of our

5   package.  Here, Your Honor, it's sort of like having to prove

6   the negative, and I've been waiting for plaintiffs to come up

7   with some gap-filler here anywhere to explain to us what is

8   the outer portion of the panel in this claim language.

9          THE COURT:  The words we are trying to determine now

10  is disposed?

11         MR. HAMELINE:  It's buoyant member dis -- so we have

12  the buoyant member, which is the inner tube, and it's

13  "disposed" -- and this is what we are really getting at --

14  "within at least a portion of the outer portion of the

15  panel."

16         THE COURT:  "Buoyant member disposed within at least

17  a portion of the outer portion of the panel."

18         MR. HAMELINE:  If you will, Your Honor, I'd refer

19  back to Page 24 of our PowerPoint which goes back to figure 1

20  of the patent.

21         THE COURT:  How do we get a spring in there?

22         MR. HAMELINE:  Because there is nothing -- because

23  the spring is disclosed in basically every line in the patent

24  specification, and it's in every figure.  When they claim a

25  buoyant member disposed within at least a portion of the

 1    outer portion of the panel, we have to answer the question,

 2    what's the outer portion of the panel?  What is outside of

 3    the buoyant member?  And the only thing we have --

 4              THE COURT:  The only thing outside, you're saying,

 5    is the spring?

 6              MR. HAMELINE:  Is the spring.  And I'm waiting for

 7    them to come up with some --

 8              THE COURT:  Well, we will hear from Mr. Brady.

 9              MR. HAMELINE:  Your Honor, we did bring in one of

10    the spring floats with a spring if you want to see what a

11    spring is.

12              THE COURT:  You want to use their --

13              MR. HAMELINE:  You asked what a spring was, so we

14    brought a spring.

15              THE COURT:  Has that got a spring on it?

16              MR. HAMELINE:  This is their product that has a

17    spring on it.

18              THE COURT:  Their product.  That's wonderful.  So

19    right now I know what a spring is, by now is metal?

20              MR. HAMELINE:  Yes.  Typically metal, yes, Your

21    Honor.

22              THE COURT:  Okay.  Mr. Brady, let's see if we can't

23    get to this "buoyant member disclosed within at least a

24    portion of the outer portion of the panel."  This one has me

25    stymied, Mr. Brady.

```
 1            MR. BRADY:  Go right to the specification where it
 2    uses that same phrase.
 3            THE COURT:  Okay.  Let's go to the --
 4            MR. BRADY:  So on the screen I have, in the bottom
 5    left corner of the slide, this is from the '540 patent.
 6            THE COURT:  What number, and so that I can refer to
 7    it?
 8            MR. BRADY:  This is slide number 23.
 9            THE COURT:  Not the slide number.
10            MR. BRADY:  The '540 patent, beginning at column 5,
11    line 50.
12            THE COURT:  '540 patent, column 5, lines --
13            MR. BRADY:  Lines 50 through 56.
14            THE COURT:  Okay.  Now, let's see what it says here.
15            Okay.  Go ahead.
16            MR. BRADY:  Okay.  So this slide, I think, is --
17    will hopefully provide the context for this claim element.
18            We know from the specification that the "outer
19    portion of the panel includes the panel's perimeter as well
20    as some portion within the perimeter."  That is a quote from
21    the specification.  We also know from the specification that
22    "the outer portion of the panel can include one or more
23    buoyant members, for example, an inflatable bladder."  We
24    also know from, actually the excerpt that's reproduced at the
25    bottom left, that the inflatable bladder can be contained
```

1    within the outer portion.

2             So with those teachings we know that the outer

3    portion of the panel can be, for example, that cylindrical

4    shell inside of which you have an inflatable bladder.  The

5    inflatable bladder in figure 1 is disposed about at least a

6    part of the outer portion of the panel.

7             THE COURT:  An inflatable bladder is disposed about

8    at least a part of the outer portion of the panel.  Tell me,

9    what does that mean?

10            MR. BRADY:  It is confusing language.  I will agree

11   with you that it is awkwardly worded, but what I think it

12   means is that if we define an outer portion of a panel as

13   it's a portion, more than just an outer perimeter, so it has

14   depth into the middle of the float.

15            THE COURT:  So what you're indicating is since it's

16   the outer portion, what Mr. Hameline has said is the only

17   outer portion is the spring?

18            MR. BRADY:  Well, the spring 104 shown in figure 1

19   is, to me, shown as outside of that outer portion of the

20   panel 102.  I reference 102.  That's what the specification

21   identified as the outer portion of the panel.

22            THE COURT:  What you're saying is the outer portion

23   of the panel does not necessarily eliminate everything except

24   the spring?

25            MR. BRADY:  I believe that's correct.  That's

```
 1   straight from the specification.  So figure 1 is described

 2   as, in terms of the limitation that we are trying to

 3   understand, figure 1 shows the limitation that's up for

 4   construction.  And it shows inflatable bladder 108 being

 5   disposed about at least a portion or a part of reference

 6   102 --

 7           THE COURT:  Figure 1 shows what now?

 8           MR. BRADY:  So figure 1, we have the inflatable

 9   bladder, which is within the outer portion of the panel,

10   which is reference 102.  So the buoyant member inside of it

11   is an inflatable bladder.  I think what that means is there

12   is an inner perimeter of that buoyant member, and the

13   specification is including that inner perimeter as part of

14   the outer portion.  If I may borrow one of the

15   demonstratives.

16           THE COURT:  The red part that says "at a portion of

17   the panel," is what you added; is that correct?

18           MR. BRADY:  Yes, Your Honor, that's correct.

19           THE COURT:  The other is what was in the

20   specification itself; correct?

21           MR. BRADY:  Yes.

22           THE COURT:  So "the inflatable bladder" is what

23   you've added in red; is that correct?

24           MR. BRADY:  I've inserted the words to identify what

25   reference numeral 108 is.
```

```
 1              THE COURT:  Okay.  Where did you get the definition
 2    "at a portion of the panel" for this?
 3              MR. BRADY:  It appears in numerous instances, but it
 4    is -- one instance is produced to the left of that figure.
 5              THE COURT:  101.
 6              MR. BRADY:  As I'm looking at it, outer portion 101
 7    of the panel 102.
 8              THE COURT:  All right.  Now, was there any
 9    definition of 101?
10              MR. BRADY:  Yes.  That is described as the outer
11    portion of the panel.
12              THE COURT:  It is described?
13              MR. BRADY:  In the specification.
14              THE COURT:  101?
15              MR. BRADY:  Unless I'm getting my numbers backwards.
16    Yes.  This is an image from the specification.
17              THE COURT:  Well, it says being continued within the
18    outer portion, 101 of the panel.
19              Thank you very much.
20              MR. HAMELINE:  Your Honor, may I respond just two
21    quick sentences on that?
22              THE COURT:  No.  I'm not going to start that.  We
23    would be here till next week if I did that.  Can't do that.
24              Okay.  What's the next one we are on?
25              MR. HAMELINE:  The next one is "mesh material
```

JODY A. STEWART, Official Court Reporter

1    disposed at least between the back support portion" --

2         THE COURT:  "Being disposed at least between the

3    back support portion and a support portion defined by the

4    panel."

5         MR. HAMELINE:  Correct.

6         THE COURT:  Yours says plain and ordinary meaning,

7    which is not limited to one piece of mesh where the mesh

8    connects to the apparatus or forming a hammock-like spring.

9         MR. HAMELINE:  So SwimWays is taking, once again,

10   plain and ordinary meaning.

11        THE COURT:  Both of you are rewriting the

12   specification.

13        MR. HAMELINE:  Well, that's what -- if we used the

14   exact same language, people would say you're not giving us

15   the meaning.  We are trying to give you the meaning by

16   quoting from the specification.

17        THE COURT:  Okay.  I don't have much problem with

18   mesh material being disposed at least between the back

19   support portion and the support portion defined by the panel.

20   So why is there a problem?

21        MR. HAMELINE:  Well, I just look at figure 7A, which

22   is on Page 58, and that's what we understand is the

23   disclosure here.  Again, in the interest of time, I'd just

24   rely on our briefs.

25        THE COURT:  One piece of mesh where the mesh

```
1    connects to the apparatus, all of that, I didn't see that in
2    the claim.
3              MR. HAMELINE:  Well, that's why you look at the
4    specification of the figures to understand what's in the
5    claim.  Thank you, Your Honor.
6              THE COURT:  Trying to stick to the wording that I'm
7    trying to interpret rather than now interpreting
8    specifications.  I'll interpret these specifications so we
9    can get to the trial, depending on the meaning of the words,
10   you know.
11             MR. HAMELINE:  Well, I just step back again.
12             THE COURT:  The problem is we can't constantly
13   rewrite all the words.  I'm not about to do that.
14             MR. HAMELINE:  I'm not disputing this, Your Honor.
15   All I'm saying is the purpose of the *Markman* hearing is to
16   give an interpretation of the words that's consistent with
17   the specification.  I've heard your comment on this one, and
18   we will move on to the next one.  Thank you.
19             THE COURT:  Okay.  What have you got to say,
20   Mr. Brady?
21             MR. BRADY:  I think the plain language of this
22   element speaks for itself.  "Mesh material disposed," that
23   means between the two items.  It is what it is.  Figure 7A
24   would exclude other figures which show a mesh material
25   between these two portions.  Thank you.
```

 1          MR. HAMELINE:  Your Honor, the next is "support

 2    portion."

 3          THE COURT:  Hold it.  The next one.

 4          MR. HAMELINE:  The next term is "support portion,"

 5    Your Honor, and that's on Page 59 of our presentation, and

 6    "support portion," our proposed construction is a spring --

 7          THE COURT:  Just a minute, Mr. Hameline.

 8          MR. HAMELINE:  Yes.  Thank you, Your Honor.

 9          THE COURT:  This is claim 23, right?

10          MR. HAMELINE:  Correct.

11          THE COURT:  Okay.  A support portion.  You got five

12    minutes.

13          MR. HAMELINE:  Yes.  Your Honor, if you go to Page

14    61 of our brief, we quote directly from the specification of

15    the '540 patent at column 3, lines 33 to 40.

16          THE COURT:  65 of this?

17          MR. HAMELINE:  61.

18          THE COURT:  61.  Okay.  Page 61.  Go ahead.

19          MR. HAMELINE:  Once again, for context, Your Honor,

20    we are trying to distinguish between what the patent, the

21    patentee, and his lawyer described as the support portion and

22    distinguishing it, because it must have some meaning over and

23    above or different from back support portion, the buoyant

24    member, the foot support member, and here the support

25    portion.  These are terms used in the patent.  These are

1    terms used by very sophisticated patent lawyers.  We assume

2    they have specific meaning.  And they are defined in the '540

3    patent at column 3, lines 33 to 40, as you will see in the

4    quote, it says, "In accordance with some embodiments of the

5    invention, the outer portion of the panel can include one or

6    more buoyant members (e.g., an inflatable bladder), one or

7    more support members (e.g., a spring, rigid support member,

8    or semi-rigid member)..."

9          So that is where we take this directly from the

10   meaning of the patent.  I assume their argument is going to

11   be what we are saying here in accordance with some

12   embodiments of the invention, but we have to give some

13   meaning here.  We can't just say, well, there must be some

14   other embodiment and it can mean anything.

15         What we are trying to do is ascribe some meaning to

16   the terms that they use in their patents so people can

17   understand the scope of their invention.

18         Thank you, Your Honor, unless you have other

19   questions.

20         THE COURT:  So you maintain that the support portion

21   is not limited to a spring, rigid support or semi-rigid

22   support or a separate inflatable bladder; correct?

23         MR. HAMELINE:  Well, I submit that it is limited to

24   what's listed, quoted right here.

25         THE COURT:  You say that's what it is?

```
 1              MR. HAMELINE:  That's what it is, yes.
 2              THE COURT:  All right.  Let me hear Mr. Brady,
 3    Mr. Hameline.
 4              Mr. Brady, he is saying that a support portion is
 5    not limited to a spring, rigid support or a semi-rigid
 6    support or a separate inflatable bladder, that whatever it is
 7    that supports it could support it.
 8              MR. BRADY:  Correct.  If we look at the entire
 9    claim, I have it on the screen right now, but this is the
10    pertinent portion.  We are talking about a support portion
11    defined by the panel.  In the specification we have the
12    unfortunate challenge of dealing with disclosure relating to
13    a support member such as a --
14              THE COURT:  All right.  The support member is
15    defined by the panel?
16              MR. BRADY:  Yes.
17              THE COURT:  Well, where is it defined?
18              MR. BRADY:  We look at figure 1, for example.  We
19    have what the specification describes as support member 106.
20    That is a support member defined by the panel 102.  When the
21    specification talks about a rigid support member, such as a
22    spring, it talks about it in the context of reference numeral
23    104 of rigid support member.
24              I believe that Aqua-Leisure is mistaking the rigid
25    support member, such as a spring, for the support member
```

1    defined by the panel, such as reference numeral 106.

2           THE COURT:  So go over that now.  What you are

3    saying is that 106 is a support member; is that right?

4           MR. BRADY:  Yes, sir.  There is a disclosure in the

5    specification about support member 106 being integral with

6    other portions or it can be separable or attached, things of

7    that nature.  So when the claim is to a support member

8    defined by the panel, that's what the patentee's identifying,

9    not a rigid support member, a spring, which is not even

10   defined by the panel.  It circumnavigates in figure 1.  I

11   switched the slide, but I can put it back.

12          THE COURT:  Said rigid support member or a

13   shape-retaining member, for example, a collapsible spring.

14          Why do you say it's limited to a spring?

15          MR. BRADY:  Oh, I don't.  I'm not saying it is.

16   Plaintiffs' position is that this should be given its

17   ordinary meaning, which is a support portion defined by the

18   panel.  Mr. Hameline is saying that it should include a

19   spring, rigid support or semi-rigid support; whereas,

20   separate inflatable bladder.  So they either reference it to

21   a spring or a rigid support or a semi-rigid support, are

22   mistaken because those elements get to the rigid support

23   member, which is reference numeral 104.

24          THE COURT:  A support portion is a portion of

25   something that supports.

```
 1          MR. BRADY:  I'd agree.  Plain and ordinary meaning,
 2   that's correct.  This must be defined by the panel.
 3          THE COURT:  Thank you.  How many have you had,
 4   Mr. Hameline?
 5          MR. HAMELINE:  I'm not keeping count.  This is my
 6   last one, and then we are moving to another patent.  We have
 7   three Mr. Brady is going to do, if you want to switch back.
 8          THE COURT:  I just don't want to be taking sides,
 9   that's all.
10          MR. HAMELINE:  We can switch at this one or finish
11   with this.
12          THE COURT:  Go ahead, Mr. Hameline.
13          MR. HAMELINE:  All right.  I apologize if I have
14   done more than my fair share.  Page 63 of our slide deck.
15   This is a term in the '640 patent.  The phrase is -- or the
16   phrase is, "The user's back is collectively supported by the
17   back portion of the mesh membrane."
18          THE COURT:  Slow down a minute.  Let me get back to
19   my notes here.  Here we are.  Somehow or another I got behind
20   here.  Let me make sure.  It was the seated position but
21   you're not on seated position.  Let me go back.  I've got to
22   go back.
23          MR. HAMELINE:  Your Honor, the seated position one
24   we've already dealt with earlier today; is that right?  So we
25   don't have to revisit.  I know that was in the list.
```

JODY A. STEWART, Official Court Reporter

```
 1            THE COURT:  Okay.
 2            MR. HAMELINE:  So we would move to what's on Page 63
 3    of my deck, which is "the user's back is collectively
 4    supported by the back portion of the mesh membrane."
 5            THE COURT:  Excuse me.  So what are you on now,
 6    Mr. Hameline?
 7            MR. HAMELINE:  Yes, Your Honor.  If you turn to Page
 8    65, you can see the figure.  Here, once again, a picture is
 9    much easier than trying to describe what's in words, but we
10    do have in words here, shows how in figure 7A.
11            THE COURT:  65.  Let me get to 65.
12            MR. HAMELINE:  65.  Here in figure 7A.
13            THE COURT:  All right.  In 7A.
14            MR. HAMELINE:  We can see, once again, how the mesh
15    membrane or the membrane that runs, that is labeled as 302,
16    is configured to collectively support the back portion of the
17    mesh membrane or the user's back is collectively supported by
18    the back portion of the mesh membrane that's on top of 302
19    that runs up to 309, and the back support portion of the
20    inflatable member is 310.
21            THE COURT:  "User's back is collectively supported
22    by the back portion of the mesh membrane and the back support
23    portion of the inflatable member."
24            MR. HAMELINE:  Correct.
25            THE COURT:  So what you're claiming is the back
```

1    support portion and the back portion are indefinite?

2         MR. HAMELINE:  Indefinite, or this figure 7A gives

3    some meaning to the terms, and it is that sling that runs and

4    collectively supports the mesh membrane running up over the

5    back support.  Because, otherwise, it's very difficult to

6    understand where in the patent it is described how this

7    collectively supports the user's back.

8         So if a mesh membrane is just sewed on to -- a piece

9    of it is just sewed onto the back portion, it doesn't support

10   anything.  It just covers it.  This shows the one place in

11   the patent where it could collectively -- where the user's

12   back could be collectively supported.

13        THE COURT:  Okay.  Let me hear from Mr. Brady.

14        Mr. Brady, you are saying that the mesh membrane

15   doesn't do anything?

16        MR. BRADY:  I think that would be incorrect but

17   should start with the plain language of the claim.

18        THE COURT:  The claim says, "The user's back is

19   collectively supported by the back portion of the mesh

20   membrane and the back support portion of the inflatable

21   member."

22        MR. BRADY:  That's correct, and I have the '640

23   patent claim on the screen.

24        THE COURT:  I don't have any problem knowing what

25   the inflatable member is.  I'm having some problems in regard

 1   to what is the back portion of the mesh membrane.

 2          MR. BRADY:  So if we look above, earlier in the

 3   claim, and I have it on the screen, and it's underlined,

 4   earlier it recites a mesh membrane, including a seat portion.

 5          THE COURT:  Including a seat portion and a back

 6   portion.

 7          MR. BRADY:  So now we have defined in the claim the

 8   piece of mesh with the seat portion and the back portion.

 9          THE COURT:  Just a minute.  All right.  I see the

10   entire '640 patent, claim number 1, apparatus.  (Reading).

11   Go ahead.  One thing you don't have here is the numbers on

12   this thing.

13          MR. BRADY:  Numbers of what?

14          THE COURT:  Line numbers.

15          MR. BRADY:  No, I dropped those off.  I apologize.

16   I could grab the copy of the patent and read them, if that

17   would help.

18          THE COURT:  Go ahead.

19          MR. BRADY:  So this claim does not say anything

20   about a hammock-like sling, which is how Aqua-Leisure would

21   like to construe this.  In fact, the word "sling" does not

22   appear in the specification.  I'm not entirely sure I know

23   what that means.  Aqua-Leisure started its construction

24   argument by beginning with figure 7A, and they're improperly

25   limiting this claim to only figure 7A, but that's not

1    necessary.

2            THE COURT:  What figures besides 7A are involved?

3            MR. BRADY:  I think this claim can cover any

4    embodiment, provided that the mesh material in that

5    embodiment has a seat portion and a back portion, and that

6    mesh back portion supports the user's back.  So I pointed to

7    this portion of the specification earlier.  It teaches that

8    we can modify where the mesh material or the membrane

9    connects to the back portion.  You can move it higher; you

10   can move it lower, depends on where the user wants to put it.

11           THE COURT:  Let's go back to the --

12           MR. BRADY:  To the constructions or to the claim?

13           THE COURT:  '640 patent, claim 1.

14           MR. BRADY:  That's on the screen now.

15           THE COURT:  Okay.

16           MR. BRADY:  Should be in the '640 patent in column

17   14.

18           THE COURT:  Yeah, I've got it.  Lines --

19           MR. BRADY:  40'ish.

20           THE COURT:  -- 40 through 60.  Okay.  How can a

21   portion of this claim aid me in determining what the first

22   portion means, is what I was having some problems with it.

23           Okay.  Go ahead, Mr. Brady.  You got two minutes to

24   say anything you want.

25           MR. BRADY:  Plain and ordinary meaning should

1    govern.  There is nothing special or difficult to understand

2    about this claim element.  Aqua-Leisure wants it to require

3    the same piece of mesh membrane as in one piece.  As a matter

4    of law, that's incorrect, and they want it to include a

5    hammock-like swing, which, as a matter of law, should be

6    incorrect.  That would exclude figure 1A, for example.

7            But the specification teaches, at least at column 8

8    starting around line 65, that the membrane can be coupled to

9    the back portion wherever these are ones.  There is other

10   parts to the patent that teach you can use those features in

11   other embodiments.  I think the takeaway to one of ordinary

12   skill, if we want the mesh to cover half of the back portion

13   or the back -- whatever the term is -- then they can make it

14   that way.  So in view of the specification, I think

15   Aqua-Leisure's proposed construction is incorrect.

16           Your Honor, I see that you are looking at Exhibit A

17   to the parties' joint claim construction statement.  I should

18   point out that we briefed some of these terms that appear in

19   the '540 and the '640 patent together.  So we've already

20   addressed a lot, and now I think that brings us to the '888

21   patent.  Those are the only terms remaining.  We are almost

22   there.

23           THE COURT:  Okay.

24           MR. ALBERT:  Your Honor, we are going to change.

25           THE COURT:  I'm glad to hear from you, Mr. Albert.

```
 1            MR. ALBERT:  I have been unusually quiet today, Your
 2     Honor.
 3            THE COURT:  You really have.
 4            MR. ALBERT:  I know, but you've had plenty of fun
 5     without me, so I didn't want to stop you while you were on a
 6     roll, Your Honor.
 7            THE COURT:  But everybody says you bring a little
 8     pleasantness to our otherwise unpleasant situation.
 9            MR. ALBERT:  I think that's a compliment, Your
10     Honor.  I'm going to take it that way.  I know it was
11     intended that way.
12            Rich Maidman is going to address the '888 patent, if
13     the Court please, and you may recall that's how we divided it
14     up on this side.  We won't have two people arguing, but we
15     just divided it up half.
16            THE COURT:  I don't mind dividing it up.  What are
17     you going to do?
18            MR. ALBERT:  I'm just a hood ornament today, Your
19     Honor.
20            THE COURT:  You just came to bring some goodwill.
21            MR. ALBERT:  I'm the hood ornament.  I'm just
22     spreading calm in the room.
23            THE COURT:  That's very good.
24            MR. ALBERT:  It's been a very calm morning.  I mean,
25     nothing has been thrown.  We've done all right, I think.
```

```
1              THE COURT:  '888 patent.  Get to that.
2              MR. MAIDMAN:  So, Your Honor, I think the next term
3     on the list was apparatus, but I believe Mr. Hameline
4     addressed that earlier this morning.
5              THE COURT:  I think we pretty well covered
6     apparatus.
7              MR. MAIDMAN:  Yes.  Agreed.
8              THE COURT:  But that's not to stop you from adding
9     something if you like.  I don't want you not to have an
10    opportunity if you want to add something.
11             MR. MAIDMAN:  I think it was pretty well covered, so
12    we will go with "a second flexible material defining an
13    inflatable chamber."  So that's on Page 67 of the packet that
14    we handed out.  So Aqua-Leisure's proposed construction here,
15    and this appears in claim 15 of the '888 patent, is that the
16    second flexible material defining an inflatable chamber is
17    airtight material which forms the bladder for the inflatable
18    chamber in the device.
19             If you go to claim 15 of the '888 patent, part of
20    that claim specifies, "A valve coupled to the second flexible
21    material, the valve configured to communicate air to the
22    inflatable chamber of the second flexible material."  Now, if
23    the inflatable chamber is made of the second flexible
24    material, necessarily the second flexible material must be
25    airtight, and that's why there is a valve that's coupled to
```

1   it under the claim.

2        THE COURT:  Let me stop you there.  Go right to

3   that's "An apparatus, comprising:  A first flexible material

4   having an outer perimeter portion; a second flexible material

5   defining an inflatable chamber and an inner perimeter

6   portion; the inner perimeter portion of the second flexible

7   material being fixedly coupled to the outer perimeter portion

8   of the first flexible material."

9        Okay.

10       MR. MAIDMAN:  So the portion that I was just reading

11  and was focused on is in column 6, line 6 of the patent.  So

12  still claim 15, where it reads, "A valve coupled to the

13  second flexible material, the valve configured" --

14       THE COURT:  Stop a minute.

15       MR. MAIDMAN:  Sure.

16       THE COURT:  I'm lost at where you're reading now.

17  Where are you?

18       MR. MAIDMAN:  So column 6 at line 6.

19       THE COURT:  Line 6.

20       MR. MAIDMAN:  Of the '888 patent.

21       THE COURT:  Talks about a valve coupled to the

22  second flexible material?

23       MR. MAIDMAN:  Exactly.  Right.  So the valve

24  configured to communicate air to the inflatable chamber of

25  the second flexible material.  So the second flexible

```
 1    material has to be airtight or else it can't hold any air,

 2    and that's why you have a valve attached to it so that you

 3    could pump it up.

 4          I'd also add that the second flexible material must

 5    be airtight because it has to define the inflatable chamber.

 6    So if you picture a balloon, you blow the balloon up.  The

 7    inflatable chamber in the balloon is going to be the shape of

 8    the outer part of the balloon.  Now, you can decorate the

 9    balloon any way you want, but the shape of the balloon is

10    going to define the inflatable chamber.

11          THE COURT:  So you maintain, then, that it doesn't

12    have to be an airtight material?

13          MR. MAIDMAN:  No.  We say it does have to be an

14    airtight material or else the claim wouldn't work.

15          THE COURT:  They are saying it's not limited to an

16    airtight material?

17          MR. MAIDMAN:  Right.

18          THE COURT:  You're saying it couldn't have a valve

19    on something if it weren't airtight?

20          MR. MAIDMAN:  Exactly.  That's kind of the theme

21    that will come out in some of the other claims as well.

22          THE COURT:  Okay.  All right, Mr. Brady.  You are

23    saying you got a valve here, has to be an airtight material,

24    and evidently the oddity is you agree it's got to be an

25    airtight material; don't you?
```

```
 1          MR. BRADY:  No, Your Honor.  That would be
 2   inconsistent with the specification.
 3          THE COURT:  Why?
 4          MR. BRADY:  Because -- let's start with the claim
 5   language first.  So this is the '888 patent, is different
 6   from the '640 and the '540.  We are now in the Arias family
 7   of the patent.  The claim language is a second flexible
 8   material defining an inflatable chamber, and that's a
 9   little --
10          THE COURT:  Slow down a minute.  Where are we now?
11   When you say the -- what line are we on?  What claim are we
12   in, like chapter and verse?
13          MR. BRADY:  We are discussing claim 15, which in the
14   '888 patent begins in column 5, line 45.
15          THE COURT:  Line 45 begins it.  An apparatus
16   comprising these things.  All right.
17          MR. BRADY:  That's correct.
18          THE COURT:  "First flexible material having on outer
19   perimeter portion; a second flexible material defining an
20   inflatable chamber and an inner perimeter portion, the inner
21   perimeter portion of the second flexible material being
22   fixedly coupled to the outer perimeter portion of the first
23   flexible material; an inflatable pillow coupled to at least
24   one of the first flexible material or the second flexible
25   material, at least a portion of the perimeter portion of the
```

```
 1    inflatable pillow and the second flexible material

 2    collectively defining an interior region."

 3            Now, it says, "A valve coupled to the second

 4    flexible material, the valve configured to communicate air to

 5    the inflatable chamber of the second flexible material."

 6            MR. BRADY:  Yes, it does.

 7            THE COURT:  So you say the second flexible material

 8    doesn't have to be airtight?

 9            MR. BRADY:  No.  And if we look at the disclosed

10    embodiments, I can explain why it does not have to be

11    airtight as claimed.

12            Figure 2, for example, describes -- and I have it on

13    the screen.  It is awfully hard to read -- item 14 is the

14    central portion of the flexible panel or it's the first

15    flexible material in the claim.

16            THE COURT:  Where are we now?

17            MR. BRADY:  I'm looking at figure 2.  It's on my

18    slide, 32, I just --

19            THE COURT:  Where am I in the patent?

20            MR. BRADY:  Figure 2.  This is --

21            THE COURT:  '888.

22            MR. BRADY:  -- '888 patent, figure 2.

23            THE COURT:  I have figure 2.  Okay.  I don't have

24    the -- and you're back on claim 1 or the claim under

25    apparatus at number 15?
```

1           MR. BRADY:  That's correct.  We are talking about

2     claim 15 now.

3           THE COURT:  Yes.

4           MR. BRADY:  That's what recites the second flexible

5     material defining an inflatable chamber.

6           THE COURT:  Okay.

7           MR. BRADY:  So let's turn to the specification, and,

8     really, figure 2 of the specification for a little bit of

9     context.  We have reference numeral 14 is a first flexible

10    material.  That's the "C" portion or central portion of the

11    flexible panel.  It has an outer perimeter portion that

12    connects to the two large ovals in figure 2.

13          THE COURT:  All right.  Figure 2.  Each of them

14    have -- they are similar only at opposite ends; correct?

15          MR. BRADY:  Yes.  This is a cross-section

16    of disclosed -- you see above in figure 1.  It's a

17    cross-section along lines II.  You see the II.  So figure 2

18    is looking at figure 1 but from a cross-section.

19          THE COURT:  All right.  Go ahead.

20          MR. BRADY:  Reference numeral 14 is a first flexible

21    material.  It has an outer perimeter portion connected to

22    reference numeral 12.  The specification identifies reference

23    numeral 12 as a perimeter pocket, but for claim 15, I'm going

24    to say that that is the second flexible material.  So claim

25    15 requires the second flexible material to do two things:

1    It has to define an inflatable chamber, and it has to have an

2    inner perimeter portion connected to the first flexible

3    material.

4            All right.  Looking at figure 2, reference numeral

5    20 identifies the inflatable chamber.  You will see in figure

6    2, that inflatable chamber is a subset, it's within reference

7    numeral 12.

8            THE COURT:  Wait a minute.  Inflatable chamber 20 is

9    within 12?

10           MR. BRADY:  Yes.  12 is a second flexible material

11   that is defined inflatable chamber 20.

12           THE COURT:  So 12 is not necessarily an inflatable

13   chamber?

14           MR. HAMELINE:  Correct.

15           MR. BRADY:  Correct.  Not as this specification has

16   described it.  I will borrow Mr. Maidman's analogy, if I may.

17   He described the second flexible material of claim 15 as a

18   balloon.  If he's right, then claim 15 does not include this

19   embodiment figure 2 in the patent, which is a serious problem

20   under Federal Circuit precedent.  But if you consider an

21   inflatable chamber as a balloon, Your Honor, encapsulate that

22   balloon in the second flexible material, just like I could

23   borrow one of the demonstratives and demonstrate what we are

24   talking about.

25           The second flexible material defining an inflatable

 1    chamber can mean what it shows in figure 2.  An inflatable

 2    chamber is inside that second flexible material.  Here's how

 3    I know that interpretation is correct.  Figure 2 shows second

 4    flexible material 12 as having an inner perimeter portion

 5    connected to the outer perimeter portion of reference numeral

 6    14.  I have that indicated on the slide on the screen.  There

 7    is a blue line identifying that point of connection.

 8            Under Mr. Maidman's argument, the second flexible

 9    material would have to be reference numeral 20.  He is saying

10    that it is the inflatable chamber itself is the balloon, but

11    in figure 2 the balloon does not have an outer perimeter

12    portion connected to an inner perimeter portion of the

13    middle.  I just repeated that in my head.  I got the

14    perimeter portions correct.

15            THE COURT:  Thank you, Mr. Brady.  I think I know

16    where you're attempting to go.

17            MR. BRADY:  Is that it for me, Your Honor?

18            THE COURT:  That's enough, Mr. Brady.

19            Mr. Maidman, I'll give you a minute to reply to him.

20            MR. MAIDMAN:  Sorry?  Oh, a minute to reply?

21            THE COURT:  Yes.  I'm going to allow you to reply.

22            MR. MAIDMAN:  Thank you.

23            THE COURT:  Because of what he's indicated in

24    relation to figure 2 here.

25            MR. MAIDMAN:  Sure.  So let me just turn to figure

1    2.  So, first of all, this is one embodiment in the patent,

2    but there is a reason why the patent has so many claims,

3    because not every claim includes every embodiment.  So this

4    is one embodiment that the inventor set out, but one thing

5    that I didn't hear was if the inflatable chamber is inside

6    this material, how do you inflate it?  If it's encapsulated,

7    where is the valve that's required by claim 15?  You can't.

8    That's why it has to be airtight, because the valve is

9    attached to it.  If the valve is attached to what's denoted

10   as 12, then there is no way to inflate the apparatus.

11           THE COURT:  Thank you.  Mr. Brady, he's asked an

12   interesting question.

13           MR. BRADY:  May I respond?

14           THE COURT:  Yes.  I'm curious about it.  You said

15   that you got to have a valve.

16           MR. BRADY:  Just using a demonstrative, there is an

17   inflatable chamber inside of this material.

18           THE COURT:  Yes.

19           MR. BRADY:  There is a valve coupled to the material

20   to blow air into this chamber that's on the inside, just like

21   in Aqua-Leisure's product, and this is a very good

22   demonstrative because you can see the inflatable chamber

23   through the second flexible material.  You can see it through

24   the mesh.

25           There is a valve somewhere, which it's coupled in

1 this case externally and you blow air into it. Just because

2 the valve is coupled to the second flexible material does not

3 preclude it from being in fluid communication with an

4 inflatable chamber.

5 THE COURT: Okay. I think I understand what each of

6 your arguments are in this case.

7 Okay. Let's move on to the next point.

8 We are still on '888; correct?

9 MR. MAIDMAN: Yes. All the rest of the claims are

10 '888. So this should be quick. On Page 71 of our

11 presentation, Aqua-Leisure's, the next term is "fixedly

12 coupled," and this term appears in claim 15 of the '888

13 patent. Aqua-Leisure's proposed construction is that the

14 term is indefinite, because a person of ordinary skill in the

15 art would not know with reasonable certainly what it means.

16 There is no definition given in the specification or the

17 patent.

18 THE COURT: All right, Mr. Brady. Why do you say

19 you don't have any definition?

20 MR. BRADY: I will stick with what we've argued in

21 the brief, that it is what any ordinary skill in the art to

22 know if it is coupled, broad concept; and fixedly coupled,

23 the narrow concept. I've laid it out in the briefing.

24 Unless the Court has specific questions, I'll rely on that.

25 THE COURT: Well, coupled is one thing. Fixedly

```
 1   coupled, I don't have any problem with.  Do you?
 2           MR. BRADY:  Not at all.  The question for
 3   indefiniteness -- first of all, that requires clear and
 4   convincing evidence for a claim to be indefinite.  Under
 5   Nautilus, Supreme Court precedent, we have to consider this
 6   from the perspective of one of ordinary skill.
 7           One of ordinary skill in this art, which I don't
 8   think we have any evidence of, I'm going to argue that he or
 9   she would understand "fixedly coupled" means it's not coming
10   apart.  My wife being fixedly coupled, she's at the hip, and
11   I can't get rid of her; or vice versa, really she can't get
12   rid of me.  Coupled, on the other hand, connotes a broader
13   meaning, which I think we have already addressed.
14           THE COURT:  Move on.  Next is the word "coupled."
15           MR. MAIDMAN:  Yes.
16           THE COURT:  So you are saying "coupled" means
17   fixedly coupled?
18           MR. MAIDMAN:  I'm saying "coupled" means coupled,
19   but we need to figure out what coupled means.  I still don't
20   know what "fixedly coupled" means.
21           THE COURT:  I have a lot of problems with the
22   coupled, because, you know, coupled means a lot of things,
23   but it depends.  And all of these words, when one takes them
24   out of context, they seem to have different meanings than
25   they have in this context in which they are placed, and
```

1    that's what's important.  So I don't have any trouble with

2    this word "coupled."  But you're indicating that it's fixedly

3    coupled, that is, that they are physically joined?

4            MR. MAIDMAN:  So we interpret coupled as simply

5    coupled, and --

6            THE COURT:  Fixedly coupled; otherwise, there is no

7    reason to have the word "fixedly" before "coupled," is it?

8            MR. MAIDMAN:  There may be, it's just the patent and

9    the specification don't explain what it means.  I don't think

10   SwimWays has set forth the definition either.  But moving on

11   to "coupled," which is present in claim 15 of the '888

12   patent, our proposed --

13           THE COURT:  I don't have any problem with this.

14   Coupled does not have to be fixedly coupled or physically

15   attached.  I couldn't do that.  My wife would object to it.

16           MR. MAIDMAN:  So the way that --

17           THE COURT:  You know she'd object to it.

18           MR. ALBERT:  Your Honor, I will provide one piece of

19   input to the hearing today.  You should do whatever possible

20   to avoid getting on the wrong side of your wife because, you

21   know, she'll have your hide.  I've been on the receiving end

22   of that, too.  So I know of which I speak.

23           THE COURT:  I've pretty well made up my mind on

24   that.

25           MR. MAIDMAN:  May I just make one point?

```
 1              THE COURT:  Fully briefed.  I didn't have to hear
 2    much argument on it.  I'm not trying to cut you off.  Let's
 3    move on to the next point, which is "first flexible material,
 4    second flexible material."
 5              MR. MAIDMAN:  Sure.  So the basic premise of
 6    Aqua-Leisure's proposed construction is that these words have
 7    meaning, and there is a reason why the patentees included
 8    them in the claim terms.  So by referring to one flexible
 9    material as a first flexible material and then a second
10    flexible material, they have to be different, or else why
11    would you refer to materials as a first flexible material and
12    a second flexible material?
13              THE COURT:  Well, it sounds logical.  I say your
14    argument sounds logical.  However, it may be that the first
15    flexible material was first referred to and the second
16    flexible material may have been secondly.  Let's take a look
17    at the use of the terminology and where it's used.  Then we
18    will determine it.
19              MR. MAIDMAN:  Sure.  So we can look at claim 15 of
20    the '888 patent.  Actually, if you go to slide 78 of the
21    presentation, we laid out language from the two claims.
22              THE COURT:  78?
23              MR. MAIDMAN:  Yes.
24              THE COURT:  It's a long book.  Okay.  I'm on 78.
25              MR. MAIDMAN:  Okay.  So 78 includes claims 15 and
```

1    claims 22.

2         THE COURT:  "First flexible material having an outer

3    perimeter portion; a second flexible material defining an

4    inflatable chamber and an inner perimeter portion, the inner

5    perimeter portion of the second flexible material being

6    fixedly coupled to the outer perimeter portion of the first

7    flexible material."

8         MR. MAIDMAN:  Right.  So here it is referring to two

9    different flexible materials, and then in claim 22 it talks

10   about -- on the right-hand side, it's referring to, "The

11   apparatus of claim 15, wherein the first flexible material is

12   substantially planar when the inflatable chamber of the

13   second flexible material" -- that is what we were referring

14   to before, how the second flexible material is airtight,

15   informed the inflatable chamber, is inflated.

16        So the patentees had a choice of what claim language

17   to use, and they used first flexible material and second

18   flexible material.

19        THE COURT:  So what you're maintaining is these are

20   two different materials; correct?

21        MR. MAIDMAN:  Correct.  Correct.

22        THE COURT:  All right.  That's what your position

23   is; right?

24        MR. MAIDMAN:  Correct.  And during prosecution of

25   the '888 patent, an office action allowed language --

1          THE COURT:  Why did it have to be different types of

2    flexible material?  All you're doing is saying there are

3    different types, but a type may mean it's a different type of

4    mesh.  But it could be the similar mesh, it would just be one

5    would be one place and one would be another; wouldn't it?

6          MR. MAIDMAN:  Well, so I don't think that -- there

7    is no reason to use first flexible material and second

8    flexible material if they are both the same material.

9    Therefore, you would just use the word "material," or you

10   would use the word "flexible material" goes over the --

11         THE COURT:  Well, certainly would have to be

12   something, one, the first flexible material having an outer

13   perimeter portion.  Second flexible material defining an

14   inflatable chamber and an inner perimeter portion.  Let me

15   see what Mr. Brady has to say about this.

16         He is saying that there are different types of

17   flexible material, but there's something different.  Tell me

18   about it.

19         MR. BRADY:  So as a patent attorney, I draft patent

20   claims.  When drafting patent claims, as a device to identify

21   a different structure, we will say a first something and a

22   second something.  That's because later I want to talk about

23   maybe the first something is on the right and the second

24   something is on the left.  Those could be the same types of

25   material or the same somethings.  I just need to talk about

```
 1    two.

 2              In this claim, claim 15, we recite a first flexible

 3    material with an outer perimeter portion and a second

 4    flexible material that has an inner perimeter portion, and

 5    they are coupled somehow.  So we know that we have two

 6    different flexible materials, and they have a configuration

 7    that we are trying to claim.

 8              This claim is silent on whether the first flexible

 9    material is the same or different type of material as the

10    second flexible material, but claim 1 of the same patent is

11    not.  If I could direct the Court's attention to that claim,

12    I think this -- I have two very good points on this.  Claim

13    1, it's in column 4, starting at line --

14              THE COURT:  In column 4?

15              MR. BRADY:  Yes.  I want to distinguish claim 1 from

16    claim 15.  There is Federal Circuit law, Your Honor, that

17    says it is reversible error to import a limitation from one

18    claim into another when it's not there.  Claim 1, it recites

19    the second flexible material being different than the first

20    flexible material.  That's in claim 1.  It's not in claim 15.

21              Okay.  We see the same treatment in the prosecution

22    history.  During prosecution there was an office action, and

23    the applicant responded, responded with some amendments.

24              I'm going to point to two pages from that

25    prosecution history.  On the screen right now, this is my
```

```
 1   slide 38 --

 2        THE COURT:  "A first flexible material having an

 3   outer perimeter portion, a second flexible material having an

 4   inner perimeter portion and an outer perimeter

 5   portion...collectively defining a sleeve, the second flexible

 6   material being different than the first flexible material,

 7   the inner perimeter portion of the second flexible material

 8   being fixedly coupled, at least in part, to the outer

 9   perimeter portion of the first flexible material."

10        MR. BRADY:  Yes.  That is claim 1.  Aqua-Leisure is

11   trying to read the limitation, the second flexible material

12   being different than the first flexible material, into claim

13   15.  That's what they're trying to do.  Claim 15 is column 5,

14   beginning around line 45.  It doesn't say the second flexible

15   material being different than the first flexible material.

16   That's not a limitation in claim 15.

17        THE COURT:  And what you're saying is you can't read

18   one definition in one claim into another?

19        MR. BRADY:  One limitation from one independent

20   claim into another independent claim.

21        THE COURT:  Why is it a limitation?

22        MR. BRADY:  It's recited.  Claim 1 has a limitation

23   that requires the second flexible material being different

24   than the first flexible material.  That's a limitation of

25   claim 1.  It's not in claim 15.  Aqua-Leisure wants it to be,
```

1    but there is two very good reasons -- technically three --

2    why that is wrong.

3            THE COURT:  Okay.

4            MR. BRADY:  First reason, claim 15 doesn't require

5    it.  Second reason, claim 1 does.  So the Federal Circuit,

6    and I believe the case is *Rodine* -- we cited it in the

7    brief -- it's for the proposition that you can't import that

8    limitation into another one.  There is another important one

9    that I think is dispositive of the issue.

10           During prosecution -- I have it on the screen -- the

11   applicant distinguished claim 1 over some prior art on two

12   grounds:  First -- and I have both grounds highlighted -- the

13   first ground was that claim 1 recites the second flexible

14   material being different than the first flexible material.

15   The second has to do with a limitation, we are about to talk

16   about, collectively defining interior region.  So claim 1,

17   the applicant said two reasons it's patentable.  Turn to the

18   applicant's argument about claim 15.  The applicant only

19   argued the collectively defining an interior region element.

20           THE COURT:  In other words, what you're saying is

21   claim 15 is distinguished from claim 1?

22           MR. BRADY:  That is correct.

23           THE COURT:  Okay.  I understand your position.

24           We are getting down to two more left here.

25           MR. MAIDMAN:  Okay.  So the next term, if you go to

1    Page 80 of Aqua-Leisure's specification.

2         THE COURT:  "Collectively defining an interior

3    region"?

4         MR. MAIDMAN:  Right.  So it's Page 80 of

5    Aqua-Leisure's presentation.  So under Aqua-Leisure's

6    proposed construction, "The exterior of the pillow extends

7    within the inner perimeter of the second material and

8    together they define the interior region."

9         Now, if you turn to Page 81 of the presentation, you

10   can see this language in context in claim 15.

11        THE COURT:  Page 81 of yours.  Okay.  I've got Page

12   81.

13        MR. MAIDMAN:  Okay.  So if you take a look at the

14   last paragraph.

15        THE COURT:  It says, "An inflatable pillow coupled

16   to at least one of the first flexible -- (reading) and the

17   second flexible material collectively defining an interior

18   region."

19        MR. MAIDMAN:  Right.

20        THE COURT:  They are trying to say that the exterior

21   of the pillow extends within the inner perimeter of the

22   second material.  Together they define the interior region.

23        MR. MAIDMAN:  Right.  So if you take a look at

24   figure 1, which is reproduced on Page 82 of the presentation,

25   you can see how the patentees illustrated this concept.  So

1    this figure shows, and we put in a yellow highlight on the

2    part of the pillow that extends within to form the interior

3    portion and a green highlight on the second flexible material

4    that forms the interior portion.

5           THE COURT:  Green is the second flexible material;

6    right?

7           MR. MAIDMAN:  Right.  In this diagram.  So when --

8           THE COURT:  Yellow is what?

9           MR. MAIDMAN:  The yellow is the exterior of the

10   pillow.

11          THE COURT:  Is exterior.

12          MR. MAIDMAN:  Is the part of the exterior of the

13   pillow which, together with the second flexible material,

14   forms the inner portion -- or, sorry, the interior region.

15          THE COURT:  Okay.  Now we've got this, just so I

16   know what is what.  Go ahead.

17          MR. MAIDMAN:  Right.  So when the claim uses the

18   words "collectively defined," that means the interior region

19   can only be defined by the part of the pillow that extends

20   through, that intersects with the second flexible material

21   and a second flexible material.  No other material can be

22   used to form that interior region.

23          In order for the claim language to have meaning, at

24   least some part of the exterior of the pillow has to

25   intersect with the second flexible material because that's

 1    how you form the enclosed interior region, and that's what

 2    the patentee showed in the specification.

 3              THE COURT:  All right.  Mr. Brady.

 4              MR. MAIDMAN:  I'm sorry, can I just --

 5              THE COURT:  In essence what he is saying is the

 6    inner perimeter must intersect to define the particular

 7    region -- excuse me.

 8              MR. MAIDMAN:  Sure.  And just to add one little

 9    piece, if you look at the example on Page 81, let's say that

10    pillow, which has a little orange highlight, if that was on

11    the exterior of the device, then the pillow and the second

12    perimeter portion -- and the second flexible material would

13    not collectively define an interior region, just as if the

14    pillow was --

15              THE COURT:  If the pillow were outside, it wouldn't

16    be --

17              MR. MAIDMAN:  Right.  Just as if it was somewhere in

18    the middle and it wasn't ever touching the second flexible

19    material, then the pillow and the second flexible material

20    could not collectively define an interior region.  So they

21    must intersect.

22              THE COURT:  Mr. Brady, so we've got a collectively

23    defined an interior region.  Their inner perimeters must

24    intersect to define that region, he says; correct?

25              MR. BRADY:  That's incorrect.

```
 1              THE COURT:  That's incorrect?

 2              MR. BRADY:  That is incorrect.

 3              THE COURT:  Why is it incorrect?

 4              MR. BRADY:  So the specification teaches that the

 5   sleeve includes an inflatable portion disposed about at least

 6   a portion of the circumference.  I know that the figures in

 7   the patent don't show this, but the specification teaches

 8   effectively you can have a "U" shaped --

 9              THE COURT:  Where is the specification you're

10   referring to?

11              MR. BRADY:  So column 2 of the '888 patent.

12              THE COURT:  Column 2 of the '888 patent.

13              MR. BRADY:  Starting at line 5, thereabouts.  Just

14   one sentence.

15              THE COURT:  Column 2, and what line are you on?

16              MR. BRADY:  Start line 5, "The sleeve includes an

17   inflatable portion disposed about at least a portion of the

18   circumference."

19              THE COURT:  It says here, "The spring is disposed

20   within the sleeve.  The sleeve includes an inflatable portion

21   disposed about at least a portion of the circumference.  It

22   is therefore an object of the present invention to provide a

23   collapsible flotation device.  It's another object of the

24   present invention to provide a collapsible flotation device

25   which is easily collapsed and extended to full size through a
```

```
1    mechanical means."

2            MR. BRADY:  I was referring only to the sentence

3    above lines 5 to 6.

4            THE COURT:  "It is yet another object of the present

5    invention to provide a collapsible flotation device which is

6    easily collapsed and extended to full size through the use of

7    a spring...to provide a collapsible flotation device which

8    requires minimal force to twist and fold into the collapsed

9    configuration...object of the present invention to accomplish

10   the foregoing objectives in a simple manner."

11           Okay.  Nothing simple about it to me, but it may be

12   simple to the inventor.

13           MR. BRADY:  These claim elements do take some time

14   to digest.

15           THE COURT:  So you say column 2 of '888 and line 5

16   does what?

17           MR. BRADY:  It tells us that the inflatable portion

18   does not have to go the entire circumference, and this is

19   important because of this claim element.  What I'm doing is

20   showing why Aqua-Leisure's incorrect.

21           THE COURT:  Why couldn't you just say, then, that

22   the plain and ordinary meaning would apply?

23           MR. BRADY:  I do.  That is what plaintiffs do.

24           THE COURT:  Oh.

25           MR. BRADY:  Aqua-Leisure is the one who wants the
```

1    exterior of the pillow to intersect with the inner perimeter.

2    Like many limitations we've talked about, the issue is not

3    the meaning of the terms.  The issue is whether the

4    limitations read on the accused product.  I think this one is

5    just another example of a claim that it means what it says.

6          The problem with the proposed construction is that

7    it would exclude potential embodiments, and I've got some

8    example embodiments shown on slide 41, which should be on

9    your screen.  What we have done here is we have just moved

10   the pillow.

11         THE COURT:  What you said, and where?  Is it in

12   here?

13         MR. BRADY:  Yes.  It should also be on your screen.

14   I'm talking about plaintiffs' presentation, slide number 41.

15   I've included some hypothetical embodiments.

16         THE COURT:  So you maintain that that construction

17   would exclude --

18         MR. BRADY:  If I move the pillow back and I have not

19   a complete circumferential inflatable member, it is just a

20   "U" shape, that's within the specification's teachings, but

21   it would be excluded from Aqua-Leisure's construction.  So I

22   don't think we need to depart from the plain and ordinary

23   meaning of this term, and certainly not the way they have

24   proposed to do so.

25         THE COURT:  All right.  I understand your position.

1          Mr. Maidman, we are on "different than the shape."
2    Isn't that where we are?
3          MR. MAIDMAN:  Yes.  Last one.  I hope the last one.
4          THE COURT:  What claim number are we in on this?
5    Claim 19 of the '888?
6          MR. MAIDMAN:  Yes.  I think we actually may have one
7    bonus construction for you.
8          THE COURT:  Okay.
9          MR. MAIDMAN:  But, anyway, let's talk about
10   different than the shape.  Our proposed construction is a
11   quick one.  We don't know what this means.  It's indefinite.
12   There are no boundaries to different than the shape.  The
13   specification doesn't talk about what this refers to.  Is it
14   surface area?  Is it a donut versus a donut hole?  General
15   perimeter shape?  There is no guidance, so this claim is
16   indefinite.
17         THE COURT:  Supposed to be claim 19 of the '888
18   patent?  I must have the wrong patent.
19         MR. BRADY:  I have it on the screen, Your Honor.
20         THE COURT:  Claim 19.  (Reading).  The second
21   flexible material has an outer most perimeter defining a
22   shape of the second flexible material in a top view when the
23   inflatable chamber of the second flexible material is
24   inflated, the shape of the first flexible material in the top
25   view being different than the shape of the second flexible

1    material in the top view when the inflatable chamber of the

2    second flexible material is inflated."

3            Is that different than the shape that you're

4    speaking of, I assume?

5            MR. BRADY:  Yes.  That is the correct claim.

6            THE COURT:  Okay.

7            MR. BRADY:  They are challenging it as indefinite.

8    It means what it says.  So when we get to indefiniteness, we

9    are back to their burden of proof.  I respect Mr. Maidman's

10   argument, but it's from the perspective of one of ordinary

11   skill, and we need clear and convincing evidence.  Here we

12   have two outer perimeters defining a shape, and they are

13   comparing the shapes.  Are they the same or are they

14   different?  That's what the claim says.

15           At best we haven't had the burden of proof met to

16   show that this is indefinite.  It can't be reasonably certain

17   about what it means.  I think reading claim 19, as wordy as

18   it is, it says what it means.  We can objectively determine,

19   when you look at the outer perimeter to get a shape, whether

20   that shape is the same or different to another shape.  There

21   is no subjectivity required.  The case law that they cited

22   says it requires subjective determination.

23           THE COURT:  Okay.  Anything else you want to add,

24   Mr. Brady?  You've got one second.

25           MR. BRADY:  Thank you very much for your time, Your

```
 1   Honor.
 2           THE COURT:  I'll give each of you five minutes to
 3   say anything you want.
 4           MR. MAIDMAN:  Your Honor, plaintiffs brought up one
 5   additional proposed construction in their responsive brief
 6   that it might make sense to address.
 7           THE COURT:  What was it?  Maybe I didn't pick it up.
 8   Okay.  What is it?
 9           MR. MAIDMAN:  You want to start, since it's your
10   construction?
11           I can go ahead.
12           THE COURT:  What are the words?
13           MR. MAIDMAN:  So we are on --
14           THE COURT:  What is the claim number, claim what?
15           MR. MAIDMAN:  This is in claim 18 of the '888
16   patent.
17           THE COURT:  18.  What are the words that you want to
18   define?
19           MR. MAIDMAN:  So this was plaintiffs' proposed
20   construction, and it's "mesh material."
21           THE COURT:  I thought maybe I had something on that.
22   Maybe I missed it.
23           MR. MAIDMAN:  So this wasn't on the parties' joint
24   list.
25           THE COURT:  It wasn't on the joint list?
```

1          MR. MAIDMAN:  Right.  It appears for the first time

2    in plaintiffs' opening brief.  So Aqua-Leisure responded to

3    it in its responsive brief just in case.

4          THE COURT:  Well, let's see where we are going.

5          MR. MAIDMAN:  Sure.

6          THE COURT:  It's "mesh material," and what does the

7    plaintiff claim it means?

8          MR. MAIDMAN:  So SwimWays' proposed construction is

9    that a mesh material is a pattern, such as a weave, that can

10   allow water to flow through.  Our proposed construction,

11   Aqua-Leisure's proposed construction, which is consistent

12   with the specification of the '888 patent, is that mesh, on

13   one hand, and nylon or polyester on the other hand, are

14   different.

15         Now, you can turn to Page 87 of the presentation, so

16   you can see the claim term in context in claim 18.

17         THE COURT:  SwimWays says a mesh material is a

18   pattern such as a weave that can allow water to flow through.

19         MR. MAIDMAN:  So Aqua-Leisure disagrees with that

20   construction.

21         THE COURT:  Mesh and nylon and polyester are

22   different?

23         MR. MAIDMAN:  Right.  So if you turn to Page 88 of

24   the presentation, I can explain the reason behind

25   Aqua-Leisure's position.

1          THE COURT:  What is this you reported, "In a
2    preferred embodiment, the center portion of the flexible
3    panel is mesh to allow water to flow through while the
4    perimeter edges are nylon or polyester."
5          MR. MAIDMAN:  So that is -- I'm sorry.  Where were
6    you reading from?
7          THE COURT:  Page 88.
8          MR. MAIDMAN:  I'm sorry.  I should back up.  I think
9    we should start with 87, which has the claim language where
10   it appears.
11         THE COURT:  Yes.  It says, "...mesh material such
12   that at least a portion of the user's body is exposed to
13   water when the user is disposed on the apparatus, and the
14   second flexible material is at least one of nylon material or
15   a polyester material."
16         MR. MAIDMAN:  Right.  So the claim itself
17   distinguishes between mesh material on the one hand, which is
18   the first flexible material, and at least one of a nylon or a
19   polyester material on the other hand, which is the second
20   flexible material.
21         THE COURT:  Didn't define the first flexible
22   material, only defines the second flexible material; is that
23   your point?
24         MR. MAIDMAN:  Well, my point is it actually defines
25   both flexible materials.  It defines the first flexible

material as being formed with a mesh material, that's number
one; and then number two, the second flexible material is at
least one of a nylon material or polyester material.  So they
are different.

THE COURT:  So you say it's not mesh?

MR. MAIDMAN:  Right.  So, yeah, mesh is not nylon or
polyester.  That's what the claim language is saying, because
it distinguishes between mesh material on one hand --

THE COURT:  Well, let me --

MR. MAIDMAN:  -- and nylon and polyester on the
other.

THE COURT:  What do you contend is mesh, so I'll
understand?  Here we have the bottom touching water, you say.
So it touches water, but you are saying that it is not mesh,
it's nylon; is that right?

MR. MAIDMAN:  No.  So the first flexible material is
mesh.  But the second flexible material is at least one of a
nylon or a polyester.  So what I'm saying is that the mesh
cannot be nylon or polyester because those are what the
second flexible material is.

THE COURT:  Well, let's take a look at where in here
is the first flexible material and where is the second
flexible material.  Take a look at it with regard to the
diagrams.  Where is the first flexible material and where is
the second flexible material?

```
 1              MR. MAIDMAN:  Sure.  So if we can take a look at

 2      figure 1.

 3              THE COURT:  I'm looking at figure 1.

 4              MR. MAIDMAN:  So the first flexible material is the

 5      interior region that we were talking about in the middle.

 6              THE COURT:  That is mesh?

 7              MR. MAIDMAN:  Yes.  So that's a donut hole.  And

 8      then the donut, which goes on the outside, is the second

 9      flexible material.

10              THE COURT:  Where?

11              MR. MAIDMAN:  So that is -- so there is the oval in

12      the middle -- well -- almost complete oval.

13              THE COURT:  Figure 1, I see, 16, 14, 12, are the

14      only numbers.

15              MR. MAIDMAN:  Yes.  So I believe 14 is referring to

16      the first flexible material.

17              THE COURT:  Okay.  You say 14 is the first flexible

18      material.

19              MR. MAIDMAN:  Then the cylinder, cylindrical portion

20      that goes around 14 is the second flexible material.

21              THE COURT:  Where is the second flexible material?

22      Number 12?

23              MR. MAIDMAN:  So it looks like it would be 12 in

24      this figure, just as an example.

25              THE COURT:  So the second flexible material is not
```

1   mesh?

2           MR. MAIDMAN:  Right.  It has to be nylon or

3   polyester, and then, equally, the inner portion, 14, cannot

4   be nylon or polyester, it can only be mesh.  Because the

5   claim distinguishes --

6           THE COURT:  Why can't it be nylon or polyester?

7           MR. MAIDMAN:  Well, I mean, technically it could in

8   real life, but that's how the patentees chose to define their

9   invention.

10          THE COURT:  It doesn't define the mesh material?

11          MR. MAIDMAN:  Well, it distinguishes mesh material

12   from nylon material.

13          THE COURT:  The definition I saw, that's the

14   material.

15          MR. MAIDMAN:  Oh, yes, sir.

16          THE COURT:  Now, the mesh material, most of the mesh

17   might be anything.

18          MR. MAIDMAN:  Well, it distinguishes between mesh on

19   the one hand and nylon or polyester on the other, and then if

20   you look at --

21          THE COURT:  Would you say -- you know, when we were

22   in Korea there were nylon hoses coming over all the time.  So

23   was it -- is that what that was, one of those old nylon hoses

24   we used to order from Sears Roebuck to sell on the black

25   market?

```
1              The mesh could be anything, and it's just mesh.

2              MR. MAIDMAN:  But that's not how the patentees

3     defined the words, and that's important here.

4              THE COURT:  Show me where the patent defines the

5     mesh.

6              MR. MAIDMAN:  Sure.  So if you look at column 3,

7     line 6 to 9 of the patent.

8              THE COURT:  All right.  Column 3, line 69.  Column

9     3, line 69 of the patent.

10             MR. MAIDMAN:  So it says, "In a preferred

11    embodiment, the center portion of the flexible panel is mesh

12    to allow water to flow through while the perimeter edges are

13    nylon or polyester."

14             THE COURT:  Well, that's what you got right here.

15             MR. MAIDMAN:  Right.  So what I'm saying is that

16    there is mesh on one hand and then nylon or polyester on the

17    other, and the mesh cannot be nylon or polyester.  That's

18    what the language says.

19             THE COURT:  I'm sorry.  I can't buy that.  I'll be

20    very frank.  Unless a mesh is defined somewhere, what the

21    outside -- the second flexible material has to be according

22    to this nylon or polyester.

23             MR. MAIDMAN:  Right.  So the mesh is defined as not

24    mesh or polyester.

25             THE COURT:  It could be most anything.  It could be
```

1   fiberglass.

2          MR. MAIDMAN:  It could, right.

3          THE COURT:  Could be anything.

4          MR. MAIDMAN:  But it couldn't be nylon or polyester.

5          THE COURT:  Can only be fiberglass, then?

6          MR. MAIDMAN:  No, it cannot be nylon or polyester.

7          THE COURT:  Could only be fiberglass?  I don't know

8   any other mesh other than fiberglass.

9          MR. MAIDMAN:  It could be anything but nylon or

10  polyester.

11         THE COURT:  It says that someplace.

12         MR. MAIDMAN:  It distinguishes the mesh.

13         THE COURT:  I understand.  It doesn't distinguish

14  the mesh.  It just defines what the second flexible material

15  is, but I understand your argument.  You say if you define

16  one material, it means the other can't be the same; correct?

17         MR. MAIDMAN:  Correct.

18         THE COURT:  If you define anything, then everything

19  else has to be different; right?

20         MR. MAIDMAN:  No, but in this context, that is

21  what's happening.  And then the last point is that plaintiffs

22  define mesh as a weave, but there is no basis for that in the

23  specification.  I mean, my suit is woven.

24         THE COURT:  I don't have any problem with mesh, and

25  neither do you, and we all know that it means something that

```
 1   will allow air or water to pass through it.

 2        MR. MAIDMAN:  To flow through, right, but not as a

 3   weave because that's too broad.

 4        THE COURT:  Sometimes woven, sometimes it isn't

 5   woven, depends on how much one wants to pay.  If you want to

 6   pay a lot, you have it woven.  If you don't want to pay a

 7   lot, it isn't woven.  Frankly, I'm worried about it.  The

 8   mesh does not have to be -- can't be nylon or polyester.  I'm

 9   afraid it can be.  I'm sorry but I don't see any problem with

10   it.  It isn't defined.  If you define it, that's one thing.

11   What defines one material does not necessarily mean other

12   material is defined the same way.  I'm sorry.  I'm just not

13   going to do it.

14        MR. MAIDMAN:  I think simply defining mesh as a

15   weave is too broad because other materials are also weaved.

16   That is my last point.

17        THE COURT:  Well, thank you.  I don't mean to be

18   cutting you off.  I think we've got it all, haven't we?

19        MR. BRADY:  Yes, Your Honor.

20        THE COURT:  I'm going to give you five minutes each

21   side to say anything you want.  You can either talk about the

22   weather.  I don't care.  You got anything you want to add,

23   Mr. Brady?

24        MR. BRADY:  Your Honor, I think we have addressed

25   all the points that plaintiffs wish to raise.  Very few terms
```

```
 1    require construction, and the weather is absolutely

 2    beautiful.  So we appreciate time.

 3            THE COURT:  Maybe you can go to Virginia Beach.  You

 4    know the other day I was out looking at the beach -- it was

 5    in February -- and people were out on the beach actually

 6    swimming in February.  Then came March, and we had the winter

 7    follows the summer, literally the winter following the

 8    summer.  We had 80 degree temperatures in February.

 9            MR. BRADY:  We had our peach tree bloom in February

10    to be frozen over in March.

11            THE COURT:  Thank you.

12            MR. BRADY:  Thank you, Judge.

13            THE COURT:  All right.

14            MR. HAMELINE:  Your Honor, thank you for your time.

15    Thank you for everyone's time.  Really do appreciate your

16    patience and your trying very hard to dig into what are not

17    complex products but very complex language in the patent, to

18    try to distinguish what are fairly simple ideas here.  I do

19    appreciate it.

20            THE COURT:  I appreciate your arguments, and I

21    appreciate more the memorandum first.  I'm sorry I missed

22    this question about mesh.

23            MR. HAMELINE:  It came up at a late date, and it was

24    sort of added to some of these.  I appreciate your dealing

25    with that.
```

```
 1          THE COURT:  Didn't have anything on it, but I don't
 2    mean to be downing everyone.  I just am not going to define
 3    something that's not defined.
 4          MR. HAMELINE:  Understood, Your Honor.  We have
 5    opinions; they have opinions.  You make the decision, and
 6    that's it.  It's done.  Thank you very much.  Appreciate your
 7    time.
 8          THE COURT:  Thank you very much.  I really
 9    appreciate it.  We will see where we go from there.  Nothing
10    else, we will recess.  We are 10 minutes early.
11          (Hearing adjourned at 4:35 p.m.)
12                       CERTIFICATION
13
14       I certify that the foregoing is a correct transcript
15    from the record of proceedings in the above-entitled matter.
16
17
18          X_____/s/_____x
19                    Jody A. Stewart
20          X_____4-6-2017 _____x
21                       Date
22
23
24
25
```

JODY A. STEWART, Official Court Reporter