## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

SWIMWAYS CORPORATION, ET AL.,

     **Plaintiffs,**

     **v.**                       **CIVIL NO. 2:16cv260**

AQUA-LEISURE INDUSTRIES, INC.,

     **Defendant.**

### ORDER

This matter comes before the Court pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), to construe certain terms contained in the following three patents, which are at issue in the instant case: (1) Patent No. 8,066,540 ("the '540 Patent"); (2) Patent No. 8,657,640 ("the '640 Patent"); and (3) Patent No. 8,079,888 ("the '888 Patent") (collectively, the "Asserted Patents").

On February 7, 2017, Swimways Corporation and Kelsyus LLC ("Plaintiffs") and Aqua-Leisure Industries, Inc. ("Defendant") submitted their Joint Statement on Claim Construction in which they identified nineteen disputed claims from the Asserted Patents and provided proposed constructions. ECF No. 38. The parties then fully briefed the issue and identified two additional disputed terms. See Plaintiffs' Opening Claim Construction Brief ("Pl. Br."), ECF No. 45; Defendant's Opening Claim Construction Brief ("Def. Br."), ECF No. 46; Plaintiffs' Response ("Pl. Resp."), ECF No. 55; and Defendant's Response ("Def. Resp."), ECF No. 56. On April 4, 2017, the Court conducted a Markman hearing during which the parties presented argument and evidence in support of their respective constructions. See ECF No. 60. The Court's rulings on the parties' disputed claim terms are contained herein.

1

## I.  LEGAL STANDARDS

A patent contains two distinct elements, a specification and claims, which serve to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996) (internal quotation omitted).  The purpose of the specification is two-fold: (i) to describe the invention, including how to make it and how to use it, "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same" and (ii) "to set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a).  The claims, which come at the end of the patent document, must "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention." Id. § 112(b).  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innoval Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

### A.  CLAIM CONSTRUCTION

Construing the meaning of the words contained in a claim is a matter of law to be determined by the Court.  Markman, 517 U.S. at 388 (1996).  The purpose of such claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

#### 1.  Presumption of Plain and Ordinary Meaning

"In construing patent claims, there is a heavy presumption that a claim term carries its ordinary and customary meaning." 3M Innovative Properties Co. v. Avery Dennison Corp., 350 F.3d 1365, 1370 (Fed. Cir. 2003).  "[T]he ordinary and customary meaning of a claim term is the

2

meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313. Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words." Id. at 1314. As the Federal Circuit has repeatedly held, "a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (footnote omitted).

In other cases, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." Phillips, 415 F.3d at 1314. In such cases, the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Id. (internal quotation marks omitted). These sources include intrinsic evidence (discussed below) and, where relevant, extrinsic evidence, such as relevant scientific principles and the meaning of relevant technical terminology. Id.

### 2. Intrinsic Evidence

The Court begins with the patent's intrinsic record, which consists of the claims, the specification, and the prosecution history. Markman, 52 F.3d at 979. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitrionics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

First, the Court looks to "the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Vitrionics, 90 F.3d at 1582. "If the claim language is clear on its face, then [the Court's] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). As the Federal Circuit has recently reiterated, there are only two circumstances in which claim interpretation may deviate from the ordinary and customary meaning of the claim terms: "1) when a patentee sets out a definition and acts as its own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012); see also Phillips, 415 F.3d at 1316–17; Interactive Gift Express, 256 F.3d at 1331. But, in order for an inventor to disavow the full scope of a claim, an "exacting" standard must be met. Thorner, 669 F.3d at 1366.

When construing claim language, the Court must apply a presumption of claim differentiation. See Marine Polymer Technologies, Inc. v. HemCon, Inc., 672 F.3d 1350, 1368 (Fed. Cir. 2012) ("Where a particular construction of an independent claim would nullify claims that depend from it, the doctrine of claim differentiation creates a presumption that such a construction is improper."); Merck & Co., Inc. v. Teva Pharm. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (recognizing that while "the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope"). This presumption can be rebutted, however, where "the circumstances suggest

4

a different explanation, or if the evidence favoring a different claim construction is strong[.]" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004).

After the claim language, the Court next looks to the specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitrionics, 90 F.3d at 1582. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." Markman, 52 F.3d at 979. It "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Id.

The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." Id. at 1315 (quoting Vitrionics, 90 F.3d at 1582). However, the Court must take care not to limit the claims based on specific embodiments from the specification. Phillips, 415 F.3d at 1323.

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.

Id.

In addition to the specification, the Court "should also consider the patent's prosecution history, if it is in evidence." Markman, 52 F.3d at 980. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the

examination of the patent." Phillips, 415 F.3d at 1317; Vitrionics, 90 F.3d at 1582. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent," but "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.

### B.   INDEFINITE CLAIMS

The Federal Circuit has instructed that, pursuant to 35 U.S.C. § 112, "the language of the claims must make it clear what subject matter they encompass." PPG Industries, Inc. v. Guardian Industries Corp., 75 F.3d 1558, 1562 (Fed. Cir. 1996). An applicant meets this requirement by providing claims that have readily understandable boundaries of the claim's scope to "those skilled in the art of the scope of the invention." S3 Inc. v. NVIDIA Corp., 259 F.3d 1364, 1367 (Fed. Cir. 2001). On the other hand, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014). "Any fact critical to a holding on indefiniteness, moreover, must be proven by the challenger by clear and convincing evidence." Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1366 (Fed. Cir. 2003).

### II.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS

Below is a chart containing a summary of the parties' disputed claim terms and the Court's ruling on each term. A discussion of the Court's reasoning is contained in the next section. See infra Part III.

| Disputed Term | Claims at Issue | Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Court's Ruling |
|---|---|---|---|---|
| **TERM 1**<br>seated position | '540 Patent:<br>Claims 1, 21 & 23<br><br>'640 Patent:<br>Claims 1 & 4 | An upright-seated position and a reclined seated position, but not a prone (or supine) position. | Position with the torso erect and the legs bent; not a lying or prone position. | **Includes an upright-seated position and reclined position, but not a prone position.** |
| **TERM 2**<br>foot support /<br>foot support<br>member | '540 Patent:<br>Claim 23<br><br>'640 Patent:<br>Claim 5 | A member that supports a user's feet, but not necessarily different or separate from the buoyant member. | A segment of the apparatus separate from the buoyant support member, that supports the user's feet and is attached to the flotation device via the panel, a rod, a tether, or the spring. | **A member that supports a user's feet, but not necessarily different or separate from the buoyant member.** |
| **TERM 3**<br>apparatus | All claims in the Asserted Patents | Plain and ordinary meaning, which does not require a spring. | The collapsible flotation device which includes a coilable spring. | **Plain and ordinary meaning, which does not require a spring.** |
| **TERM 4**<br>back support<br>member / back<br>support portion | '540 Patent:<br>Claims 1, 21 & 23<br><br>'640 Patent:<br>Claims 1 & 2 | Plain and ordinary meaning, which does not require a "separate segment" or providing support "over and above the perimeter buoyant member." | Indefinite – the specification refers to a back support member only.<br><br>Alternatively:<br>The back support portion of the device is a separate part of the inflatable member, which provides back support over and above the perimeter buoyant member, for the user to float in a seated position.<br><br>The back support member is a separate segment of the inflatable flotation device. | **Not indefinite.**<br><br>**Plain and ordinary meaning.**<br><br>**The terms "back support member" and "back support portion" may or may not be interchangeable depending on the context in which they are used.** |
| **TERM 5**<br>coupled | '540 Patent:<br>Claim 1<br><br>'640 Patent:<br>Claims 3 & 9 | Plain and ordinary meaning. | Physically joined. | **Plain and ordinary meaning, which does not require being physically joined.** |
| **TERM 6**<br>opening | '540 Patent:<br>Claims 22 & 23<br><br>'640 Patent:<br>Claim 1 | Relates to the shape of the panel or inflatable member, but does not require a physical hole. | Requires a physical hole without a covering. | **Plain and ordinary meaning, which does not require a physical hole.** |

| Disputed Term | Claims at Issue | Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Court's Ruling |
|---|---|---|---|---|
| **TERM 7**<br>**buoyant member** | '540 Patent:<br>Claims 1, 2, 3, 21 & 23 | Plain and ordinary meaning, e.g., a member providing buoyancy, which may be or include an inflatable bladder, which does not require the buoyant member to be physically separate or "separate from the back support member." | Part of the inflatable flotation device, separate from the back support member, support member and the foot support member, which enables flotation, being comprised of an inflatable bladder or bladders. | **Plain and ordinary meaning, which does not require an inflatable-bladder component or separation from the back support member, support member, or the foot support member.**<br>**Merely a "buoyant" member.** |
| **TERM 8**<br>**buoyant member having a first portion and a second portion** | '540 Patent:<br>Claims 1 & 21 | Plain and ordinary meaning, which does not require physically separate parts (i.e., the portions may be portions of a single buoyant member) and is not limited to inflatable bladders. | Separate parts of the buoyant member, such as separate inflatable bladders. | **Plain and ordinary meaning, which does not require physically separate parts and is not limited to an "inflatable" member.** |
| **TERM 9**<br>**extending continuously** | '540 Patent:<br>Claim 1 | The entire claim element requires the inner portion to extend between the first and second portions of the buoyant member without an intervening buoyant member.<br><br>Does not require physically separate portions. | Material extending completely and without interruption from one separate portion of the buoyant member (such as a separate inflatable bladder) to another separate portion of the buoyant member on the opposite side of the inner panel. | **The term "continuously" means uninterrupted by an intervening buoyant member.**<br>**Otherwise, plain and ordinary meaning applies.** |
| **TERM 10**<br>**buoyant member disposed within at least a portion of the outer portion of the panel** | '540 Patent:<br>Claims 1, 2, 21 & 23 | Plain and ordinary meaning, which does not require a "coilable spring" or a "spring which forms the outer part of the panel." | The buoyant member is disposed within at least a portion of the coilable spring that forms the outer part of the panel. | **Plain and ordinary meaning, which does not require a spring.** |
| **TERM 11**<br>**mesh material being disposed at least between the back support portion and a support portion defined by the panel** | '540 Patent:<br>Claim 23 | Plain and ordinary meaning, which is not limited to (1) "one piece of mesh," (2) where the mesh connects to the apparatus, or (3) forming a "hammock-like spring [sic]". | One piece of mesh connected to the back support portion on one end and connected to the support portion on the other end of the opening, forming a hammock-like sling. | **Plain and ordinary meaning.** |

8

| Disputed Term | Claims at Issue | Plaintiffs' Proposed Construction | Defendant's Proposed Construction | Court's Ruling |
|---|---|---|---|---|
| **TERM 12**<br>**support portion** | '540 Patent:<br>Claim 23 | Plain and ordinary meaning, which is not limited to a "spring, rigid support or semi-rigid support or a separate inflatable bladder." | A spring, rigid support or semi-rigid support or a separate inflatable bladder. | **Plain and ordinary meaning.** |
| **TERM 13**<br>**the user's back is collectively supported by the back portion of the mesh membrane and the back support portion of the inflatable member** | '640 Patent:<br>Claim 1 | Plain and ordinary meaning, which is not limited to "same piece of mesh membrane connected to the support portion covers the seat portion and is attached to the back support portion forming a hammock-like sling with the mesh supporting that user." | The same piece of mesh membrane connected to the support portion covers the seat portion and is attached to the back support portion forming a hammock-like sling with the mesh supporting that user. | **Plain and ordinary meaning.** |
| **TERM 14**<br>**a second flexible material defining an inflatable chamber** | '888 Patent:<br>Claim 15 | Plain and ordinary meaning, which is not limited to an "air tight material … form[ing] the bladder for the inflatable chamber." | Air tight material which forms the bladder for the inflatable chamber. | **Plain and ordinary meaning, which does not require that the second flexible material form or create the inflatable chamber.** |
| **TERM 15**<br>**coupled** | '888 Patent:<br>Claim 15 | Plain and ordinary meaning. | Physically joined or attached. | **Plain and ordinary meaning, which does not require being physically joined or attached.** |
| **TERM 16**<br>**fixedly coupled** | '888 Patent:<br>Claim 15 | Plain and ordinary meaning. | Indefinite. | **Not indefinite.**<br>**Plain and ordinary meaning.** |
| **TERM 17**<br>**first flexible material / second flexible material** | '888 Patent:<br>Claim 15 | Plain and ordinary meaning. | Different types of flexible material. | **Plain and ordinary meaning.** |
| **TERM 18**<br>**collectively defining an interior region** | '888 Patent:<br>Claim 15 | Plain and ordinary meaning. | The exterior of the pillow extends within the inner perimeter of the second material and together they define the interior region. | **Plain and ordinary meaning.** |
| **TERM 19**<br>**different than the shape** | '888 Patent:<br>Claim 19 | Plain and ordinary meaning. | Indefinite. | **Not indefinite.**<br>**Plain and ordinary meaning.** |
| **TERM 20**<br>**mesh material** | '888 Patent:<br>Claim 18 | A pattern, such as a weave, that allows water to flow through. | Material other than nylon or polyester. | **Plain and ordinary meaning.** |

## III.   DISCUSSION

### 1.   "seated position" – Claims 1, 21 & 23 of the '540 Patent; Claims 1 & 4 of the '640 Patent

Plaintiffs and Defendant have already appeared in this Court and disputed the construction of **Term 1** before United States District Judge John A. Gibney, Jr. in the following suit: Swimways Corporation, et al., v. Aqua-Leisure Industries, Inc., Civil Case No. 3:12cv205. In that case, Judge Gibney construed the term "seated position" with respect to the '540 Patent, finding that the term "includes an upright-seated position and reclined seated position, but not a prone position." See October 23, 2013 Markman Order, Case No. 3:12cv205, Dkt. No. 38 (Term 5). Importantly, the '640 Patent now at issue is in the same family as the '540 Patent and contains the same specification as the '540 Patent except for one additional figure (Figure 4A) added to the '640 Patent's specification. See Pl. Br. at 2–3; '640 Patent at Fig. 4A.

The Court finds that, in light of the claim language and the specification of both the '540 and '640 Patents, Judge Gibney's construction of Term 1 is appropriate. See, e.g., '540 Patent at 4:17–19 and '640 Patent at 4:22–24 (". . . the back support may be configured to recline at various angles . . .") (emphasis added); '540 Patent at 6:29–30 and '640 Patent at 6:38–40 (differentiating between an "upright-seated position" and other seated positions). Therefore, the Court adopts Judge Gibney's prior construction of **Term 1** in the instant case. See DE Techs., Inc. v. IShopUSA, Inc., 826 F. Supp. 2d 937, 941 (W.D. Va. 2011) (finding that the court's prior Markman rulings should be given "deferential treatment unless clearly erroneous") (internal citation omitted).

### 2.   "foot support" / "foot support member" – Claim 23 of the '540 Patent; Claim 5 of the '640 Patent

Like Term 1 above, **Term 2** has already been construed by Judge Gibney with respect to the '540 Patent in Case No. 3:12cv205 in this Court. See October 23, 2013 Markman Order,

Dkt. No. 38 (Term 6, "foot support"). The Court finds no error in Judge Gibney's conclusion that "[n]othing in the claims or specification require this Court to limit the definition of foot support to a <u>different</u> member from the buoyant member" as Defendant proposes. <u>Id.</u> Notably, the description of Figure 1 in both the '540 and '640 Patents expressly states that, in cases of inflatable foot members, the foot support member "may be inflated . . . <u>by connecting the inflatable bladder . . . to the foot support member</u> to provide air pressure within the foot support member." '540 Patent at 6:46–50 (emphasis added); '640 Patent at 6:56–60 (emphasis added). It follows that the foot support does not necessarily need to be different or separate from the buoyant member because the common specification teaches that they could be seamlessly connected. Therefore, the Court adopts Judge Gibney's prior construction of **Term 2** in the instant case. <u>See</u> <u>DE Techs., Inc.</u>, 826 F. Supp. 2d at 941.

### 3. "apparatus" – All Claims in the Asserted Patents

While each of the asserted claims in this case contains the term "apparatus" in the preamble, none of the asserted claims refers to a "coilable spring." Nonetheless, Defendant argues that **Term 3** must be given a limiting construction to account for what was actually invented in each of the Asserted Patents, which, according to Defendant, is a collapsible flotation device <u>with a coilable spring</u>. Def. Br., ECF No. 46 at 10. In support, Defendant emphasizes the fact that "no embodiments or examples disclosed in any of the patents are of an apparatus that does not contain a spring." <u>Id.</u>

The Court notes at the outset that, in the prior litigation before Judge Gibney, Defendant tried to import a spring limitation from the '540 Patent's specification into its claims by proposing that the term "panel" be construed as "having a circumferentially attached spring" even though the claims at issue did not reference a spring. Case No. 3:12cv205, October 23, 2013 Markman Order, Dkt. No. 38 at 4. Judge Gibney rejected Defendant's limiting

11

construction of "panel," relying on the Federal Circuit's guidance that a court's claim construction "must not import limitations from the specification into the claims." Id. (quoting Deere & Co. v. Bush Hog, LLC, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (internal citation omitted)). This principle applies here too for several reasons.

First, a special definition of the otherwise unambiguous term "apparatus" is not specified in any of the Asserted Patents in this case. See Interactive Gift Express, 256 F.3d at 1331; see also Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299–300 (Fed. Cir. 2014) (construing "rod" according to its ordinary and plain meaning where there was "no indication or reference in the specification that 'rod' mean[t] 'rod-plus-container.'"). Nonetheless, Defendant argues that the Court should limit preamble language like "apparatus" where it is necessary to give "life and meaning" to the claim. Def. Br., ECF No. 46, at 5 (citing Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251 (Fed. Cir. 1989)). But Corning Glass Works is clearly distinguishable. In that case, the disputed preamble term was not a general term like "apparatus" but rather a technical term related to fiber optics ("optical waveguide"), which was specifically defined in the patent's specifications. Id. at 1256; see also Merck, 395 F.3d at 1370 ("When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description."). Such is clearly not the case here, where nothing in the patent specifications indicates that the term "apparatus" deviates from its plain and ordinary meaning.

Second, a close reading of the Asserted Patents in this case shows that the spring-containing embodiments detailed in the specifications are meant to be exemplary, not coextensive with the claims. See Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (noting the difference between embodiments intended to be instructional examples and those

intended to be exhaustive). For example, the Detailed Description of the Preferred Embodiments in the '888 Patent states that the "description is of the best presently contemplated modes of carrying out the invention," and are "not to be taken in a limiting sense." '888 Patent at 2:48–50. It goes on to state "that many modifications may be made [to the described embodiments] without departing from the spirit thereof" and that the patent claims are "intended to cover such modifications as would fall within the true scope and spirit of the present invention." Id. at 4:4–8. The '540 and '640 Patents contain similar instructional disclaimers. See, e.g., '540 Patent at 14: 22–23; '640 Patent at 14:33–36.

Finally, the doctrine of claim differentiation precludes importing a spring limitation into the term "apparatus" as the Defendant proposes. All three Asserted Patents contain several claims that specifically reference a "spring" or "shape-retaining member," many of which are dependent on the asserted claims, which make no such reference. See, e.g., '540 Patent at Claims 4, 5, 8, 15 (reciting a "shape-retaining member"); '640 Patent at Claims 10, 11 (reciting a "shape-retaining member"); and '888 Patent at Claims 2, 11, 16 (reciting a "spring"). Therefore, under the doctrine of claim differentiation, the Court must presume that the dependent claims were specifically intended to add such a limitation and that such limitation is not otherwise present in the asserted claims. Phillips, 415 F.3d at 1315; see also Liebel-Flarsheim, 358 F.3d at 910 ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."). Furthermore, the presumption is unrebutted here because Defendant has offered no compelling evidence favoring a different construction. See Liebel-Flarsheim, 358 F.3d at 910.

For all of these reasons, the Court finds that **Term 3** does not require construction. The plain and ordinary meaning of this term applies, which does not require a spring.

13

### 4. "back support member" / "back support portion" – Claims 1, 21 & 23 of '540 Patent; Claims 1 & 2 of '640 Patent

The Court does not find **Term 4** indefinite as Defendant suggests. Rather, the Court finds that the ordinary meaning of both "back support member" and "back support portion" in the asserted claims, as understood by a person of skill in the art, "is readily apparent to even lay judges." Phillips, 415 F.3d at 1314 (citation omitted). Therefore, claim construction here "involves little more than the application of the widely accepted meaning of commonly understood words." Id. And because these claims can be construed, they are not indefinite. Aero Prods. Int'l Inc. v. Intext Recreation Corp., 466 F.3d 1000, 1016 (Fed. Cir. 2006).

The plain and ordinary meaning of "portion" is a part of a larger whole. Depending on the context of a particular claim in the Asserted Patents, a "back support portion" can mean a portion of the "back support member" or it can mean a portion of the larger apparatus. Therefore, the terms "back support member" and "back support portion" could be interchangeable in some claims and distinct in other claims depending on the context in which they appear. In sum, no construction of **Term 4** is necessary. The plain and ordinary meaning of this term applies.

### 5. "coupled" – Claim 1 of '540 Patent; Claims 3 & 9 of '640 Patent

Defendant argues that the '540 and '640 Patent specifications require that the term "coupled" be construed as "physically joined" because several of the embodiments describe or depict "coupled" parts of the device as directly, physically joined. Def. Br., ECF No. 46 at 18– 20 (citing, e.g., '540 Patent at 8:64–9:6; '640 Patent at 9:4–16 (describing Figures 7A and 7B which distinguish between a membrane that is coupled and one that is not coupled to other members of the device)). Defendant claims that, without this limiting construction, the term "coupled" would be meaningless with respect to the invention because "each part of the float

would always be coupled to every other part of the float." Id. at 20.

Upon reviewing the claims at issue, the ordinary meaning of the term "coupled," as understood by a person of skill in the art, is readily apparent to the Court. Phillips, 415 F.3d at 1314. Nothing in this ordinary meaning of the term requires direct, physical joining. See, e.g., Couple (v.), Webster's Third New International Dictionary (3d ed. 1981) ("1. to connect for consideration together, or to join for combined effect; 2. to fasten together: join, link."). Indeed, the means by which components are "coupled" (e.g., directly or indirectly, with or without the use of intervening parts, etc.) is only limited, if at all, by other elements in the claims.

Nothing in the patent specifications indicates that the patentee intended to limit or alter the ordinary meaning of "coupled." In fact, the descriptions of Figure 7A and 7B, which are cited by Defendant, use the terms "coupled" and "attached" interchangeably. See '540 Patent at 8:64–9:6; '640 Patent at 9:4–16. In a second example, which is highlighted by Plaintiffs, the specification describes a spring being "coupled to the panel (e.g., by way of a sleeve, etc.)," revealing that the components are joined or attached but not directly or physically so. See '540 Patent at 5:29–31 (emphasis added); '640 Patent at 5:39–41 (emphasis added).

Finally, in the case cited by Defendant, Medtronic Sofamore Danel USA, Inc. v. Glibus Med., Inc., the court construed the term "coupled" to mean "joined, linked or fastened together" based on the parties' agreement to construe it "according to its ordinary meaning, as evidenced by general purpose dictionaries." No. 06-4248, 2008 WL 732022, at *17 (E.D. Pa. Mar. 18, 2008), aff'd sub nom. Warsaw Orthopedic, Inc. v. Globus Med., Inc., 416 F. App'x 67 (Fed. Cir. 2011); see Def. Br., ECF No. 46 at 20. Contrary to Defendant's position, nothing in this definition implies direct, physical joining.

In sum, the Court finds that no construction of **Term 5** is required. The plain and

ordinary meaning of the term applies, which does not require being physically joined.

### 6. "opening" – Claims 22 & 23 of '540 Patent; Claim 1 of '640 Patent

**Term 6** was not initially identified in the parties' Joint Statement on Claims Construction but surfaced as an additional disputed term in the parties' briefing. See Pl. Br., ECF No. 45 at 16; Appendix to Def. Resp., ECF No. 56-1. The parties dispute whether the term "opening" means a physical hole. Plaintiffs argue that the terms "opening" and "hole" are used differently in the patents and therefore must have different meanings. Pl. Br., ECF No. 45 at 16. For example, Plaintiffs highlight the fact that Claim 6 of the '640 Patent recites a "hole between the leg support portion and the foot support member" rather than using the term "opening," and that the common specification for both the '540 and '640 Patents states that, in some embodiments, "the outer portion of the panel can include . . . a hole or opening . . ." Id. (citing '640 Patent at 15:17–18 and '540 Patent at 3:40 (emphasis added)). From this, Plaintiffs conclude that the term "opening" "relates to the shape of the panel or inflatable member (such as a toroidal shape or a loop shape), but does not require a physical hole." Id. Defendant rejects Plaintiffs' construction as deviating from the plain meaning of "opening," which in Defendant's view, cannot be covered. Appendix to Def. Resp., ECF No. 56-1.

The Court begins with the ordinary meaning of "opening." When used in the physical sense, the term "opening" means a gap or vacant space in a structure. See, e.g., Opening (n.), Oxford English Dictionary (OED Online, March 2017) ("9.(a). a vacant space between portions of solid matter; a gap, hole, or passage; an aperture"); Opening (n.), Webster's Third New International Dictionary (3d ed. 1981) ("something that is open: as (a) (1): breach, aperture"). Therefore, in the ordinary usage of the term, an "opening" can be covered or crossed by some other structure or material. The "opening" merely refers to the gap or space in the structure itself.

16

Nothing in the claims or specification suggests that the patentee intended to limit or alter this ordinary meaning of "opening." For example, Claims 23 and 23 of the '540 Patent shows that the patentee did not contemplate than an "opening" in the device would necessarily require a wholly vacant space that would allow objects, such as legs, to pass through. Claim 22 recites "the panel defining an opening configured to collectively receive a user's legs therethrough . . ." '540 Patent at 17: 42–45. By contrast, Claim 23 recites "the panel defining an opening" with no mention of such opening being configured to receive a user's legs therethrough. Id. at 18:11–12. Moreover, Claim of the '640 Patent recites "the mesh membrane disposed entirely over the opening of the inflatable member," which shows that the term "opening" with respect to this invention does not preclude an opening that is covered. See '640 Patent at 14: 46–47 (emphasis added). Thus, the term's usage in the asserted claims is consistent with the ordinary meaning of "opening," which is not limited to an uncovered, physical hole. Similarly, nothing in the specification indicates that the patentee disavowed or redefined this ordinary meaning of "opening." Thorner, 669 F.3d at 1365.

For these reasons, the Court finds that the ordinary and plain meaning of **Term 6** applies, which does not require a physical hole.

### 7.    "buoyant member" – Claims 1, 2, 3, 21 & 23 of '540 Patent

The ordinary meaning of "buoyant member" in the asserted claims, as understood by a person of skill in the art, is "readily apparent" to the Court. Phillips, 415 F.3d at 1314. Therefore, the "widely accepted meaning" of these "commonly understood words" applies, id., which is a member providing or enabling buoyancy.

Defendant proposes a limited construction of **Term 7**, which would require an inflatable-bladder component as well as "separateness" from the back support member, support member, and the foot support member. See Def. Br., ECF No. 46 at 21. But imposing such limitations is

not supported by the claims or the specification. First, the specification expressly contemplates a "foam insert" as a potential buoyant member. '540 Patent at 13:61–14:13. Therefore, the term is clearly not limited to members "comprised of an inflatable bladder or bladders" as the Defendant proposes.

Second, the specification clearly states that, in some embodiments, the buoyant member and one or more other "members" of the apparatus can form one integral piece. See, e.g., '540 Patent at 8:10–12 ("In other embodiments, the support member, the inflatable bladder, and the back support member can form an integral piece."); '540 Patent at 6:24–26 ("In yet another embodiment, the back support member can be inflated by an inflatable bladder portion integrally formed with [the inflatable] bladder."). Therefore, "separateness" from other components of the apparatus is not implied by the term "buoyant member." Nor is the Court persuaded by Defendant's argument that the term "buoyant member" has to be separate from other members for the term to have any "real meaning." See Def. Br., EECF No. 46 at 21. The necessary delineation between various members of the device flows from the claims themselves, which describe the function and configuration of each member.

For these reasons, the Court finds that no construction of **Term 7** is necessary. The plain and ordinary meaning of the term applies, which does not require an inflatable-bladder component or separation from the back support member, support member, or the foot support member. It merely requires a "buoyant" member.

### 8.    "buoyant member having a first portion and a second portion" – Claims 1 & 21 of '540 Patent

With respect to **Term 8**, the Court again finds that claim construction "involves little more than application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. The Court does not find any ambiguity in the words of this term or in

18

the context in which they are used. As noted above, the plain meaning of "portion" means a part of a larger whole. Nothing in the ordinary meaning of the phrase "a first portion and a second portion" implies that such parts must be physically separate, as Defendant proposes. Nor does anything in the specification indicate that the patentee redefined or disavowed the ordinary meaning of the phrase "a first portion and a second portion" to impose such a limitation. See Thorner, 669 F.3d at 1366; Interactive Gift Express, 256 F.3d at 1331. To the extent Defendant argues that the two "portions" must be "separate" so as to be distinct, such distinction flows from the claims themselves.

Furthermore, the Court has already found that the term "buoyant member" is not limited to "being comprised of an inflatable bladder or bladders." See supra discussion of Term 7. Therefore, it follows that "portions" of such buoyant member are not necessarily comprised of inflatable members.

For these reasons, the plain and ordinary meaning of **Term 8** applies, which does not require physically separate parts and is not limited to an "inflatable" member.

### 9. "extending continuously" – Claim 1 of '540 Patent

**Term 9** appears in the following claim element of Claim 1: "the inner portion of the panel extending continuously between the first portion of the buoyant member and the second portion of the buoyant member without an intervening buoyant member." '540 Patent at 14:49–52 (emphasis added).

Defendant argues that the term "extending continuously" means that the panel must extend "completely and without interruption from one separate portion of the buoyant member (such as a separate inflatable bladder) to another separate portion of the buoyant member on the opposite side of the inner panel." Def. Br., ECF No. 46 at 21. However, much of this proposed construction relies on Defendant's proposed construction of Term 8 above, which attempts to

19

limit the meaning of the first and second "portions" of the buoyant member as being "separate," as in "separate inflatable bladders." The Court has already found that the plain and ordinary meaning of "first portion" and "second portion" applies. Therefore, the Court rejects Defendant's proposed construction of **Term 9** insofar as it rewrites these claim terms to require "separate portions" of the buoyant member or the presence of inflatable bladders.

The remainder of Defendant's proposed construction construes the term "extending continuously" to mean "extending completely and without interruption," as in without any holes or gaps, between "each claimed portion of the buoyant member." Def. Br., ECF No. 46 at 22. Defendant argues that this is the plain meaning of the term and that it is supported by the specification. Id. (comparing Figures 1 and 7A of the '540 Patent to show the difference between an inner panel that extends continuously and one that does not); see also Def. Resp., ECF No. 56 at 6.

Plaintiffs contest this construction of the term "extending continuously," claiming that Defendant ignores the end of the claim term – "without an intervening buoyant member" – which provides important context for the meaning of the term. Pl. Br., ECF No. 20 at 19. Plaintiffs explain that this specific claim element was added during prosecution of the parent patent in 2009 in order to overcome a prior art rejection. Id. at 20. The prosecution history reveals that the Examiner issued a rejection on the grounds that another patent disclosed a similar flotation device, which had an intervening buoyant member. Id. (citing Figure 1 of U.S. Patent 6,257,943, which depicts a flotation device with an inner panel that is interrupted by an intervening buoyant member in the center of the float). As a result, the parent-patent applicant submitted an amendment, which added the "extending continuously" phrase. Id. Then, this exact limiting phrase was included in Claim 1 of the '540 Patent, which is now at issue here. Id.

20

In light of the claim language and the relevant prosecution history, the Court finds that the word "continuously" in **Term 9** means "uninterrupted by an intervening buoyant member." See Philips, 415 F.3d at 1317 (holding that prosecution history often demonstrates how the inventor understood the invention and thus informs the meaning of the claim language). Otherwise, the plan and ordinary meaning of the term applies.

### 10. "buoyant member disposed within at least a portion of the outer portion of the panel" – Claims 1, 2, 21 & 23 of '540 Patent

With respect to **Term 10**, Defendant again seeks to impose a spring limitation into claim elements that make no reference to a spring. To support its limited construction, Defendant relies on references to a spring in both the Abstract and the Summary sections of the specification, the latter of which states: "The various collapsible flotation devices of the invention are formed from a panel including an inner portion and an outer portion, and a spring disposed about the outer portion of the panel . . ." Id. (citing Patent '540 at 3:6–9 (emphasis added)). From this and the patent's spring-containing embodiments, Defendant insists that the "the inventors made a coilable spring a necessary part of the device." Id.

Similar to the Court's findings with respect to Term 3 ("apparatus"), neither the claims nor the specification supports Defendant's rewriting of the phrase "outer portion of the panel" to mean "the coilable spring that forms the outer part of the panel." As discussed above, Judge Gibney already rejected Defendant's proposal to construe the term "panel" in the '540 Patent to mean a panel-with-a-spring. Case No. 3:12cv205, October 23, 2013 Markman Order at 4. This Court again finds that it cannot import a spring limitation from the specification and embodiments where no such limitation exists in the claims themselves. Philips, 415 F.3d at 1323.

Furthermore, the doctrine of claim differentiation disfavors reading a limitation into

21

asserted claims when that limitation is expressly included in other, nonasserted claims. Phillips, 415 F.3d at 1315; Liebel-Flarsheim, 358 F.3d at 910. For example, Claim 4 of the '540 Patent is dependent on Claim 1, which contains the disputed term at issue here. Claim 4 expressly adds the following limitation to Claim 1: ". . . a shape-retaining member disposed about the outer portion of the panel, the shape-retaining member being movable between a coiled configuration and an uncoiled configuration." '540 Patent at 15: 10–14. This dependent claim would be superfluous if Claim 1 already required a coilable spring to form the outer portion of the panel. Therefore, there is a strong presumption that the patentee specifically intended for the claims at issue here to not include a spring or other shape-retaining member. Liebel-Flarsheim, 358 F.3d at 910. Defendant has presented no compelling evidence to rebut this presumption.

For these reasons, the Court finds that **Term 10** does not require construction. The plain and ordinary meaning of this term applies, which does not require a spring.

### 11. "mesh material being disposed at least between the back support portion and a support portion defined by the panel" – Claim 23 of '540 Patent

With respect to **Term 11**, the Court again finds that claim construction "involves little more than application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. The Court does not find any ambiguity in the words of this term or in the context in which they are used. Nor is the ordinary meaning of any of these words redefined or disavowed in the specification. Thorner, 669 F.3d at 1365.

Defendant seeks to limit the ordinary meaning of **Term 11** in three ways: (1) by construing the phrase "mesh material" to mean "one piece of mesh;" (2) by construing the phrase "disposed at least between" to mean "connected to;" and (3) by adding the requirement that the mesh material form "a hammock-like swing." Def. Br., ECF No. 46 at 24. Defendant's only support for this limited construction is Figure 7A, which, according to Defendant, "illustrates

22

what the inventors meant with [**Term 11**]." Id. (citing '540 Patent at Sheet 7).  However, the Federal Circuit has clearly stated that limitations depicted in the specification must not be imported into the claims.  Deere & Co., 703 F.3d at 1354.  The features of Figure 7A are clearly exemplary and not required of every embodiment of the invention. See Philips, 415 F.3d at 1323.

In sum, the Court finds that no construction of **Term 11** is necessary.  The plain and ordinary meaning of this term applies.

### 12. "support portion" – Claim 23 of '540 Patent

With respect to **Term 12**, the Court again finds that claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314.  A support portion is a portion that provides support.  This term is broad and is used broadly in the claim.  '540 Patent at 18:12–14 ("the mesh material being disposed at least between the back support portion and a support portion defined by the panel") (emphasis added); id. at 18:20–22 ("the opening disposed between the foot support and the support portion").  The Court does not find any ambiguity in the words of this term or in the context in which it is used.  Nor is the ordinary meaning of "support portion" redefined or disavowed in the specification.  Thorner, 669 F.3d at 1365.

Defendant argues that the meaning of the term "support portion" is uncertain because it is not used in the patent specification and that the only clue with respect to its meaning comes from the following discussion of "support members" in the specification: "In accordance with some embodiments of the invention, the outer portion of the panel can include one or more buoyant members (e.g., an inflatable bladder), one or more support members (e.g., a spring, rigid support member, or semi-rigid member) . . ." Def. Br., ECF No. 46 at 24–25 (citing '540 Patent at 3:33–37). From this, Defendant concludes that "support portion" must mean "a spring, rigid support or semi-rigid support or separate inflatable bladder." Id. at 24.

However, Defendant defies its own logic by inserting "separate inflatable bladder" into its proposed construction where the specification excerpt on which it relies refers to such bladder as a buoyant member, not a support member. Furthermore, it is clear from the specification that these various components are listed as examples only ("e.g."). Exemplary embodiments contained in the specification cannot be imported as limitations into the claims. See Deere & Co., 703 F.3d at 1354.

Because the Court is "not obligated to construe terms with ordinary meanings," no construction of the term "support portion" is necessary. See O2 Micro Int'l Ltd., 521 F.3d at 1360. Therefore, the plain and ordinary meaning of **Term 12** applies.

> **13.** **"the user's back is collectively supported by the back portion of the mesh membrane and the back support portion of the inflatable member" – Claim 1 of '640 Patent**

With respect to **Term 13**, Defendant argues that the phrases "back support portion" and "back portion" contained therein are indefinite. Def. Br., ECF No. 46 at 25. In the alternative, Defendant argues that **Term 13** should be construed as follows: "The same piece of mesh membrane connected to the support portion covers the seat portion and is attached to the back support portion forming a hammock-like sling with the mesh supporting that user." Id.

First, the Court does not find the terms "back support portion" and "back portion" indefinite as Defendant suggests. See Def. Br., ECF No. 46 at 25. As discussed above, the term "portion" means a part of a larger whole. Similar to this Court's finding with respect to Term 4, the meaning of "back support portion" and "back portion" is readily apparent from the context in which these phrases appear. Therefore, construction of these phrases "involves little more than the application of the widely accepted meaning of commonly understood words." Philips, 415 F.3d at 1314.

Second, the Court rejects Defendant's proposed construction of **Term 13**. Similar to its

24

proposed construction of Term 11, Defendant argues that Figure 7A is "illustrative" of this claim element. Def. Br. ECF No. 46 at 25. But nothing in the claims or specification indicates that the patentee redefined or disavowed the ordinary meaning of any of the words in this term. Without such evidence, importing limitations from the specification into a claim is improper. Deere & Co., 703 F.3d at 1354.

In sum, the Court finds that the ordinary meaning of **Term 13**, as understood by a person of skill in the art, "is readily apparent to even lay judges." Phillips, 415 F.3d at 1314 (citation omitted). Therefore, no construction is necessary, and the plain and ordinary meaning applies.

### 14. "a second flexible material defining an inflatable chamber" – Claim 15 of '888 Patent

Defendant proposes a limiting construction of **Term 14**. It argues that the phrase "defining an inflatable chamber" means "forming the bladder for the inflatable chamber;" and because the material must form the actual bladder, it must be "air tight material" like PVC tubing. Def. Br., ECF No. 46 at 26 (emphasis added). In support, Defendant cites to language in Claim 15, which states at the end of the claim: "a valve coupled to the second flexible material, the valve configured to communicate air to the inflatable chamber of the second flexible material." Id. (citing '888 Patent, Claim 15, at 6:6–8 (emphasis added)). Because the inflatable chamber is described as being "of the second flexible material," Defendant argues that the second flexible material must form the inflatable bladder itself. Id.

Defendant's proposed construction hinges on the meaning of the word "defining," which Defendant construes to mean "forming" or "creating." Plaintiffs argue that this construction is wrong because it equates "second flexible material" to the inflatable chamber itself, which Plaintiffs suggest are clearly separate structures, not least because, according to the specification, there can be more than one inflatable chamber contained in the "flexible panel[s] of material."

Pl. Br., ECF No. 45 at 26 (citing '888 Patent at 3:4–12 (describing the flexible panel of material as a "pocket")). Thus, in Plaintiffs' view, Claim 15 does not preclude the possibility that the inflatable chamber is placed <u>inside</u> the second flexible material, which thereby "defines" the limits of the chamber without being the inflatable bladder itself. Id.

Upon reviewing the patent claims and specification, the Court finds that the meaning of **Term 14**, as understood by a person of skill in the art, is readily apparent, and such meaning is not consistent with Defendant's limiting construction. See Phillips, 415 F.3d at 1314. The way the word "define" is used in Claim 15, as well as in other claims in the '888 Patent, shows that it means to "delimit" or "mark the boundaries of," not to "form" or "create." See, e.g., Claim 1 of '888 Patent at 4:30–33 ("the second flexible material and the inflatable pillow collectively defining an interior region"); Claim 9 of '888 Patent at 5:9–12 ("the first inflatable bladder and the second inflatable bladder collectively defining an interior region").[1] This plain meaning is not undermined, as Defendant suggests, by the end of Claim 15, which states that the valve is coupled to the second flexible material. If the inflatable chamber is placed inside the second flexible material as a pocket, the valve would have to be coupled to the second flexible material in order to communicate air to the chamber. It does not require that the second flexible material form the bladder itself.

For these reasons, the plain and ordinary meaning of **Term 14** applies, which does not require that the second flexible material form or create the inflatable chamber.

### 15. "coupled" – Claim 15 of '888 Patent

As this Court found with respect to Term 5 above, the Court finds that the ordinary meaning of the term "coupled," as understood by a person of skill in the art, is readily apparent.

---

[1] See also Define (v.), Webster's Third New International Dictionary (3d ed. 1981) (". . . (3): to mark the limits of: determine with precision or exhibit clearly the boundaries of; (4): to make distinct in outline or features").

Phillips, 415 F.3d at 1314. For reasons already stated, this meaning does not imply being "physically joined or attached." Furthermore, nothing in the '888 Patent suggests that the term "coupled" is ambiguous or was intended by the patentee to have a special or limited meaning.

The Court is not persuaded by Defendant's argument that the way the term "coupled" is used in Claim 15 of the '888 Patent shows that its means "physically joined or attached." See Def. Br., ECF No. 46 at 27. Claim 15 recites: ". . . a valve coupled to the second flexible material, the valve configured to communicate air to the inflatable chamber of the second flexible material." '888 Patent at 6:6–8. Defendant argues that without direct, physical attachment of the valve, air could not be communicated to the chamber. ECF No. 46 at 27. However, the second part of this cited claim element—the valve's configuration—establishes that the valve must be joined in a certain way to allow direct air flow. The term "coupled" does not (and does not need to) carry special meaning for this claim requirement to be communicated.

Therefore, the Court finds that the plain and ordinary meaning of **Term 15** applies, which does not require being physically joined or attached.

### 16. "fixedly coupled" – Claim 15 of '**888 Patent**

The Court does not find **Term 16** indefinite as Defendant suggests. For the reasons stated with respect to Terms 5 and 15 above, the meaning of "coupled" is readily apparent to the Court and is not in need of a limiting construction. The term "fixedly coupled" merely adds the modifier "fixedly," which means securely or firmly. See, e.g., Fixedly, Webster's Third New International Dictionary (3d ed. 1981) ("in a fixed manner"); Fixed, id. ("1. securely placed or fastened: not adjustable"). When reading Claim 15 of the '888 Patent, the ordinary meaning of the term "fixedly coupled" is readily apparent to the Court. Phillips, 415 F.3d at 1314. Therefore, no construction of **Term 16** is needed. The plain and ordinary meaning of the term applies.

27

### 17. "first flexible material" / "second flexible material" – Claim 15 of '888 Patent

Defendant asks the Court to construe **Term 17** as requiring two "different types of flexible material" even though the claim is silent as to the types of material required. In support, Defendant argues that the '888 Patent's specification refers to several different types of material, and "it would make no sense for a claim to refer to two distinct flexible materials if they were the same materials." Def. Br., ECF No. 46 at 27. At the outset, the Court notes that several of the claims refer to various materials (and bladders) as "first," "second," and "third" in order to explain the function and configuration of the various parts in relation to one another. See, e.g., '888 Patent, Claim 9 at 4:63–5:17 (referring to "first flexible material," "second flexible material," and "third flexible material;" "first inflatable bladder" and "second inflatable bladder"). Without numbered identifiers of the various parts, the claims would be confusing. Therefore, the usage of "first" and "second" in **Term 17** makes sense even if the materials are of the same type.

Furthermore, Claim 1 of the '888 Patent specifically recites the following: ". . . the second flexible material being different than the first flexible material . . ." Id. at 4:15–16 (emphasis added). No such limitation is stated in Claim 15. Defendant has failed to rebut the presumption of claim differentiation here and therefore presents no justifiable basis for importing an express limitation from one claim into another claim that states no such limitation. See supra discussion at 13.

In sum, the Court finds that the ordinary meaning of **Term 17** is "readily apparent" upon reading the asserted claim. Phillips, 415 F.3d at 1314. Therefore, no construction is necessary, and the plain and ordinary meaning of the term applies.

28

### 18.    "collectively defining an interior region" – Claim 15 of '888 Patent

With respect to **Term 18**, the Court again finds that the ordinary meaning of the term, as understood by a person skilled in the art, is readily apparent. Phillips, 415 F.3d at 1314. Therefore, claim construction here involves little more than applying "the widely accepted meaning of commonly understood words." Id.

Defendant seeks to import a limiting construction of this term based on specific configurations of the inflatable pillow displayed in the patent's embodiments, which Defendant argues "illustrate" what the patentee meant by this claim element. Def. Br., ECF No. 46 at 28–29 (citing Figures 1, 4, 5, 7 & 9 of the '888 Patent to argue that the "exterior of the pillow [must] extend[] within the inner perimeter of the second material"). However, Defendant does not claim that any of the words in this claim element are ambiguous. Nor does Defendant show that the meaning of any of these words was disavowed or redefined in the patent's specification. Thorner, 669 F.3d at 1365. Thus, Defendant improperly seeks to rewrite Claim 15 to impose limits that do not otherwise exist in the claim language.

For these reasons, no construction of **Term 18** is necessary. The plain and ordinary meaning of the term applies.

### 19.    "different than the shape" – Claim 19 of '888 Patent

The Court does not find **Term 19** indefinite as Defendant suggests. Claim 19 of the '888 Patent, which is dependent on Claim 15, recites: "the shape of the first flexible material in the top view being different than the shape of the second flexible material in the top view when the inflatable chamber of the second flexible material is inflated." '888 Patent at 6:30–33 (emphasis added). Defendant claims that the term "different than the shape" is indefinite because "there are no boundaries to this claim element" and a person of ordinary skill in the art would not understand what this means. Def. Br., ECF No. 46 at 29. In particular, Defendant claims that

there is no way to know if "shape" refers to "the general shape of the perimeters of the flexible materials" or to the "shape of the surface areas of the flexible materials" or something else entirely. Def. Resp., ECF No. 56 at 10.

The Court finds that, in the context of the entire patent, especially Claims 15 and 19, the term "shape" in Claim 19 means what it says; it is the shape of the first and second flexible materials defined by their "outer most perimeters" from "the top view" when the inflatable chamber of the second flexible material is inflated. See Claim 19 of '888 Patent at 6:23–30 (stating that "the first flexible material has an outer most perimeter defining a shape of the first flexible material in the top view when the inflatable chamber . . . is inflated" and "the second flexible material has an outer most perimeter defining a shape of the second flexible material in the top view when the inflatable chamber . . . is inflated") (emphasis added). In other words, "shape" here means the shape that would result if one traced the outer most perimeters of the flexible materials from the top view when the float's inflatable chamber is inflated.

Claim 15, on which Claim 19 depends, is instructive here. Claim 15 recites: ". . . at least a portion of the perimeter portion of the inflatable pillow and the second flexible material collectively defining an interior region, the first flexible material being disposed within the interior region . . ." '888 Patent at 5:53–56. Therefore, the shape of the outer perimeter portion of the inner flexible material is impacted by the shape of the interior region, which is collectively defined by at least a portion of the perimeter of the inflatable pillow and the second flexible material. Depending on the shape of the perimeter portion of the pillow and the way it intersects with the second flexible material, the shape of the interior region can vary, and thus the shape of the first flexible material, including its outer perimeter portion, can vary. Cf. Claim 3 of '888 Patent at 4:40–42 ("wherein the inflatable pillow is disposed offset from the outer perimeter

30

portion of the first flexible material") (emphasis added).

In sum, Defendant has failed to present clear and convincing evidence that **Term 19** is indefinite. Intel, 319 F.3d at 1366. The Court finds that, in the context of the patent as a whole, the asserted claim informs, with reasonable certainty, those skilled in the art about the scope of the invention. See Nautilus, 134 S. Ct. at 2124. Furthermore, because the Court finds no ambiguity or uncertainty in the meaning of **Term 19** in the context of the patent's claims and the specification, no construction is necessary. The plain and ordinary meaning of the term applies.

### 20. "mesh material" – Claim 18 of '888 Patent

**Term 20** was not initially identified in the parties' Joint Statement on Claims Construction, ECF No. 38, but it surfaced as an additional disputed term in the parties' briefing. Defendant argues that the '888 Patent specification requires that "mesh material" must be distinct from both nylon and polyester because the specification appears to distinguish between mesh and these two types of materials. See Def. Appendix, ECF No. 56-1 (citing, e.g., '888 Patent at 3:38–41 ("The perimeter pocket (12) portion of the flexible panel is nylon while the central portion (14) of the flexible material is made from a mesh material.") (emphasis added); id. at 3:6–9 (". . . the center portion of the flexible panel is mesh . . . while the perimeter edges are nylon or polyester.") (emphasis added). Plaintiffs contest this limitation and instead propose that "mesh material" means "a pattern, such as a weave, that allows water to flow through," which is not restricted to any certain type of material. Pl. Br., ECF No. 45 at 29–30 (citing '888 Patent at 3:6–9).

The Court begins with the ordinary meaning of "mesh," which refers to how a material is structured rather than what it is made of. See, e.g., Mesh, Webster's Third New International Dictionary (3d ed. 1981) ("1. one of the openings between threads or cords of a net; 2a. the cords, threads, or wires that produce the open spaces in a net or screen; the fabric of a net; 2b. a

woven, knit, or knitted fabric that has an open texture with evenly spaced small holes; 3. an interlocking or intertwining arrangement or construction"). Therefore, in the ordinary usage of the term, "mesh material" means material that is structured to have open spaces or holes such that the material is permeable.

Next, the Court considers the claims and specification. Neither suggests that the patentee intended to limit or alter this ordinary meaning of "mesh material." Claim 18, where **Term 20** is found, recites: "wherein the first flexible material is formed with mesh material such that at least a portion of the user's body is exposed to water when the user is disposed on the apparatus, and the second flexible material is at least one of a nylon material or a polyester material." '888 Patent at 6:18–23 (emphasis added); see also Claim 12 at 5:29–33 and Claim 23 at 6:51–56 (both reciting same). Thus, the purpose of the mesh material in Claim 18 is to enable the user's body to be at least partially exposed to water. This is consistent with the ordinary meaning of "mesh." Contrary to Defendant's claim, just because the second flexible material is required to be nylon or polyester does not imply that the mesh material cannot also be made of nylon or polyester, so long as it is structured in a way to have open spaces or holes making it permeable. Similarly, the specification only refers to mesh as "allow[ing] water to flow through," id. at 3:9, not as being comprised of any certain type of material. Therefore, Defendant's proposed construction of "mesh material" is without support.

In sum, the Court finds that no construction of **Term 20** is necessary. The plain and ordinary meaning of the term applies.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

Robert G. Doumar /s/
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
April 24, 2017

33